

1  ERICA J. VAN LOON (admitted *Pro Hac Vice*)
   evanloon@glaserweil.com
2  GLASER WEIL FINK HOWARD
3    AVCHEN & SHAPIRO LLP
   10250 Constellation Boulevard, 19th Floor
4  Los Angeles, California 90067
   Telephone:  (310) 553-3000
5  Facsimile:   (310) 556-2920
6
   *Attorney for Defendants*
7  *GLP 5, Inc. and Netmedia Services Inc.*
8
9              IN THE UNITED STATES DISTRICT COURT
                      DISTRICT OF ARIZONA
10
   AMA MULTIMEDIA LLC, a Nevada          CASE NO.: CV16-1269 PHX DGC
11 limited liability company,
                                          Hon. David G. Campbell
12                Plaintiff,
13 v.                                     **DECLARATION OF PHILIP**
                                          **BRADBURY IN SUPPORT OF**
14                                        **DEFENDANTS' MOTION TO**
   SAGAN LIMITED, a Republic of          **DISMISS FOR LACK OF PERSONAL**
15 Seychelles company, individually and d/b/a  **JURISDICTION OR, IN THE**
   PORN.COM; CYBERWEB LTD., formerly     **ALTERNATIVE, TO STAY**
16 MXN LTD., a Barbados Company,         **PROCEEDINGS PENDING**
   individually and d/b/a PORN.COM;      **RESOLUTION OF THE BARBADOS**
17 NETMEDIA SERVICES INC., a Canadian    **ACTION**
   Company, individually and d/b/a
18 PORN.COM; GLP 5, Inc., a Michigan
   Company individually and d/b/a
19 Trafficforce.com; DAVID KOONAR, an
   individual; and John Does 1-20,
20
21
22                Defendants.
23
24
25
26
27
28

BRADBURY DECLARATION ISO DEFENDANTS' MOTION TO DISMISS OR STAY

1213368

**DECLARATION OF PHILIP BRADBURY**

I, Philip Bradbury, declare and state as follows:

1.      I make this Declaration on my personal and firsthand knowledge and, if called and sworn as a witness, I could and would testify competently hereto.

2.      I am Vice President of Defendant Netmedia Services Inc. ("Netmedia").  I am also the sole director, president, and secretary of Defendant GLP 5, Inc. ("GLP 5").  As such, I have valuable information to offer in connection with GLP 5 and Netmedia's defenses in this action.

3.      GLP 5 is a Michigan corporation with its principal place of business in Bingham Farms, Michigan.

4.      GLP 5 does not have any offices in Arizona. GLP 5 does not own or lease equipment located in Arizona or elsewhere in the United States.  GLP 5 has no employees.  I am GLP 5's sole officer and director and reside in Canada.  Attached hereto as Exhibit 1 is a true and correct copy of the Consent to Act as Director, President and Secretary of GLP 5 that I signed and Resignation of David Koonar, dated August 11, 2014.

5.      GLP 5 owns no domain names or websites. GLP 5 does not place servers in Arizona.

6.      Attached hereto as Exhibit 2 is a true and correct copy of a printout from the State of Michigan Department of Licensing and Regulatory Affairs website showing the corporate registration of GLP 5.

7.      GLP 5 is a financial service entity whose sole function is to receive payments tendered by credit card processing companies (Stripe and MMG Bill) and to distribute those proceeds to others.  GLP 5 does not receive payments directly from the holders of credit cards or the users of any websites that may be owned or controlled by any other defendant. GLP 5 has no commercial or other relationship with any users of any website that may be owned or controlled by any other defendant.

8.      GLP 5 has no contract with any entity located in Arizona to provide services, including the hosting of content or the like.

1213368

9.  GLP 5 has never had any contract with Limelight Networks, Inc. ("Limelight").

10.  Netmedia is a Canadian company with its principal place of business, officers, directors and employees located in Ontario, Canada. Attached hereto as Exhibit 3 is a true and correct copy of a printout from the Ontario Ministry of Government Services website showing the corporate registration of Netmedia.

11.  Netmedia has no office, property, servers, employees or business relationship with the United States, let alone Arizona.

12.  Netmedia is a computer services company.  It provides general maintenance of certain websites, including Porn.com, which is owned and operated by CyberWeb, Ltd. ("CyberWeb") out of Barbados.

13.  GLP 5, Netmedia and other named defendants to this action filed suit in the Supreme Court of Barbados against AMA and Adam Silverman for injunctive relief to restrain anticipatory breach of contract or breach of contract. Attached hereto as Exhibit 4 is a true and correct copy of the Claim Form filed in the Supreme Court of Barbados for the case captioned, *Cyberweb Ltd., et al. v. AMA Multimedia LLC, et al.,* Claim No. CV600-2016 ("Barbados Action").  GLP 5 and David Koonar have since been removed as claimants in the Barbados Action.

14.  Attached hereto as Exhibit 5 is a true and correct copy of the Content Partner Revenue Sharing Agreement entered into between AMA and G.I.M. Corp. ("GIM").  GIM is a Barbados corporate entity with its registered address in Barbados.

15.  GIM is an indirect partial owner of CyberWeb, (formerly MXN, LTD), a Barbados corporation that owns and operates Porn.com and has its registered address in Barbados.

16.  Netmedia has never had any agreement with Limelight.

17.  Netmedia does not own any domain names or websites or contract with any entity located in Arizona to provide services, including hosting of content or the like.

Glaser Weil

18.     Netmedia has no commercial or other relationship with any users of any website that may be owned or controlled by any other defendant.

19.     The servers for Porn.com are located in Amsterdam, Netherlands.

20.     Neither GLP 5 nor Netmedia targets Arizona clientele or pairs advertisers with Arizona publishers.

21.     Neither GLP 5 nor Netmedia has any employee who lives in or regularly travels to Arizona to conduct business.  It would be extremely burdensome and costly for GLP 5 and Netmedia to travel to Arizona for trial and other proceedings in this case.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing facts are true and correct.

Executed on July 8, 2016 at Windsor, Ontario, Canada.

PHILIP BRADBURY

**Glaser Weil**

BRADBURY DECLARATION ISO DEFENDANTS' MOTION TO DISMISS OR STAY

1211948

# Exhibit 1

## CONSENT TO ACT AS DIRECTOR, PRESIDENT and SECRETARY

**TO:**          **GLP 5, Inc.**

**AND TO:**      **The Shareholder thereof**

**I, THE UNDERSIGNED,** hereby:

i)      Consent to being elected and to acting as Director, President and Secretary of the above Corporation, such consent to take effect immediately and to continue in effect until I give written notice to the Corporation revoking such consent or until I otherwise cease to be the Director, President or Secretary of the Corporation;

ii)     Consent to the holding of meetings of directors or of committees of directors by means of such telephone, electronic or other communication facilities as permit all persons participating in the meetings to communicate with each other simultaneously and instantaneously; and

iii)    Certify that I am a resident of Canada and that I shall notify the Corporation forthwith in the event of a change in such status.

**DATED** the 11th day of August, 2014.

Philip Bradbury

**<u>RESIGNATION</u>**

TO:  **GLP 5, Inc.**

I hereby resign as the Director, President and Secretary of your Corporation, my resignation to take effect forthwith.

DATED to take effect as and from the 11th day of August, 2014.

_____

DAVID KOONAR

# Exhibit 2



# LARA
## Department of Licensing and Regulatory Affairs

MICHIGAN.GOV
Michigan's
Official
Web Site

Michigan.gov Home     Business Entity Search Home | Corps Home | Contact Corporations | LARA Home

## CORPORATE ENTITY DETAILS

**Searched for:** GLP 5, INC.

**ID Num:** 02850N

**Entity Name:** GLP 5, INC.
**Type of Entity:** Domestic Profit Corporation
**Resident Agent:** COMPANY HOME, INC.
**Registered Office Address:** 30150 TELEGRAPH RD STE 444  BINGHAM FARMS  MI  48025
**Mailing Address:**  MI
**Formed Under Act Number(s):** 284-1972
**Incorporation/Qualification Date:** 1-8-2010
**Jurisdiction of Origin:** MICHIGAN
**Number of Shares:** 50,000
**Year of Most Recent Annual Report:** 16
**Year of Most Recent Annual Report With Officers & Directors:** 11
**Status:** ACTIVE    **Date:** Present

View Document Images

Return to Search Results           New Search

Michigan.gov Home  |  Business Entity Search Home  |  Contact Corporations  |  Corps Home  |  LARA Home
State Web Sites  |  Accessibility Policy  |  Link Policy  |  Security Policy

Copyright © 2001- 2016 State of Michigan

# Exhibit 3

| | | |
|---|---|---|
| Request ID: 019141299 | Province of Ontario | Date Report Produced: 2016/07/06 |
| Demande n° : | Province de l'Ontario | Document produit le : |
| Transaction ID: 61586216 | Ministry of Government Services | Time Report Produced: 09:39:15 |
| Transaction n° : | Ministère des Services gouvernementaux | Imprimé à : |
| Category ID: CT | | |
| Catégorie : | | |

# CERTIFICATE OF STATUS
# ATTESTATION DU STATUT JURIDIQUE

This is to certify that according to the records of the Ministry of Government Services

D'après les dossiers du Ministère des Services gouvernementaux, nous attestons que la société

### N E T M E D I A   S E R V I C E S   I N C .

Ontario Corporation Number

Numéro matricule de la société (Ontario)

### 0 0 1 8 9 0 9 3 3

is a corporation incorporated, amalgamated or continued under the laws of the Province of Ontario.

est une société constituée, prorogée ou née d'une fusion aux termes des lois de la Province de l'Ontario.

The corporation came into existence on

La société a été fondée le

### A U G U S T   0 1   A O Û T ,   2 0 1 3

and has not been dissolved.

et n'est pas dissoute.

Dated

Fait le

### J U L Y   0 6   J U I L L E T ,   2 0 1 6

Director
Directeur

The issuance of this certifcate in electronic form is authorized by the Ministry of Government Services.

La délivrance du présent certificat sous forme électronique  est autorisée par le Ministère des Services gouvernementaux.

Request ID:      019141298
Transaction ID:  61586214
Category ID:     UN/E

Province of Ontario
Ministry of Government Services

Date Report Produced:  2016/07/06
Time Report Produced:  09:39:06
Page:                  1

# CORPORATION PROFILE REPORT

| Ontario Corp Number | Corporation Name | Amalgamation Date |
|---|---|---|
| 1890933 | NETMEDIA SERVICES INC. | 2013/08/01 |

**Jurisdiction**

ONTARIO

| Corporation Type | Corporation Status | Former Jurisdiction |
|---|---|---|
| ONTARIO BUSINESS CORP. | ACTIVE | NOT APPLICABLE |

| Registered Office Address | | Date Amalgamated | Amalgamation Ind. |
|---|---|---|---|
| 1785 TURNER ROAD | | NOT APPLICABLE | A |

| | New Amal. Number | Notice Date |
|---|---|---|
| WINDSOR | NOT APPLICABLE | NOT APPLICABLE |
| ONTARIO | | |
| CANADA   N8W 3J9 | | **Letter Date** |
| | | NOT APPLICABLE |

**Mailing Address**

NOT AVAILABLE

| Revival Date | Continuation Date |
|---|---|
| NOT APPLICABLE | NOT APPLICABLE |

| Transferred Out Date | Cancel/Inactive Date |
|---|---|
| NOT APPLICABLE | NOT APPLICABLE |

| EP Licence Eff.Date | EP Licence Term.Date |
|---|---|
| NOT APPLICABLE | NOT APPLICABLE |

| Number of Directors | | Date Commenced in Ontario | Date Ceased in Ontario |
|---|---|---|---|
| Minimum | Maximum | | |
| 00001 | 00010 | NOT APPLICABLE | NOT APPLICABLE |

**Activity Classification**

NOT AVAILABLE

| | | |
|---|---|---|
| Request ID: 019141298 | Province of Ontario | Date Report Produced: 2016/07/06 |
| Transaction ID: 61586214 | Ministry of Government Services | Time Report Produced: 09:39:06 |
| Category ID: UN/E | | Page: 2 |

# CORPORATION PROFILE REPORT

**Ontario Corp Number**                     **Corporation Name**

1890933                                     NETMEDIA SERVICES INC.


**Corporate Name History**                  **Effective Date**

NETMEDIA SERVICES INC.                      2013/08/01


**Current Business Name(s) Exist:**         NO

**Expired Business Name(s) Exist:**         NO


**Amalgamating Corporations**

**Corporation Name**                        **Corporate Number**

NADAMISA LIMITED                            1722918

MERCHANT BILLING INC.                       2165644

NETMEDIA SERVICES INC.                      1869139

Request ID:        019141298
Transaction ID:    61586214
Category ID:       UN/E

Province of Ontario
Ministry of Government Services

Date Report Produced:   2016/07/06
Time Report Produced:   09:39:06
Page:                   3

# CORPORATION PROFILE REPORT

**Ontario Corp Number**

1890933

**Corporation Name**

NETMEDIA SERVICES INC.

**Administrator:**
**Name (Individual / Corporation)**

DAVID

KOONAR

**Address**

5055 RIVERSIDE DRIVE EAST
UNIT 304

WINDSOR
ONTARIO
CANADA   N8Y 5A6

**Date Began**

2013/08/01

**First Director**

YES

**Designation**

DIRECTOR

**Officer Type**

**Resident Canadian**

Y

Request ID:       019141298
Transaction ID:   61586214
Category ID:      UN/E

Province of Ontario
Ministry of Government Services

Date Report Produced:   2016/07/06
Time Report Produced:   09:39:06
Page:                   4

# CORPORATION PROFILE REPORT

**Ontario Corp Number**

1890933

**Corporation Name**

NETMEDIA SERVICES INC.

**Last Document Recorded**

| Act/Code | Description | Form | Date |
|----------|-------------|------|------|
| CIA | ANNUAL RETURN 2015 | 1C | 2016/03/05  (ELECTRONIC FILING) |

THIS REPORT SETS OUT THE MOST RECENT INFORMATION FILED BY THE CORPORATION ON OR AFTER JUNE 27, 1992, AND RECORDED IN THE ONTARIO BUSINESS INFORMATION SYSTEM AS AT THE DATE AND TIME OF PRINTING.  ALL PERSONS WHO ARE RECORDED AS CURRENT DIRECTORS OR OFFICERS ARE INCLUDED IN THE LIST OF ADMINISTRATORS.

ADDITIONAL HISTORICAL INFORMATION MAY EXIST ON MICROFICHE.

The issuance of this report in electronic form is authorized by the Ministry of Government Services.

# Exhibit 4



DRAWN AND PREPARED BY

..........................................

**ZARINA KHAN**

ATTORNEY-AT-LAW
Prospect Chambers
"Sunderland House"
Prospect Road, St James
BB24003, Barbados

## CLAIM FORM

### Form 1

### (Rule 8.1(4))

## SUPREME COURT OF BARBADOS
## IN THE HIGH COURT OF JUSTICE

CLAIM NO. | CV600|2016 |

### BETWEEN:

**CYBERWEB LTD**
**NETMEDIA SERVICES INC**
**SAGAN LTD**
**GLP 5, INC**
**GIM CORP**
**DAVID KOONAR**                                            **CLAIMANTS**

**AND**

**AMA MULTIMEDIA LLC**
**ADAM SILVERMAN**                                          **DEFENDANTS**

**The Claimants**, **CYBERWEB LTD** formerly MXN LTD of Coconut Creek House, Derricks in the parish of St. James, Barbados; **NETMEDIA SERVICES INC** of 5060 Tecumseh Rd. East, Windsor, ON Canada; **SAGAN LTD** of Suite 9, Ansuya Estate, Revolution Avenue, Victoria, Mahe, Seychelles; **GLP 5, INC** of 30150 Telegraph Road, STE 444, Bingham Farms, MI, 48025-4549 USA, **GIM CORP** of Coconut Creek House, Derricks in the parish of St. James, Barbados  **AND DAVID KOONAR** of Asolo (Treviso – Italy), Via Santa Caterina 35 claim jointly and severally against **the Defendants**, **AMA MULTIMEDIA, LLC** of Las Vegas, Nevada, USA and **ADAM SILVERMAN** of Las Vegas, Nevada, USA.

## (SET OUT BRIEFLY THE NATURE OF THE CLAIM, ANY SPECIFIC AMOUNT CLAIMED AND ANY OTHER REMEDY SOUGHT FROM THE COURT)

1.      Injunctive relief to restrain anticipatory breach of contract and or breach of the Claimant - GIM CORP- rights in an Agreement entitled Content Partner Revenue Sharing Agreement made between GIM CORP and the Defendants herein on or about the 10th day of September, 2012 ("Content Partner Revenue Sharing Agreement").

2.     A Declaration that the Content Partner Revenue Sharing Agreement is entirely and solely justiciable only in the Courts of Barbados pursuant to Barbados law and without regard to conflicts of laws principles.

3.     A Declaration that all of the Claimants herein are entitled to rely on the rights granted by the Defendants to GIM CORP under the Content Partner Revenue Sharing Agreement..

4.     A Declaration that all of the Claimants herein are, pursuant to the Content Partner Revenue Sharing Agreement, entitled to publicize and or distribute materials submitted provided to or otherwise made available to the Claimants by the Defendants or either of them, including without limitation, materials as to which Defendants claim or otherwise assert copyright interests, .

5.     Relief for breach of the Content Partner Revenue Sharing Agreement by Defendants, including, without limitation, damages for and order restraining breach and or further breach or violation of representations and warranties that Defendant(s) would not, directly or indirectly, undertake any action (or authorize others to undertake any action) in conflict with the rights of GIM CORP, including those rights held by GIM CORP pursuant to the Content Partner Revenue Sharing Agreement.

6.     Interest pursuant to section 35 of Cap 117A;

7.     Costs including costs provided for under the Content Partner Revenue Sharing Agreement.

8.     Further or other relief deemed fit.

**(THE FOLLOWING IS TO BE COMPLETED ONLY WHERE THE CLAIM IS FOR A SPECIFIED AMOUNT)**

|  | $ |
|---|---|
| Amount Claimed |  |
| Interest |  |
| Court fees |  |
| Attorney's Fixed Costs on issue |  |
| Total Amount Claimed |  |

I Kris Richardson certify that all facts set out in this Claim Form are true to the best of my knowledge, information and belief.

Dated the   **27**   day of   April   2016

.........................................................

*Claimant's signature*

## NOTICE TO THE DEFENDANT

### See the notes in Form 1A served with this Claim Form.

This Claim Form must contain or have served with it either a Statement of Claim or a copy of a court order entitling the Claimant to serve the Claim Form without a Statement of Claim.

If you do not complete the form of Acknowledgment of Service served on you with this Claim Form and deliver or send it to the Registry (address below) so that it is received there within FOURTEEN DAYS of service of the Claim Form on you, the Claimant will be entitled to apply to have judgment entered against you. See Rules 9.2(4) and 9.3(1).

The form of Acknowledgment of Service may be completed by you or by an attorney-at-law acting for you.

You should consider obtaining legal advice with regard to this Claim.

**This Claim Form has no validity if it is not served within twelve months of the date below unless it is accompanied by an order extending that time.**

The Court has fixed the                                   day of                            2016 , at                            am/pm, as the time and date for a directions hearing in this Claim. You or your representative must attend that hearing, unless the Court dispenses with your attendance, or orders may be made against you in your absence.

You are referred to Part 27, and particularly rule 27.4, of the Rules of the Supreme Court.

The Registry is located at The Law Courts, Bridgetown, telephone number 246-426-3461, FAX (246)426-2405. The office is open to the public between 8.15 a.m. and 3.30 p.m. Mondays to Fridays except on public holidays.

Dated the                            day of                            2016

The Claimant's address for service is Zarina Khan, and Ivan Alert Attorneys-at-Law of and whose address for service is Prospect Chambers, Summerland House, Prospect Road, St James. Telephone No. 622 0050, Fax No. 438 7266.

Filed by Zarina Khan, in association with Ivan Alert, Attorneys-at-Law of Prospect Chambers, "Summerland House", Prospect Road, Prospect, St James, Barbados.

## ACKNOWLEDGMENT OF SERVICE OF CLAIM FORM

### Form 3

*(Rule 8.12 (1)(a) and Part 9)*

### SUPREME COURT OF BARBADOS
### IN THE HIGH COURT OF JUSTICE

CLAIM NO. [_____]

### BETWEEN:

**CYBERWEB LTD**
**NETMEDIA SERVICES INC**
**SAGAN LTD**
**GLP 5, INC**                                                **CLAIMANTS**

**AND**

**AMA MULTIMEDIA LLC**                                        **DEFENDANT**

**WARNING:** If this document is not fully completed and returned to the Registry at the address below within FOURTEEN DAYS of service of the Claim Form on you, the Claimant will be entitled to apply to have judgment entered against you. If he does so you will have no right to be heard by the Court except as to costs or the method of paying any judgment unless you apply to set the judgment aside (and it may not be possible for you to succeed in having it set aside).

1. Have you received the Claim Form with the above Claim number?                    YES/NO

2. If so, when?                                                                      ___/___/___
                                                                                     *Date*

3. Did you also receive the Claimant's Statement of Claim?                           YES/NO

4. If so, when?                                                                      ___/___/___
                                                                                     *Date*

5. Are your names properly stated in the Claim Form?                                 YES/NO

   If not, what are your full names?
   ..................................................................................................................................................

6. Do you intend to defend the Claim?                                               YES/NO

   (If so you must file a Defence within 28 days of the date of service of the Claim Form on you.)

7. Do you admit the whole of the claim made in the Claim Form?                       YES/NO

   (If you do you should either

   (a)  pay the claim directly to the Claimant or his attorney-at-law, or;

   (b)  complete the form of application to pay the claim by instalments.

   If you pay the whole debt together with the costs and interest as shown in the Claim Form within FOURTEEN DAYS you will have no further liability for costs.)

**FORM 3** – *Cont'd*

*(Rule 8.12(1)(a) and Part 9)*

8.  If you do not admit the whole of the claim, do you admit any part of the claim?          YES/NO

(If you do you may

(a)  pay the money that you admit direct to the Claimant or his attorney-at-law; or

(b)  complete the form of application to pay the claim by instalments.)

9.  If so, how much do you admit? ...........................................................................................................

(If you dispute the balance of the claim you must also file a Defence within TWENTY-EIGHT DAYS of the date of service of the Claim Form on you or judgment may be entered against you for the whole amount claimed.)

10.  What is your own address?          ......................................................................................

......................................................................................

......................................................................................

11.  What is your address for service?
(If you are acting in person you must give an address to which documents may be sent either from other parties or from the court. You should also give your telephone number and FAX number, if any.)

......................................................................................

......................................................................................

......................................................................................

12.  Dated the                    day of                    2016

........................................................
Attorney-at-Law for the Defendant
Defendant in person

The Registry is located at The Law Courts, Bridgetown, telephone number (246)426-3461, FAX (246)426-2405. The Office is open to the public between 8:15 a.m. and 3:30 p.m. Mondays to Fridays except on public holidays.

Filed by Zarina Khan, and Ivan Alert Attorneys-at-Law of Prospect Chambers, "Summerland House", Prospect Road, Prospect, St James, Barbados.

**SUPREME COURT OF BARBADOS**

**IN THE HIGH COURT OF JUSTICE**

CLAIM NO. CVb0012016

**BETWEEN**

**CYBERWEB LTD**
**FOSHAN LTD**
**NETMEDIA SERVICES INC**
**SAGAN LTD**
**GLP 5, INC**
**DAVID KOONAR**                                    **CLAIMANTS**

**AND**

**AMA MULTIMEDIA LLC**
**ADAM SILVERMAN**                                  **DEFENDANTS**

**CLAIM FORM**

**ZARINA KHAN**
**ATTORNEY-AT-LAW**

# Exhibit 5

## CONTENT PARTNER REVENUE SHARING AGREEMENT

This Content Partner Revenue Sharing Agreement, (the *"Agreement"*) is made and entered into, as of the date that YOU signed up to become a member of the Paidperview.com program, (the *"Program"*), (the *"Effective Date"*) by and between, YOU, (*"Licensor"*) and G.I.M. CORP., a Barbados corporation, with its principal offices at 'Coconut Creek House', Derricks, St James, Barbados, BB24008, (*"Licensee"*). Licensor and Licensee shall sometimes be referred to herein as the *"Party"* in the singular and the *"Parties"* in the plural. By proceeding with applying to become or becoming a member of the Program, YOU hereby agree to be legally bound by the terms contained in this Agreement.

BACKGROUND:

A.     Licensor is and attests that he is the author, license holder, and/or aggregator of certain sexually explicit content (the *"Content"*).

B.     Licensee desires to provide the Content to end users of a single/(group of) website(s) (the *"Website(s)"*) on the Worldwide Web, who's advertisements are controlled by the Traffic Force Advertising Management System, (*"Traffic Force"*), at which Licensee can stream and provide downloading of video and audio Content over electronic devices, including without limitation desktop and laptop computers, handheld receivers and wireless phones, to end users. (the *"Purpose"*).

C.     Licensor desires to make the Content available to Licensee for use on the Website(s) in order to be eligible to take part in the Content Partner Advertising Revenue Sharing Program (currently located on http://www.paidperview.com), and obtain compensation therewith.

D.     Licensor attests that Licensor is at least 18 years of age and is over the age of majority in the jurisdiction where Licensor resides.

AGREEMENT:

In consideration of the mutual covenants and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is agreed as follows:

**1.     Grant of License.**

**1.1**     Subject to the terms and conditions set forth in this Agreement, with respect to any and all Content that Licensor submits or provides to Licensee, Licensor grants Licensee a non-exclusive, nontransferable worldwide license during the Term to use, publish, display, and distribute the Content on the Website(s), solely for the Purpose. Licensee acquires no ownership rights in or to the Content. No license to any other intellectual property of Licensor (*"Licensor Intellectual Property"*) is provided hereby. For the avoidance of doubt, this license is non- exclusive; nothing herein shall prevent Licensor from entering into a similar license agreement with a third-party.

**1.3**     Subject to the terms and conditions set forth in this Agreement, Licensor grants Licensee the right to use Licensors Brand Names and Trade Names for the purpose of the promotion of the Content on the Websites(s) and/or the Program, in advertisements and press releases. Any such advertisements and press releases shall be made in the sole and absolute discretion of Licensee.

**1.3**     All rights in and to the Content not expressly licensed to Licensee under Section 1.1 are reserved to Licensor, including but not limited to, the right to use and exploit the Content in all languages in any medium or form, whether now known or hereafter invented, including, but not limited to, books, magazines, newspapers, newsletters, microform, reprint, serial, syndication, condensation, abridgment, radio adaptation, television, motion picture, video, recording, tape, wireless or any other electronic or digital form and in connection with any services or business.

**1.4**     Licensee agrees that it will only provide streaming services of the Content in both the public and private areas of the Website(s) and that any and all downloads will be strictly limited to password protected areas of the Website(s).

**2.     Term and Termination.**

**2.1**     Unless terminated earlier pursuant to this Agreement, the term of this Agreement ("Term") shall be for an initial period of one (1) calendar month commencing on the Effective Date. After the expiration of the initial period, or any subsequent Term, this Agreement shall renew for an additional one (1) month period, in perpetuity, unless either party gives notice to the other prior to the expiration of the initial period, or any subsequent Term, of its

intention to terminate this Agreement on that expiration date.

**2.2**    Except as otherwise provided for herein, either Party may terminate this Agreement, by providing at least thirty (30) days prior written notice. Notwithstanding the foregoing, Licensee maintains the absolute right to terminate this Agreement without any notice to Licensor in the event that Licensor is believed to have (in Licensee's sole and absolute discretion), or has breached any of its obligations pursuant to the terms herein.

**2.3**    Any terms, conditions and warranties contained in the Agreement that by their sense and context are intended to survive the performance hereof by the Parties hereunder shall so survive the completion of the performance, cancellation or termination of the Agreement.

**2.4**    Upon any termination or expiration of this Agreement, at such expiration or termination, Licensee agrees to remove the Content from the Website(s) within thirty (30) days of the termination or expiration of this Agreement. Licensee further agrees to continue to accrue advertising revenue commissions payable to Licensor until such time as the Content is completely removed from the Website(s)

**2.5**    Upon any termination or expiration of this Agreement, so long as Licensor has fully complied with all of the terms contained herein, Licensor shall have no further obligation to provide new Content and Licensee shall pay all unpaid and outstanding fees through the effective date of termination or expiration of this Agreement.

**3.**    **Compensation.**

**3.1**    In consideration for the license granted by Licensor under this Agreement, Licensee shall pay Licensor a percentage of Licensor's proportionate share ("Licensor Share") of the Advertising Revenue ("Ad Revenue") generated by Licensee for displaying advertisements on the pages of the Website(s) that stream the Content. The percentage of the revenue that will be shared with the Licensor will be determined on a tiered structure based on the length of the videos that are provided to the Licensee under this Agreement. The following outlines the formula used in determining the appropriate percentage of the Licensor Share the Licensor will receive for each video:

**Edited Videos/Clips:**

6 - 9:59 minutes in length – (20%); *

10 - 19:59 minutes in length – (25%);

20 minutes or longer in length – (30%).

* We will not accept edited or cut video clips under 6 minutes in length

**Full Length Videos/Clips:**

Any length – (30%).

**3.2**    For the purposes of this Agreement, "Ad Revenue" shall mean all monies received by Licensee for Cost Per Mille ("CPM") advertising on the Website(s) sold through Traffic Force. It should be noted that all CPM advertisements for the Website(s) are sold exclusively through Traffic Force.

**3.3**    For the purposes of this agreement, Licensor Share shall mean the proportionate amount of views of the videos provided by Licensor to Licensee expressed as a percentage (%) of the aggregate total views of the pages of the Website(s) for the period in question. A view is determined when a page that contains Licensors stream-able content on it is loaded and viewed by a user, and does not include pages that contains thumbnails of multiple videos that require further navigation before an individual video can be viewed.

**3.4**    License Fees shall accrue on a monthly basis and monies payable to Licensor shall be due by the end of the next calendar month for any period in which Licensor's Content has received views on the Website(s). Upon any termination or expiration of this Agreement the final payment of License Fees shall be due by the end of the next calendar month after the last day on which the Content of Licensor appeared on the Website(s). There will be a minimum earnings amount of $200.00 that any Licensor must earn before they are eligible for payout during the term of this Agreement. At the expiration of this Agreement however, all monies owed to Licensor shall be paid via the terms of the Agreement, regardless of whether or not the minimum payout has been reached. Payouts will be made via standard check at no additional cost to the Licensor. Payouts may also be received using Paxum, which carries a handling fee of $2.00 per payment. Other methods of payout include "overnight check" (available in Canada and the U.S. only) which carries a shipping cost of $40.00 or wire payout which carries a cost of $25.00 (within the U.S.) and $50.00 (international).

**3.5**    The Ad Revenue received for displaying specific advertisements on the Website(s) varies based on the geographic location of the customer who views the pages of the website that display that advertisement. Licensor

shall be paid based on the actual value of the advertisements that appear on pages that display their content, meaning that the value of a given video view will vary based on the geographical location of the customers who generate those page views. The price paid to display an advertisement in a specific advertisement zone can also fluctuate due to many factors, so it is important to note that a particular amount of video views that generates a specific amount of income in one period, could generate a different amount of income in another period.

**3.6**    Should a Licensor ""Refer"", (cause another to enroll in the content partnership agreement), another Licensor, the referring Licensor shall receive as compensation for this referral, 10% of all monies earned by the referred licensor. In order for a referred licensor to be considered referred by Licensor, Licensor must contact Licensee prior to the referred licensor enrolling in the Program and provide the complete name and contact information of the referred licensor. In the event, that a referred licensor had already been in or had already been contacted by Licensee regarding the Program, then Licensor shall not be entitled to any compensation of any kind related to the referred licensor. Licensee may reject a referred licensor and refuse access to the Program for any reason whatsoever.

**3.7**    In any case where Licensor provides Licensee with 1080p HD versions of the Content. Licensee may make these videos available for download to members of the Website(s) for a fee. In any such event, Licensor shall receive 30% of the gross revenue generated from the sale of the 1080p HD versions of the Content.

**3.8**    Except as contemplated by this Article 3, no other amounts shall be due and payable hereunder and each Party shall bear all of the costs associated with its obligations hereunder.

**3.9**    In the event that the Content originates and/or is associated with an existing website associated with Licensor, Licensee may amongst its various methodologies, direct traffic to any such website and Licensee shall be compensated for any revenues generated as a result of Licensee directing such traffic.

**3.10**    In the event that Licensor provides Licensee with at least twenty (20) full length videos and continues to provide Licensee with regular Content contributions, Licensee may create a branded channel (a dedicated area on the Websites), featuring the Content.

**4.**    **Provision of Content.**

**4.1**    During the Term, Licensor shall provide the Content in a mutually agreed form, Examples of which can be seen in Exhibit "A". Licensor shall also provide all the materials laid out in the "Minimum Content Requirements" in Exhibit "A". While Licensor is only responsible for providing the Minimum Content Requirements, Licensor understands that provision by Licensor of additional materials, as laid out in the "Ideal Submission materials" will expedite the process of cataloguing and processing the Content.

**4.2**    Any information relating to authorship credit, trademarks or copyrights shall not be changed for any reason and must be included in any public disclosure of the Content in accordance with the terms and conditions of this Agreement.

**4.3**    Notwithstanding any provision in this Agreement to the contrary, Licensor reserves the right not to provide Licensee with any item of Content, and, if Licensor is notified or believes that there is a likelihood of a suit or claim relating to any item of Content, to revoke by notice to Licensee the right to publish any such item of Content. Licensee shall not use or display that item after receipt from Licensor of such notice. Any action by Licensee in breach of this Section 4.3 shall be at Licensee's own risk.

**4.4**    Licensor has no obligation to provide any specific amount of Content over any specific timeline; however Licensor understands that a lack of delivering a sufficient amount of Content in a timely manner to Licensee will result in a monetary disadvantage to the Licensor's ability to generate License Fees.

**4.5**    Licensor shall provide to Licensee valid records as required under Title 18, United States Code, Section 2257, and any other records required in the United States or applicable jurisdiction. If Licensee is required to produce information or other records with respect to the Content, Licensor shall utilize its best efforts to assist and cooperate with Licensee to produce such records.

**4.6**    Licensor shall have the sole responsibility for providing, at its own expense, the Content to Licensee via one of the acceptable methods of delivery, as set forth in Exhibit "B". Should Content arrive damaged or be deemed unusable at the time of delivery, due in no part by the actions of Licensee, Licensor shall at its own expense provide Licensee with replacements as requested by Licensee.

**5.**    **Additional Obligations of Licensee.**

**5.1**    Licensee shall establish, build, develop and maintain the Website(s) featuring the Content and including without limitation a secure system through which Content may be provided to users, and Licensee shall market access to the Content via the Website(s), all under the Licensee's brand. Licensee shall use its best efforts to solicit users for

the Website(s) and to promote use of the Website(s) to maximize Ad Revenues. Notwithstanding the foregoing, Licensee shall determine in its sole and absolute discretion the methodologies applied in maintaining and promoting the Website(s).

**5.2**    Licensee shall require all users of the Website(s) to assent to terms and conditions or end-user license agreements which shall, at minimum, provide ample protection of Licensor's intellectual property rights and list prohibited conduct with respect to the Content such as sublicensing or other distribution thereof.

**5.3**    Licensee shall not challenge or assist others to challenge Licensor's ownership of the Content or the Licensor Intellectual Property or the registration thereof or attempt to register any copyright with respect to the Content or any trademarks, marks or trade names confusingly similar to the Licensor Intellectual Property.

**5.4**    Licensee shall, at the request of Licensor, watermark any and all videos provided by Licensor with any brand name or websites that represents the brand whose content is being provided by Licensor.

**5.5**    Licensee shall perform all encoding, processing and uploading tasks with respect to the Content.

**6.    Representations and Warranties.**

**6.1**    Licensor represents and warrants that: (i) Licensor is the legal owner, or the license holder in and to the Content; (ii) the Content does not violate any rules, regulations, laws or best practices with respect to content use and content legality; (iii) the Content is not obscene, illegal, unlawful, defamatory, libelous, hateful, racially offensive, harassing, ethnically offensive, or otherwise inappropriate in any way; (iv) Licensor holds a valid copy of all documentation related to age verification, compliance with record keeping laws and regulations, copyrights, and licenses; (v) Licensor has independently confirmed that all persons appearing in the Content were over the age of eighteen (18) at the time of the production of the Content; (vi) Licensor has not done and will not do anything, by contract or otherwise (including by its contract with Licensee), which would materially impair the license granted under this Agreement or the ability of Licensor to perform its obligations under this Agreement; (vii) Licensee's use of the Content will not libel any party, or violate any copyright, trademark, privacy right, publicity right, or other personal or property right of any party; (viii) all actions taken by Licensor, its employees and agents, with respect to the Content or the relationship contemplated by this Agreement shall comply with applicable law; (vix) it has all right, power and authority necessary to enter into and perform its obligations under this Agreement; and (x) Licensor shall not at any time during the Term of this Agreement do anything or authorize other parties to do anything contrary to the rights licensed to Licensee under this Agreement.

**6.2**    Licensee represents and warrants that: (i) Licensee has not done and will not do anything, by contract or otherwise, which would materially impact the integrity of the Content or the ability of Licensee to perform its obligations under this Agreement; (ii) that any modifications or edits to the Content and any updates thereto will not knowingly libel any party, or violate any known, copyright, trademark, privacy right, publicity right, or other personal or property right of any party; (iii) that all actions taken by Licensee, its employees and agents, with respect to the Content or the relationship contemplated by this Agreement shall comply with applicable law; and (iv) it has all right, power and authority necessary to enter into and perform its obligations under this Agreement.

**6.3**    Licensor agrees and understands that the Program maintains a zero tolerance policy towards the submission of illegal content, including but not limited to child pornography, rape, bestiality, torture, death, or any other material that the Program deems to be obscene. Licensee shall immediately terminate Licensor in the event that Licensor submits any obscene materials.

**7.    Indemnities.**

**7.1**    Licensee shall defend, indemnify and hold Licensor harmless from any and all loss, cost, liability, damage and expense (including reasonable attorneys' fees and other legal costs) incurred by Licensor arising out of or in connection with Licensee's breach of its obligations under this Agreement or a violation of the terms or conditions of this Agreement or any other act or omission of Licensee. Licensor shall promptly advise Licensee of any such claim, shall give Licensee the opportunity to defend, compromise or settle the same, as Licensee in its sole discretion may determine, shall cooperate fully with Licensee, at Licensee's cost, in the defense of same, and shall not settle any such claim without first obtaining Licensee's written consent, which shall not be unreasonably withheld or delayed.

**7.2**    Licensor shall indemnify and hold Licensee harmless from any and all losses, costs, liabilities, damages and expenses (including reasonable attorneys' fees and other legal costs) incurred by Licensee due to a suit or claim by a third party against Licensee that arises out of Licensee's use of the Content in accordance with the terms and conditions of this Agreement and/or is based on copyright, trademark, trade secret or privacy right of a third party. Licensee shall promptly advise Licensor of any such claim, shall give Licensor the opportunity to defend, compromise or settle any such claim, as Licensor in its sole discretion may determine, shall cooperate fully with Licensor, at Licensor's cost, in the defense of any such claim, and shall not settle any such claim without first obtaining Licensor's written consent, which shall not be unreasonably withheld or delayed.

7.3    NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, IN NO EVENT SHALL LICENSEE BE LIABLE TO LICENSOR FOR CONSEQUENTIAL, INCIDENTAL, SPECIAL OR INDIRECT DAMAGES, INCLUDING, BUT NOT LIMITED TO DAMAGES RESULTING FROM LOSS OF BUSINESS PROFITS, INFORMATION OR GOODWILL OR BUSINESS INTERRUPTION, EVEN IF LICENSEE HAS BEEN ADVISED OR IS AWARE OF THE POSSIBILITY OF SUCH DAMAGES, UNLESS OTHERWISE PROHIBITED BY APPLICABLE LAW.

**8. Injunctive Relief.**    Licensor acknowledges that the remedy at law for breach of its obligations and covenants under this Agreement will be inadequate and, accordingly, in the event of any breach or threatened breach by Licensor of this Agreement, Licensee shall be entitled, in addition to all other remedies, to an interlocutory or other preliminary injunction restraining any such breach, without any bond or other security being required.

**9.    Confidential Information.**

9.1    "Confidential Information" shall mean any information with respect to the financial terms and provisions of this Agreement, any confidential technical data, trade secret, know-how or other confidential information disclosed by any party hereunder in writing, orally, or by drawing or other form and which shall be marked by the disclosing party as "Confidential" or "Proprietary." If such information is disclosed orally, or through demonstration, in order to be deemed Confidential Information, it must be specifically designated as being of a confidential nature at the time of disclosure and reduced in writing and delivered to the receiving party within ten (10) days of such disclosure.

9.2    Notwithstanding the foregoing, Confidential Information shall not include information which: (i) is known to the receiving party at the time of disclosure or becomes known to the receiving party without breach of this Agreement; (ii) is or becomes publicly known through no wrongful act of the receiving party or any subsidiary of the receiving party; (iii) is rightfully received from a third party without restriction on disclosure; (iv) is independently developed by the receiving party or any of its subsidiary; (v) is furnished to any third party by the disclosing party without restriction on its disclosure; (vi) is approved for release upon a prior written consent of the disclosing party; (vii) is disclosed pursuant to judicial order, requirement of a governmental agency or by operation of law.

9.3    The receiving party agrees that it will not disclose any Confidential Information to any third party and will not use Confidential Information of the disclosing party for any purpose other than for the performance of the rights and obligations hereunder, without the prior written consent of the disclosing party. The receiving party further agrees that Confidential Information shall remain the sole property of the disclosing party and that it will take all reasonable precautions to prevent any unauthorized disclosure of Confidential Information by its employees. No license shall be granted by the disclosing party to the receiving party with respect to Confidential Information disclosed hereunder unless otherwise expressly provided herein. For the purpose of this agreement, confidential information does not include the statistics pertaining to the performance of the program, or the details of the agreement that where such knowledge could be easily gained by requesting said information, such as the terms of the contract itself. The receiving party may disclose such information with the intent of doing so for the purpose of generating additional Licensors for the program.

9.4    Upon the request of the disclosing party, the receiving party will promptly return all Confidential Information furnished hereunder and all copies thereof.

9.5    The Parties agree that all publicity and public announcements concerning the formation and existence of this Agreement shall be planned and coordinated in the sole and absolute discretion of Licensee. Licensor shall not disclose any of the specific terms of this Agreement to any third party without the prior written consent of Licensee. Notwithstanding the foregoing, any Party may disclose information concerning this Agreement as required by the rules, orders, regulations, subpoenas or directives of a court, government or governmental agency, after giving prior notice to the other party.

9.6    If a Party breaches any of its obligations with respect to confidentiality and unauthorized use of Confidential Information hereunder, the non-breaching Party shall be entitled to equitable relief to protect its interest therein, including but not limited to injunctive relief, as well as money damages notwithstanding anything to the contrary contained herein.

9.7    Except as otherwise set forth in this Agreement, Licensor shall not make any public statement, press release or other announcement relating to the terms of this Agreement without the prior written approval of Licensee.

**10.    Miscellaneous.**

**10.1 Notices.**    All notices, requests and demands shall be in writing and shall be sent via personal delivery, mail, registered or certified, return receipt requested, or by overnight courier and addressed to the party at the address listed below. As an alternative, all notices, requests and demands may be sent via electronic mail (email) provided that the receipt of any such email is confirmed by the receiving party.

**10.2 Relationship of the Parties.**    The relationship of Licensor and Licensee is that of an independent

contractor. Neither Party shall have the right to bind the other to any obligation to third parties.

**10.3 Assignment.**     Licensor is precluded from assigning this Agreement without the prior written consent of Licensee. Licensee may assign this Agreement without consent to an affiliate, parent, or subsidiary, or to a successor or purchaser of substantially all of its assets in connection with a merger, acquisition or consolidation. This Agreement shall be binding upon, inure to the benefit of, and be enforceable by and against the successors and permitted assigns of the parties to this Agreement.

**10.4 Waivers.**     The waiver by either party of a breach or default under this Agreement, shall not be construed as a waiver of any subsequent breach of the Agreement, nor shall any delay or omission on the part of either party to exercise or avail itself of any right or remedy that it has or may have hereunder operate as a permanent waiver of any right or remedy.

**10.5 Choice of Law.**     This Agreement shall be governed by and construed in accordance with the laws of Barbados, without regard to conflicts of law principles. Any legal action arising out of or relating to this Agreement must be instituted in a court located in Barbados and the Parties submit to the jurisdiction of any such court. In any action or suit brought by a party to enforce the terms of this Agreement, the prevailing party shall be entitled to the payment of reasonable attorneys' fees and costs. If any provision of this Agreement shall be held to be invalid, illegal or unenforceable, the remaining provisions of the Agreement shall not be affected or impaired thereby.

**10.6 Entire Agreement; Amendment.**     This Agreement constitutes the complete and entire agreement of the parties with respect to the subject matter herein, and supersedes all prior and contemporaneous understandings or agreements of the parties. This Agreement may only be amended, modified, or waived by Licensee in its sole and absolute discretion. In the event that Licensee does amend, modify or waive and of the terms contained in this Agreement, Licensee shall notify you by email. Headings in this Agreement are for convenient reference only and shall not affect the interpretation or construction hereof.

**10.7 Force Majeure.**     Neither party will be liable for or be in default under this Agreement due to any delay or failure to perform an obligation required by this Agreement if such delay was due to a cause or condition beyond such party's reasonable control.

**10.8 Contract Interpretation.**     Any rule of construction that states that ambiguities shall be construed against the drafting party shall not apply in interpreting this Agreement.

**10.9 Acceptance.**     Licensor hereby agrees to by legally bound by all of the terms contained in this Agreement by attempting to become a member of the Program.


**EXHIBIT "A"**

**The following outlines minimum content requirements and ideal submission materials that pertain to content coming from DVD's, delivery necessities for content with other origins may vary and can be discussed with the administrators of the program, or details can be found on paidperview.com.**


**MINIMUM CONTENT REQUIREMENTS**

Content provided by Licensor shall, minimally, include the following:

**a.**    The DVD's in their entirety including art work, (Box Art);

**b.**    All supporting documentation as required under Title 18, United States Code, Section 2257, and any other records required in the United States.


**IDEAL SUBMISSION MATERIALS**

*Providing any or all of the following will help to expedite the content processing procedure.*

**a.**    The full, individual scenes in high quality file format, (VOB or MP4 - H264);

**b.**    A list of all actors in each scene with a way to identify all actors, (list in order of appearance, or attach named headshots);

   **c.**   High Resolution images of the Content, (for headshots of the actors, sample images, and promotional design);

   **d.**   High Resolution scan or copy of the Box Art, or the original design file; or any applicable artwork

   **e.**   The primary Niche of the Content as well as any secondary Niches it may cover;

   **f.**   A Fact Sheet listing any other pertinent information, including but not limited to: Date of Production, Release Date, Scene Descriptions, DVD Description, Producer, Director, Keywords and/or Tags.

   **g.**   At least one banner and description of the applicable paysite(s) related to the Content.

**EXHIBIT "B"**

**ACCEPTABLE METHODS OF DELIVERY**

Licensor shall have the sole responsibility for providing, at its own expense, the Content to Company via one of the acceptable methods of delivery set forth below.

   **a.**   File Transfer Protocol, (FTP). Licensor may provide Licensee access via FTP to a specified location on Licensor's servers where the Content can be downloaded;

   **b.**   Physical Copy Delivery. Licensor may ship physical copies of the Content to the address of Licensee along with supporting documentation and other materials;

   **c.**   Hard Drive Copy. Licensor may place all required items on a PC formatted hard drive and ship the hard drive to the address of Licensee. Licensee may make 1 copy of the Content and ship the drive back to Licensor within 45 days of the receipt of the drive.

   **d.**   Use of the PaidPerView Uploader. Licensor may use the uploader located in Licensor's PaidPerView account to upload the Content. The uploader will instruct the Licensor as to what is required to complete a submission.

Wednesday, June 1, 2016

# Paid Per View Account Creation - AMA Multimedia LLC.

## Account Creation Process Matrix

Below is a matrix of actions taken by the end user, the administrative staff at Paid Per View and the programmatic system from the application of the account to activation. The email templates and example emails may be seen as Exhibit 1

| # | Action | User | Admin | System |
|---|--------|------|-------|--------|
| 1 | Apply for Account | X | | |
| 2 | Account Created | | | X |
| 3 | Confirmation Email Sent | | | X |
| 4 | Email link clicked to confirm | X | | |
| 5 | Account flagged for approval | | | X |
| 6 | More Information Requested (optional) | | X | |
| 7 | Provide more information (optional) | X | | |
| 8 | Approve / Deny Account | | X | |
| 9 | Email Sent to notify account approval | | | X |
| 10 | Login for first time | X | | |
| 11 | Present Content Partner Revenue Sharing Agreement | | | X |
| 12 | Accept Agreement | X | | |
| 13 | Account activated, time/date logged, account and site may be used | | | X |

1

Wednesday, June 1, 2016

# Account Activation Summary

What follows is a true summary of the activity relating to an account created on Paid Per View. The account activity log utilized as a reference for this summary is available in its entirety as Exhibit 2 to this document. The log is kept in Eastern Standard Time.

An SSC Group LLC / AMA Multimedia LLC staff member applied for a Paid Per View (PPV) account on September 10, 2012 at 00:49 hours EST. The account was confirmed, reviewed and approved according to Paid Per View's application process and was activated on September 10, 2012 at 0:9:07 hours EST with the following information:

Username: pornpros
Email: lewis@fuckyoucash.com
Password: **********
**Company Information**
Company/Studio Name: SSC Group LLC
Name: Adam Silverman
Phone Number: Not Entered
Company URL: pornpros.com
Address: 6280 South Valley View #302
Address:
City: Las Vegas
State: Nv

Zip Code: 89118
Country: United States
**Payout Information**
Payout Method: Check
Minimum Payout: $100
Check Details
Payable to:
Address: 6280 south valley view #302
Address:
City: las vegas
State: nv
Zip Code: 89118
Country: United States

Upon activation the AMA Staff member visited the site from IP address 110.142.72.225 and accepted the terms of the agreement by clicking a checkbox and pressing a submit button. The only way to access any features of the account is to accept the terms by first clicking the checkbox and then clicking the submit button. The submit button cannot be clicked without first clicking the checkbox. The terms can be viewed as Exhibit 3.



At all times, when logged in, a user has the ability to view the terms that they agreed to using a link at the bottom of every page within PPV by clicking the link "Content Partner Revenue Sharing Agreement" which takes them to http://www.paidperview.com/contract.html. The

2

Wednesday, June 1, 2016

agreement that was in force between September 10, 2012 and May 31, 2016 may be see as Exhibit 4.
On September 17, 2012 at 12:43 hours EST the first scene was uploaded.

Since activation of the account, between September 17, 2012 and May 31, 2016,  2,116 videos were uploaded to the account and 45 cheques have been sent in payment for a total of $5,404.09 USD. Combined total payments of $4776.60 by MXN Ltd / Cyberweb Ltd and $627.49 by GIM Corp respectively.

3