DocuSign Envelope ID: 9462AE51-EB50-4C39-B3E8-732C186B99C0

1

LAW OFFICES
**MANOLIO & FIRESTONE, PLC**
8686 E. San Alberto Dr., Suite 200

2  Scottsdale, Arizona  85258
(480) 222-9100

3  vmanolio@mf-firm.com
Veronica L. Manolio, SBN 020230

4  *Attorneys for Plaintiff*

5

6  ## IN THE UNITED STATES DISTRICT COURT

7  ## IN AND FOR THE DISTRICT OF ARIZONA

8  AMA Multimedia, LLC, a Nevada
limited liability company,

9

| | |
|---|---|
| | Case No. CV-16-1269-PHX-DGC |

10  Plaintiff,

11  v.

12  Sagan, Ltd., a Republic of Seychelles
company, individually and d/b/a Porn.com;

13  Cyberweb, Ltd., formerly MXN, Ltd., a
Barbados Company, individually and d/b/a

14  Porn.com; Netmedia Services, Inc., a

15  Canadian Company, individually and d/b/a
Porn.com; GLP 5, Inc., a Michigan Company

16  individually and d/b/a Trafficforce.com;

17  David Koonar, an individual, *et. al.*,

18  Defendants.

**DECLARATION OF ADAM
SILVERMAN IN SUPPORT OF
PLAINTIFF AMA
MULTIMEDIA, LLC'S
OPPOSITION TO
DEFENDANTS GLP 5, INC.
AND NETMEDIA SERVICES,
INC.'S MOTION TO STAY
PROCEEDINGS**

19

20  I, Adam Silverman, declare:

21      1.      I am a United States Citizen, over the age of 18 years old, and make this

22  declaration based upon personal knowledge and, if called to testify could and would

23  testify competently to the facts set forth herein.

24      2.      I am the President of AMA Multimedia, LLC, Plaintiff in this lawsuit.

25      3.      In December 2015, with intention to resolve this dispute without

26  litigation, I directed AMA Multimedia, LLC's ("AMA") counsel, Spencer D.

DocuSign Envelope ID: 9462AE51-EB50-4C39-B3F8-732C186B99C0

1  Freeman, to deliver Defendants' then counsel, Corey Silverstein, a draft complaint to
2  initiate negotiations.

3  4.  By April 2016, it appeared that a string of delays from the Defendants
4  stalled negotiations.  Therefore, in early April 2016 I instructed AMA's counsel to
5  Defendants' then counsel an amended complaint intended to push forward
6  negotiations, and if those negotiations failed, to file the complaint.

7  5.  In late April, AMA gave the Defendants a hard deadline to choose
8  between accepting an offer or have the case filed in United States District Court
9  District of Arizona.

10  6.  I was made aware that the Defendants requested AMA counsel for an
11  extension of the deadline in order to contemplate the settlement offer.

12  7.  David Koonar also emailed me on behalf of all Defendants, requesting
13  an extension of the deadline imposed by AMA.  Mr. Koonar told me that he needed
14  to flush issues out with their accountant.

15  8.  Based upon Mr. Koonar's representations I agreed to an extension, from
16  Monday April 25, 2016 through and including Thursday April 28, 2016.

17  9.  Mr. Koonar emailed me confirming that AMA would be waiting until
18  Friday April 29, 2016 to file its action while Mr. Koonar worked on presenting
19  settlement terms.  The same day as this email, Defendants filed an action in Barbados
20  seeking declaratory relief relating to a content partnership agreement.

21  10.  Defendants' filing in Barbados was a two-page complaint, within which
22  the requested relief is unclear.  The complaint offers no supporting evidence, nor a
23  factual basis for their claims.  Attached hereto as Exhibit A is a true and correct copy of
24  the Barbados claim form.

25
26

- 2 -

DocuSign Envelope ID: 9462AE51-EB50-4C39-B3E8-732C186B99C0

1    11.    Defendants were aware that AMA was about to file this lawsuit and
2  under the guise of settlement sought delay, only to rush an incomplete filing in
3  Barbados. I have not yet been served with the Barbados claim.

4    12.    Defendants filed the action in Barbados in a last minute throw together
5  fashion after manipulating me into granting a few more days to decide on a
6  settlement offer before AMA filed this action. Defendants had been provided a draft
7  copy of AMA's lawsuit four months before AMA set a deadline for negotiations.

8    13.    The Barbados claim form does not contain any specific factual
9  allegations nor any supporting evidence, as is required.

10   14.    In Barbados, a party must obtain permission from court to attempt
11  foreign service.

12   15.    Contrary to Defendants' allegations, neither AMA Multimedia nor I am
13  avoiding service. AMA's staff has been instructed to look for service of the Barbados
14  claim and to cooperate in service.  On the same date this declaration is signed,
15  service on AMA was achieved through its registered agent.  A process service
16  showed up twice previously at AMA's office while I have been away, each time it
17  was offered by AMA staff to accept service and each time the offer was refused.

18   16.    I have been informed that the action in Barbados will likely take years
19  to resolve.   More importantly, Defendants assertions that a Content Partnership
20  Agreement governs their actions alleged in the AMA's complaint are simply not true.

21   17.    In September 2012, AMA entered into a content partnership agreement
22  with GIM for revenue sharing on content posted on Porn.com. It was known that the
23  Porn.com revenue sharing program was operated through paidperview.com.   An
24  AMA non-agent independent contractor, in Australia, signed up for the content
25  revenue sharing program by performing an automated sign up process at
26  paidperview.com.

1      18.    The Content Partnership Agreement ("CPA") was entered into by
2   clicking through an automated signup process on the PaidPerView.com website. The
3   server hosting paidperview.com was located in the United States.   There was no
4   direct contact between AMA and any of the defendants regarding the CPA.   There
5   were no negotiations regarding any of the terms of the CPA.   The operators of
6   Porn.com and Paidperview.com are located in Canada.

7      19.    Attached hereto as Exhibit B is a true and correct copy of the Content
8   Partnership Agreement.

9      20.    The CPA granted GIM license to use content provided by AMA for use
10   on web sites "who's advertisements are controlled by" Traffic Force.   The CPA
11   included specific provisions that dictated the manner and form which AMA would
12   provide content.

13      21.    A plain reading of the CPA makes it clear that only the content
14   provided by AMA in the enumerated manner and form stated in the CPA are licensed
15   to GIM.

16      22.    Paragraph 4.1 of the CPA states explicitly that "Licensor [AMA] shall
17   provide content in a mutually agreed form, Examples of which can be seen in Exhibit
18   'A'." Exhibit A requires AMA to provide the content in DVD form *and* to provide
19   all supporting documentation required by 18 U.S.C. § 2257.

20      23.    Paragraph 4.6 dictates that the Licensor (AMA) "shall have the *sole
21   responsibility for providing*" (emphasis added) the content to Licensee in one of the
22   acceptable methods of delivery set forth in Exhibit B.   Exhibit B provides the
23   acceptable methods of delivery of the content:   File Transfer Protocol (FTP);
24   Physical Copy Delivery; Hard Drive Copy Deliver; and Licensor's Use of
25   PaidPerView Uploader.

26

- 4 -

1    24.    **The Defendants, in a desperate attempt to defend this lawsuit,**
2    **erroneously and egregiously wish to expand the scope of this agreement through**
3    **their own bad faith interpretation to allow for carte blanche piracy. They do**
4    **this by applying one of many dictionary definitions of the word "provide" to**
5    **mean "make available," and argue they can make content available to**
6    **themselves rather than AMA having to provide the content. They do not even**
7    **apprise their own agreement as to the specific enumerated methods to how**
8    **content was to be delivered by AMA (See Section 4, CPA).** The CPA clearly does
9    not grant the Licensee the ability to actively take whatever AMA videos could be
10   located throughout the Internet and use as if licensed under the CPA.  Such action
11   would be in absolute contradiction to Paragraphs 4.1 and 4.6 of the CPA.  The
12   Defendants' Motion to Stay materially ignores the entirety of Section 4 in the CPA,
13   appropriately titled "Provision of Content."

14   25.    I would never allow any company to display and re-sell our content,
15   without our permission, with no benefit given to us.  Defendants' have been caught
16   red-handed stealing content and misrepresenting them to be 3rd party user uploads.

17   26.    Pursuant to the CPA, AMA provided Porn.com with limited sample
18   promotional videos to be displayed on Porn.com for the purpose of directing Internet
19   traffic to AMA's paid membership site, and provided those videos through one of the
20   stated delivery methods under the CPA.

21   27.    AMA and the owners/operators of Porn.com share in the revenue
22   generated by Internet traffic directed to AMA's membership sites through these
23   promotional materials.

24   28.    The limited promotional materials were provided to Porn.com through
25   the methods stated in the CPA.

26

DocuSign Envelope ID: 9462AE51-EB50-4C39-B3E8-732C186B99C0

29.     None of the full length videos alleged as infringed in AMA's complaint were provided to Defendants through methods stated by the CPA.

30.     None of the full length videos alleged as infringed in AMA's complaint were provided to Defendants by AMA at all.

31.     None of the full length videos alleged as infringed in AMA's complaint directed Internet traffic to AMA's paid membership web sites.

32.     While the CPA states Barbados as the forum to resolve disputes regarding the CPA, Defendants do not operate in Barbados and do not have any connection to Barbados, other than the registration of Barbados foreign corporations used for tax purposes.

33.     The videos provided to Defendants by AMA pursuant to the CPA were uploaded via the use of the PaidPerView uploader tool. AMA uploaded the content from its offices in the U.S. The content was received by Defendants' on their servers, also located in the U.S.

34.     Payments to AMA pursuant to the CPA were mailed from Canada, drawn on a United States bank account. Any payments from AMA to the Barbados corporations were instructed and subsequently mailed to Canada at the 1785 Turner Road address.

35.     Since AMA filed its complaint, the Defendants have been systematically changing their corporate and business structures.

36.     At the time that this lawsuit was filed, GLP 5, Inc. was a Michigan company operating Traffic Force. Now, Traffic Force is operated by GLP 5, Ltd., a Seychelles Corporation.

37.     It is my earnest belief, that Defendants have no real contact with Seychelles, which is an island off the coast of East Africa.

1    38.    I am aware that GLP 5, Inc. has asserted that it does not own or operate
2    Traffic Force, but that it is only a credit card transaction company. Attached hereto
3    as Exhibit C is a true and correct copy of the Terms of Service for Traffic Force at
4    the time this lawsuit was filed. The opening paragraph to the Terms of Service are
5    explicit and clear. GLP 5, Inc. operates Traffic Force.

6    39.    Attached hereto as Exhibit D is a true and correct copy of the current
7    Terms of Service for Traffic Force, which states that GLP 5, Ltd., a Seychelles
8    company, operates Traffic Force.

9    40.    At the time that this lawsuit was filed, NetMedia Services had an active
10   web site, netmsi.com, with a listed address in Canada. Now, netmsi.com is offline.

11   41.    The operation and/or ownership entity of Paidperview.com,
12   Defendants' content partnership program for Porn.com, has changed. At the time
13   AMA filed this complaint, the content partnership program was operated by G.I.M.
14   Corporation, a Barbados corporation. All of AMA's contact regarding the CPA was
15   with G.I.M. Corporation.

16   42.    Currently, Paidperview.com is operated by Foshan Limited, a
17   Seychelles corporation. Since AMA filed this complaint, Defendants have feverishly
18   attempted to switch all contracts away from G.I.M. Corporation to Foshan Limited.
19   AMA, when logging into PaidPerView.com, has been contacted and asked to sign a
20   new contract, which AMA has not done, in order to access anything inside the
21   account. The new contract, among other changes, now includes a jurisdiction of
22   Seychelles to resolve all disputes, even though Defendants are operating out of the
23   United States and Canada. It appears that Defendants are picking jurisdictions at
24   random, where they do not even carry on operations.

25   43.    On August 5, 2016, AMA was served with the Barbados Claim. The claim
26   was amended on June 9, 2016. Attached hereto as Exhibit E is a true and correct copy of

- 7 -

1  the Statement of Claim AMA was served.  Attached hereto as Exhibit F is a true and
2  correct copy of the Amended Claim Form AMA was served.

3       44.    AMA was also served with a document that stated GLP 5 was no
4  longer a party to the Barbados Claim.  Attached hereto as Exhibit G is a true and
5  correct copy of the Notice of Discontinuance.

6       45.    The Defendants are attempting to insert language and meaning to the
7  existing CPA that never existed.  The CPA is incredibly clear that it governs content
8  provided by AMA only.

9       46.    In paragraph 4 of the Barbados Amended Claim Form, the Defendants
10 of this action ask for a "Declaration that all of the Claimants herein are, pursuant to
11 the Content Partner Revenue Sharing Agreement, entitled to publicize and or
12 distribute materials **submitted provided to** or *otherwise made available to the*
13 *Claimants by* the Defendants or *either of them*, including without limitation,
14 materials as to which Defendants claim or otherwise assert copyright interests."

15      47.    This language they inserted into their Barbados Amended Claim Form,
16 that is italicized just above, reads that Defendants seek a "Declaration that all of the
17 Claimants herein are, pursuant to the Content Partner Revenue Sharing Agreement,
18 entitled to publicize and or distribute materials submitted provided to **or otherwise**
19 **made available to the Claimants by the** (Defendants or) **Claimants** [*either of*
20 *them*]."  In other words, Defendants now, after they have been exposed, claim that
21 they can make any AMA content available to themselves for distribution, that was
22 not provided by us.  They've inserted the phrase "otherwise made available" and
23 "either of them" in their Barbados claim.  **The CPA only governs content that**
24 **AMA provides, not content that they make available to themselves, nor content**
25 **that is "otherwise available" that is not distinctly provided by AMA.**

26

- 8 -

DocuSign Envelope ID: 9462AE51-EB50-4C39-B3E8-732C186B99C0

48.     The CPA does grant them license **only** to materials that AMA has submitted or provided to them, through a mutually agreed form, citing the clear enumerated methods of delivery under Section 4 of the CPA.

49.     However, the CPA does not give them rights to content that AMA did, not submit or provide to them, including other pirated content that is generally available on the internet, or pirated full length content that the Defendants make available to themselves. There is no language in the CPA that supports this at all, and it is in direct contradiction to other provisions of the CPA that they have ignored entirely and make no mention of in any filing, both in the US and Barbados.

50.     If the Defendants wished to publish and distribute pirated material they obtained on their own, and misrepresent them as third party user uploads, perhaps the Defendants should have inserted that language into the CPA with the same level of specificity in the CPA that enumerated the methods that AMA was to deliver content.

51.     Defendants are intentionally adding language and meaning to an agreement that does not exist, while simultaneously requesting a stay, as a means to confuse this Court into granting a stay in a far off land (where neither party carries on operations), whose outcome would take years to resolve by which time AMA would have little relief in it's current action.

52.     While Defendants creatively search for an excuse to explain away their infringement, **the Defendants' actions in the aftermath of being informed of the imminent litigation contradict their bad faith interpretation** they have asserted to both the U.S. and Barbados Courts.

53.     After the first draft Complaint was received by Defendants' counsel, in December 2015, Defendants deleted every video they obtained themselves and clandestinely misrepresented the same videos as third party user uploads, and ceased uploading new videos in this fashion. However, Defendants continued to publish and

DocuSign Envelope ID: 9462AE51-EB50-4C39-B3E8-732C186B99C0

1  distribute content materials that AMA submitted or provided to them under the CPA, or

2  the short promotional video samples we uploaded through an acceptable method of

3  delivery under Section 4 of the CPA. *If the Defendants believed the content they*

4  *clandestinely uploaded and misrepresented as uploaded by third parties was governed*

5  *under the CPA, then the Defendants would not have deleted those videos, while*

6  *continuing to distribute and publicize the shorter promotional samples we provided.*

7      54.    This behavior is consistent with the truth and reality of the situation.

8  Defendants understood the content they obtained on their own, and misrepresented to be

9  third party user uploads were illegal and unlawful, while content submitted or provided to

10  them by AMA was governed by the CPA.

11      55.    It should also be noted that AMA was not the only content producer stolen

12  from by the Defendants. It appears that all the other content materials Defendants

13  obtained on their own, uploaded, and misrepresented as third party user uploads related to

14  these other companies were also deleted once their infringement scheme was exposed by

15  our draft complaint.

16      56.    It is my earnest belief that Defendants' filed the vexatious claim in

17  Barbados just to stall and delay the US case so they could shift assets and business

18  around to shield liability from their blatantly egregious copyright infringement.

19      57.    I have been advised by my Barbados counsel that Barbados will not apply

20  US copyright law, and that Barbados would instruct the parties to go back to the

21  jurisdiction, the United States, to prosecute my US copyright claims.

22      I declare under the penalty of perjury under the laws of the United States of

23  America that the foregoing is true and correct.

24      Executed on the 8th day of August 2016 at Sicily, Italy.

25

26



Adam Silverman

- 10 -

# EXHIBIT A

# Copy of Barbados Claim Form



**CLAIM FORM**

**Form 1**

*(Rule 8.1(4))*

**SUPREME COURT OF BARBADOS**
**IN THE HIGH COURT OF JUSTICE**

DRAWN AND PREP... ...BY

**ZARINA KH**. ...N
ATTORNEY-AT-LAW
Prospect Chambers
"Prospect House"
Prospect Road, St James
BB24003, Barbados

**CLAIM NO.** CUb00 | 2016

**BETWEEN:**

**CYBERWEB LTD**
**NETMEDIA SERVICES INC**
**SAGAN LTD**
**GLP 5, INC**
**GIM CORP**
**DAVID KOONAR**                                              **CLAIMANTS**

**AND**

**AMA MULTIMEDIA LLC**
**ADAM SILVERMAN**                                           **DEFENDANTS**

The Claimants, **CYBERWEB** LTD formerly MXN LTD of Coconut Creek House, Derricks
in the parish of St. James, Barbados; **NETMEDIA SERVICES INC** of 5060 Tecumseh Rd.
East, Windsor, ON Canada; **SAGAN LTD** of Suite 9, Ansuya Estate, Revolution Avenue.
Victoria, Mahe, Seychelles; **GLP 5, INC** of 30150 Telegraph Road, STE 444, Bingham
Farms, MI, 48025-4549 USA, **GIM CORP** of Coconut Creek House, Derricks in the parish
of St. James, Barbados  **AND DAVID KOONAR** of Asolo (Treviso – Italy), Via Santa
Caterina 35 claim jointly and severally against **the Defendants, AMA MULTIMEDIA, LLC**
of Las Vegas, Nevada, USA and **ADAM SILVERMAN** of Las Vegas, Nevada, USA.

**(SET OUT BRIEFLY THE NATURE OF THE CLAIM, ANY SPECIFIC AMOUNT**
**CLAIMED AND ANY OTHER REMEDY SOUGHT FROM THE COURT)**

1.       Injunctive relief to restrain anticipatory breach of contract and or breach of the
Claimant - GIM CORP- rights in an Agreement entitled Content Partner Revenue Sharing
Agreement made between GIM CORP and the Defendants herein on or about the 10th
day of September, 2012 ("Content Partner Revenue Sharing Agreement").

2.    A Declaration that the Content Partner Revenue Sharing Agreement is entirely and solely justiciable only in the Courts of Barbados pursuant to Barbados law and without regard to conflicts of laws principles.

3.    A Declaration that all of the Claimants herein are entitled to rely on the rights granted by the Defendants to GIM CORP under the Content Partner Revenue Sharing Agreement..

4.    A Declaration that all of the Claimants herein are, pursuant to the Content Partner Revenue Sharing Agreement, entitled to publicize and or distribute materials submitted provided to or otherwise made available to the Claimants by the Defendants or either of them, including without limitation, materials as to which Defendants claim or otherwise assert copyright interests, .

5.    Relief for breach of the Content Partner Revenue Sharing Agreement by Defendants, including, without limitation, damages for and order restraining breach and or further breach or violation of representations and warranties that Defendant(s) would not, directly or indirectly, undertake any action (or authorize others to undertake any action) in conflict with the rights of GIM CORP, including those rights held by GIM CORP pursuant to the Content Partner Revenue Sharing Agreement.

6.    Interest pursuant to section 35 of Cap 117A;

7.    Costs including costs provided for under the Content Partner Revenue Sharing Agreement.

8.    Further or other relief deemed fit.

(THE FOLLOWING IS TO BE COMPLETED ONLY WHERE THE CLAIM IS FOR A SPECIFIED AMOUNT)

| | $ |
|---|---|
| Amount Claimed | |
| Interest | |
| Court fees | |
| Attorney's Fixed Costs on issue | |
| Total Amount Claimed | |

I Kris Richardson certify that all facts set out in this Claim Form are true to the best of my knowledge, information and belief.

Dated the     27     day of  April     2016

Claimant's signature

## NOTICE TO THE DEFENDANT

See the notes in Form 1A served with this Claim Form.

This Claim Form must contain or have served with it either a Statement of Claim or a copy of a court order entitling the Claimant to serve the Claim Form without a Statement of Claim.

If you do not complete the form of Acknowledgment of Service served on you with this Claim Form and deliver or send it to the Registry (address below) so that it is received there within FOURTEEN DAYS of service of the Claim Form on you, the Claimant will be entitled to apply to have judgment entered against you. See Rules 9.2(4) and 9.3(1).

The form of Acknowledgment of Service may be completed by you or by an attorney-at-law acting for you.

You should consider obtaining legal advice with regard to this Claim.

**This Claim Form has no validity if it is not served within twelve months of the date below unless it is accompanied by an order extending that time.**

The Court has fixed the                           day of                           2016 , at                           am/pm, as the time and date for a directions hearing in this Claim. You or your representative must attend that hearing, unless the Court dispenses with your attendance, or orders may be made against you in your absence.

You are referred to Part 27, and particularly rule 27.4, of the Rules of the Supreme Court.

The Registry is located at The Law Courts, Bridgetown, telephone number 246-426-3461, FAX (246)426-2405. The office is open to the public between 8.15 a.m. and 3.30 p.m. Mondays to Fridays except on public holidays.

Dated the                           day of                           2016

The Claimant's address for service is Zarina Khan, and Ivan Alert Attorneys-at-Law of and whose address for service is Prospect Chambers, Summerland House, Prospect Road, St James. Telephone No. 622 0050, Fax No. 438 7266.

Filed by Zarina Khan, in association with Ivan Alert, Attorneys-at-Law of Prospect Chambers, "Summerland House", Prospect Road, Prospect, St James, Barbados.

## ACKNOWLEDGMENT OF SERVICE OF CLAIM FORM

**Form 3**

*(Rule 8.12 (1)(a) and Part 9)*

### SUPREME COURT OF BARBADOS
### IN THE HIGH COURT OF JUSTICE

CLAIM NO. [_____]

**BETWEEN:**

**CYBERWEB LTD**
**NETMEDIA SERVICES INC**
**SAGAN LTD**
**GLP 5, INC**                                                     **CLAIMANTS**

**AND**

**AMA MULTIMEDIA LLC**                                             **DEFENDANT**

**WARNING:** If this document is not fully completed and returned to the Registry at the address below within FOURTEEN DAYS of service of the Claim Form on you, the Claimant will be entitled to apply to have judgment entered against you. If he does so you will have no right to be heard by the Court except as to costs or the method of paying any judgment unless you apply to set the judgment aside (and it may not be possible for you to succeed in having it set aside).

1. Have you received the Claim Form with the above Claim number?           YES/NO

2. If so, when?                                                                          __/__/__
                                                                                              Date

3. Did you also receive the Claimant's Statement of Claim?                  YES/NO

4. If so, when?                                                                          __/__/__
                                                                                              Date

5. Are your names properly stated in the Claim Form?                        YES/NO

   If not, what are your full names?
   .......................................................................................................................................................

6. Do you intend to defend the Claim?                                         YES/NO

   (If so you must file a Defence within 28 days of the date of service of the Claim Form on you.)

7. Do you admit the whole of the claim made in the Claim Form?             YES/NO

   (If you do you should either

   (a) pay the claim directly to the Claimant or his attorney-at-law, or;

   (b) complete the form of application to pay the claim by instalments.

   If you pay the whole debt together with the costs and interest as shown in the Claim Form within FOURTEEN DAYS you will have no further liability for costs.)

**FORM 3** – *Cont'd*

*(Rule 8.12(1)(a) and Part 9)*

8.  If you do not admit the whole of the claim, do you admit any part of the claim?            YES/NO

    (If you do you may

    (a)  pay the money that you admit direct to the Claimant or his attorney-at-law; or

    (b)  complete the form of application to pay the claim by instalments.)

9.  If so, how much do you admit? ...............................................................................................................

    (If you dispute the balance of the claim you must also file a Defence within TWENTY-EIGHT DAYS of the
    date of service of the Claim Form on you or judgment may be entered against you for the whole amount
    claimed.)

10.  What is your own address?        ...........................................................................................

                                      ...........................................................................................

                                      ...........................................................................................

11.  What is your address for service?
     (If you are acting in person you must give an address to which documents may be sent either from other parties or
     from the court. You should also give your telephone number and FAX number, if any.)

                                      ...........................................................................................

                                      ...........................................................................................

                                      ...........................................................................................

12.  Dated the            day of            2016


                         ...........................................................
                         Attorney-at-Law for the Defendant
                         Defendant in person




The Registry is located at The Law Courts, Bridgetown, telephone number (246)426-3461, FAX
(246)426-2405. The Office is open to the public between 8:15 a.m. and 3:30 p.m. Mondays to Fridays
except on public holidays.

Filed by Zarina Khan, and Ivan Alert Attorneys-at-Law of Prospect Chambers, "Summerland House",
Prospect Road, Prospect, St James, Barbados.

**SUPREME COURT OF BARBADOS**

**IN THE HIGH COURT OF JUSTICE**

CLAIM NO. CU0001 2016

**BETWEEN**

**CYBERWEB LTD**
**FOSHAN LTD**
**NETMEDIA SERVICES INC**
**SAGAN LTD**
**GLP 5, INC**
**DAVID KOONAR**

**CLAIMANTS**

**AND**

**AMA MULTIMEDIA LLC**
**ADAM SILVERMAN**

**DEFENDANTS**

**CLAIM FORM**

**ZARINA KHAN**
**ATTORNEY-AT-LAW**

# EXHIBIT B

# Content Partnership Agreement



## Content Partner Agreement

You can review the terms of Content Partner Revenue Sharing Agreement below, you can also view a printer-friendly version.

You agreed to this contract on Sep 10, 2012.

### CONTENT PARTNER REVENUE SHARING AGREEMENT

This Content Partner Revenue Sharing Agreement, (the *"Agreement"*) is made and entered into, as of the date that YOU signed up to become a member of the Paidperview.com program, (the *"Program"*), (the *"Effective Date"*) by and between, YOU, (*"Licensor"*) and G.I.M. CORP., a Barbados corporation, with its principal offices at 'Coconut Creek House', Derricks, St James, Barbados, BB24008, (*"Licensee"*). Licensor and Licensee shall sometimes be referred to herein as the *"Party"* in the singular and the *"Parties"* in the plural. By proceeding with applying to become or becoming a member of the Program, YOU hereby agree to be legally bound by the terms contained in this Agreement.

#### BACKGROUND:

A.     Licensor is and attests that he is the author, license holder, and/or aggregator of certain sexually explicit content (the *"Content"*).

B.     Licensee desires to provide the Content to end users of a single/(group of) website(s) (the *"Website(s)"*) on the Worldwide Web, who's advertisements are controlled by the Traffic Force Advertising Management System, (*"Traffic Force"*), at which Licensee can stream and provide downloading of video and audio Content over electronic devices, including without limitation desktop and laptop computers, handheld receivers and wireless phones, to end users, (the *"Purpose"*).

C.     Licensor desires to make the Content available to Licensee for use on the Website(s) in order to be eligible to take part in the Content Partner Advertising Revenue Sharing Program (currently located on http://www.paidperview.com), and obtain compensation therewith.

D.     Licensor attests that Licensor is at least 18 years of age and is over the age of majority in the jurisdiction where Licensor resides.

#### AGREEMENT:

In consideration of the mutual covenants and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is agreed as follows:

**1.     Grant of License.**

    **1.1**     Subject to the terms and conditions set forth in this Agreement, with respect to any and all Content that Licensor submits or provides to Licensee, Licensor grants Licensee a non-exclusive, nontransferable worldwide license during the Term to use, publish, display, and distribute the Content on the Website(s), solely for the Purpose. Licensee acquires no ownership rights in or to the Content. No license to any other intellectual property of Licensor (*"Licensor Intellectual Property"*) is provided hereby. For the avoidance of doubt, this license is non- exclusive; nothing herein shall prevent Licensor from entering into a similar license agreement with a third-party.

    **1.3**     Subject to the terms and conditions set forth in this Agreement, Licensor grants Licensee the right to use Licensors Brand Names and Trade Names for the purpose of the promotion of the Content on the Websites(s) and/or the Program, in advertisements and press releases. Any such advertisements and press releases shall be made in the sole and absolute discretion of Licensee.

    **1.3**     All rights in and to the Content not expressly licensed to Licensee under Section 1.1 are reserved to Licensor, including but not limited to, the right to use and exploit the Content in all languages in any medium or form, whether now known or hereafter invented, including, but not limited to, books, magazines, newspapers, newsletters,

microform, reprint, serial, syndication, condensation, abridgment, radio adaptation, television, motion picture, video, recording, tape, wireless or any other electronic or digital form and in connection with any services or business.

    **1.4**   Licensee agrees that it will only provide streaming services of the Content in both the public and private areas of the Website(s) and that any and all downloads will be strictly limited to password protected areas of the Website(s).

## 2.    Term and Termination.

    **2.1**   Unless terminated earlier pursuant to this Agreement, the term of this Agreement ("Term") shall be for an initial period of one (1) calendar month commencing on the Effective Date. After the expiration of the initial period, or any subsequent Term, this Agreement shall renew for an additional one (1) month period, in perpetuity, unless either party gives notice to the other prior to the expiration of the initial period, or any subsequent Term, of its intention to terminate this Agreement on that expiration date.

    **2.2**   Except as otherwise provided for herein, either Party may terminate this Agreement, by providing at least thirty (30) days prior written notice. Notwithstanding the foregoing, Licensee maintains the absolute right to terminate this Agreement without any notice to Licensor in the event that Licensor is believed to have (in Licensee's sole and absolute discretion), or has breached any of its obligations pursuant to the terms herein.

    **2.3**   Any terms, conditions and warranties contained in the Agreement that by their sense and context are intended to survive the performance hereof by the Parties hereunder shall so survive the completion of the performance, cancellation or termination of the Agreement.

    **2.4**   Upon any termination or expiration of this Agreement, at such expiration or termination, Licensee agrees to remove the Content from the Website(s) within thirty (30) days of the termination or expiration of this Agreement, Licensee further agrees to continue to accrue advertising revenue commissions payable to Licensor until such time as the Content is completely removed from the Website(s)

    **2.5**   Upon any termination or expiration of this Agreement, so long as Licensor has fully complied with all of the terms contained herein, Licensor shall have no further obligation to provide new Content and Licensee shall pay all unpaid and outstanding fees through the effective date of termination or expiration of this Agreement.

## 3.    Compensation.

    **3.1**   In consideration for the license granted by Licensor under this Agreement, Licensee shall pay Licensor a percentage of Licensor's proportionate share ("Licensor Share") of the Advertising Revenue ("Ad Revenue") generated by Licensee for displaying advertisements on the pages of the Website(s) that stream the Content. The percentage of the revenue that will be shared with the Licensor will be determined on a tiered structure based on the length of the videos that are provided to the Licensee under this Agreement. The following outlines the formula used in determining the appropriate percentage of the Licensor Share the Licensor will receive for each video:

**Edited Videos/Clips:**

6 - 9:59 minutes in length – (20%); *

10 - 19:59 minutes in length – (25%);

20 minutes or longer in length – (30%).

* We will not accept edited or cut video clips under 6 minutes in length

**Full Length Videos/Clips:**

Any length – (30%).

    **3.2**   For the purposes of this Agreement, "Ad Revenue" shall mean all monies received by Licensee for Cost Per Mille ("CPM") advertising on the Website(s) sold through Traffic Force. It should be noted that all CPM advertisements for the Website(s) are sold exclusively through Traffic Force.

    **3.3**   For the purposes of this agreement, Licensor Share shall mean the proportionate amount of views of the videos provided by Licensor to Licensee expressed as a percentage (%) of the aggregate total views of the pages of the Website(s) for the period in question. A view is determined when a page that contains Licensors stream-able content on it is loaded and viewed by a user, and does not include pages that contains thumbnails of multiple videos that require further navigation before an individual video can be viewed.

    **3.4**   License Fees shall accrue on a monthly basis and monies payable to Licensor shall be due by the end of

PaidPerView.com

the next calendar month for any period in which Licensor's Content has received views on the Website(s). Upon any termination or expiration of this Agreement the final payment of License Fees shall be due by the end of the next calendar month after the last day on which the Content of Licensor appeared on the Website(s). There will be a minimum earnings amount of $200.00 that any Licensor must earn before they are eligible for payout during the term of this Agreement. At the expiration of this Agreement however, all monies owed to Licensor shall be paid via the terms of the Agreement, regardless of whether or not the minimum payout has been reached. Payouts will be made via standard check at no additional cost to the Licensor. Payouts may also be received using Paxum, which carries a handling fee of $2.00 per payment. Other methods of payout include "overnight check" (available in Canada and the U.S. only) which carries a shipping cost of $40.00 or wire payout which carries a cost of $25.00 (within the U.S.) and $50.00 (international).

3.5   The Ad Revenue received for displaying specific advertisements on the Website(s) varies based on the geographic location of the customer who views the pages of the website that display that advertisement. Licensor shall be paid based on the actual value of the advertisements that appear on pages that display their content, meaning that the value of a given video view will vary based on the geographical location of the customers who generate those page views. The price paid to display an advertisement in a specific advertisement zone can also fluctuate due to many factors, so it is important to note that a particular amount of video views that generates a specific amount of income in one period, could generate a different amount of income in another period.

3.6   Should a Licensor "'Refer'", (cause another to enroll in the content partnership agreement), another Licensor, the referring Licensor shall receive as compensation for this referral, 10% of all monies earned by the referred licensor. In order for a referred licensor to be considered referred by Licensor, Licensor must contact Licensee prior to the referred licensor enrolling in the Program and provide the complete name and contact information of the referred licensor. In the event, that a referred licensor had already been in or had already been contacted by Licensee regarding the Program, then Licensor shall not be entitled to any compensation of any kind related to the referred licensor. Licensee may reject a referred licensor and refuse access to the Program for any reason whatsoever.

3.7   In any case where Licensor provides Licensee with 1080p HD versions of the Content, Licensee may make these videos available for download to members of the Website(s) for a fee. In any such event, Licensor shall receive 30% of the gross revenue generated from the sale of the 1080p HD versions of the Content.

3.8   Except as contemplated by this Article 3, no other amounts shall be due and payable hereunder and each Party shall bear all of the costs associated with its obligations hereunder.

3.9   In the event that the Content originates and/or is associated with an existing website associated with Licensor, Licensee may amongst its various methodologies, direct traffic to any such website and Licensee shall be compensated for any revenues generated as a result of Licensee directing such traffic.

3.10   In the event that Licensor provides Licensee with at least twenty (20) full length videos and continues to provide Licensee with regular Content contributions, Licensee may create a branded channel (a dedicated area on the Websites), featuring the Content.

4.   **Provision of Content.**

4.1   During the Term, Licensor shall provide the Content in a mutually agreed form. Examples of which can be seen in Exhibit "A". Licensor shall also provide all the materials laid out in the "Minimum Content Requirements" in Exhibit "A". While Licensor is only responsible for providing the Minimum Content Requirements, Licensor understands that provision by Licensor of additional materials, as laid out in the "Ideal Submission materials" will expedite the process of cataloguing and processing the Content.

4.2   Any information relating to authorship credit, trademarks or copyrights shall not be changed for any reason and must be included in any public disclosure of the Content in accordance with the terms and conditions of this Agreement.

4.3   Notwithstanding any provision in this Agreement to the contrary, Licensor reserves the right not to provide Licensee with any item of Content, and, if Licensor is notified or believes that there is a likelihood of a suit or claim relating to any item of Content, to revoke by notice to Licensee the right to publish any such item of Content. Licensee shall not use or display that item after receipt from Licensor of such notice. Any action by Licensee in breach of this Section 4.3 shall be at Licensee's own risk.

4.4   Licensor has no obligation to provide any specific amount of Content over any specific timeline; however Licensor understands that a lack of delivering a sufficient amount of Content in a timely manner to Licensee will result in a monetary disadvantage to the Licensor's ability to generate License Fees.

4.5   Licensor shall provide to Licensee valid records as required under Title 18, United States Code, Section 2257, and any other records required in the United States or applicable jurisdiction. If Licensee is required to produce

PaidPerView.com

information or other records with respect to the Content. Licensor shall utilize its best efforts to assist and cooperate with Licensee to produce such records.

4.6    Licensor shall have the sole responsibility for providing, at its own expense, the Content to Licensee via one of the acceptable methods of delivery, as set forth in Exhibit "B". Should Content arrive damaged or be deemed unusable at the time of delivery, due in no part by the actions of Licensee, Licensor shall at its own expense provide Licensee with replacements as requested by Licensee.

## 5.    Additional Obligations of Licensee.

5.1    Licensee shall establish, build, develop and maintain the Website(s) featuring the Content and including without limitation a secure system through which Content may be provided to users, and Licensee shall market access to the Content via the Website(s), all under the Licensee's brand. Licensee shall use its best efforts to solicit users for the Website(s) and to promote use of the Website(s) to maximize Ad Revenues. Notwithstanding the foregoing, Licensee shall determine in its sole and absolute discretion the methodologies applied in maintaining and promoting the Website(s).

5.2    Licensee shall require all users of the Website(s) to assent to terms and conditions or end-user license agreements which shall, at minimum, provide ample protection of Licensor's intellectual property rights and list prohibited conduct with respect to the Content such as sublicensing or other distribution thereof.

5.3    Licensee shall not challenge or assist others to challenge Licensor's ownership of the Content or the Licensor Intellectual Property or the registration thereof or attempt to register any copyright with respect to the Content or any trademarks, marks or trade names confusingly similar to the Licensor Intellectual Property.

5.4    Licensee shall, at the request of Licensor, watermark any and all videos provided by Licensor with any brand name or websites that represents the brand whose content is being provided by Licensor.

5.5    Licensee shall perform all encoding, processing and uploading tasks with respect to the Content.

## 6.    Representations and Warranties.

6.1    Licensor represents and warrants that: (i) Licensor is the legal owner, or the license holder in and to the Content; (ii) the Content does not violate any rules, regulations, laws or best practices with respect to content use and content legality; (iii) the Content is not obscene, illegal, unlawful, defamatory, libelous, hateful, racially offensive, harassing, ethnically offensive, or otherwise inappropriate in any way; (iv) Licensor holds a valid copy of all documentation related to age verification, compliance with record keeping laws and regulations, copyrights, and licenses; (v) Licensor has independently confirmed that all persons appearing in the Content were over the age of eighteen (18) at the time of the production of the Content; (vi) Licensor has not done and will not do anything, by contract or otherwise (including by its contract with Licensee), which would materially impair the license granted under this Agreement or the ability of Licensor to perform its obligations under this Agreement; (vii) Licensee's use of the Content will not libel any party, or violate any copyright, trademark, privacy right, publicity right, or other personal or property right of any party; (viii) all actions taken by Licensor, its employees and agents, with respect to the Content or the relationship contemplated by this Agreement shall comply with applicable law; (vix) it has all right, power and authority necessary to enter into and perform its obligations under this Agreement; and (x) Licensor shall not at any time during the Term of this Agreement do anything or authorize other parties to do anything contrary to the rights licensed to Licensee under this Agreement.

6.2    Licensee represents and warrants that: (i) Licensee has not done and will not do anything, by contract or otherwise, which would materially impact the integrity of the Content or the ability of Licensee to perform its obligations under this Agreement; (ii) that any modifications or edits to the Content and any updates thereto will not knowingly libel any party, or violate any known, copyright, trademark, privacy right, publicity right, or other personal or property right of any party; (iii) that all actions taken by Licensee, its employees and agents, with respect to the Content or the relationship contemplated by this Agreement shall comply with applicable law; and (iv) it has all right, power and authority necessary to enter into and perform its obligations under this Agreement.

6.3    Licensor agrees and understands that the Program maintains a zero tolerance policy towards the submission of illegal content, including but not limited to child pornography, rape, bestiality, torture, death, or any other material that the Program deems to be obscene. Licensee shall immediately terminate Licensor in the event that Licensor submits any obscene materials.

## 7.    Indemnities.

7.1    Licensee shall defend, indemnify and hold Licensor harmless from any and all loss, cost, liability, damage and expense (including reasonable attorneys' fees and other legal costs) incurred by Licensor arising out of or in connection with Licensee's breach of its obligations under this Agreement or a violation of the terms or conditions of this Agreement or any other act or omission of Licensee. Licensor shall promptly advise Licensee of any such

PaidPerView.com

claim, shall give Licensee the opportunity to defend, compromise or settle the same, as Licensee in its sole discretion may determine, shall cooperate fully with Licensee, at Licensee's cost, in the defense of same, and shall not settle any such claim without first obtaining Licensee's written consent, which shall not be unreasonably withheld or delayed.

    **7.2**    Licensor shall indemnify and hold Licensee harmless from any and all losses, costs, liabilities, damages and expenses (including reasonable attorneys' fees and other legal costs) incurred by Licensee due to a suit or claim by a third party against Licensee that arises out of Licensee's use of the Content in accordance with the terms and conditions of this Agreement and/or is based on copyright, trademark, trade secret or privacy right of a third party. Licensee shall promptly advise Licensor of any such claim, shall give Licensor the opportunity to defend, compromise or settle any such claim, as Licensor in its sole discretion may determine, shall cooperate fully with Licensor, at Licensor's cost, in the defense of any such claim, and shall not settle any such claim without first obtaining Licensor's written consent, which shall not be unreasonably withheld or delayed.

    **7.3**    NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, IN NO EVENT SHALL LICENSEE BE LIABLE TO LICENSOR FOR CONSEQUENTIAL, INCIDENTAL, SPECIAL OR INDIRECT DAMAGES, INCLUDING, BUT NOT LIMITED TO DAMAGES RESULTING FROM LOSS OF BUSINESS PROFITS, INFORMATION OR GOODWILL OR BUSINESS INTERRUPTION, EVEN IF LICENSEE HAS BEEN ADVISED OR IS AWARE OF THE POSSIBILITY OF SUCH DAMAGES, UNLESS OTHERWISE PROHIBITED BY APPLICABLE LAW.

    **8. Injunctive Relief.**    Licensor acknowledges that the remedy at law for breach of its obligations and covenants under this Agreement will be inadequate and, accordingly, in the event of any breach or threatened breach by Licensor of this Agreement, Licensee shall be entitled, in addition to all other remedies, to an interlocutory or other preliminary injunction restraining any such breach, without any bond or other security being required.

**9.**    **Confidential Information.**

    **9.1**    "Confidential Information" shall mean any information with respect to the financial terms and provisions of this Agreement, any confidential technical data, trade secret, know-how or other confidential information disclosed by any party hereunder in writing, orally, or by drawing or other form and which shall be marked by the disclosing party as "Confidential" or "Proprietary." If such information is disclosed orally, or through demonstration, in order to be deemed Confidential Information, it must be specifically designated as being of a confidential nature at the time of disclosure and reduced in writing and delivered to the receiving party within ten (10) days of such disclosure.

    **9.2**    Notwithstanding the foregoing, Confidential Information shall not include information which: (i) is known to the receiving party at the time of disclosure or becomes known to the receiving party without breach of this Agreement; (ii) is or becomes publicly known through no wrongful act of the receiving party or any subsidiary of the receiving party; (iii) is rightfully received from a third party without restriction on disclosure; (iv) is independently developed by the receiving party or any of its subsidiary; (v) is furnished to any third party by the disclosing party without restriction on its disclosure; (vi) is approved for release upon a prior written consent of the disclosing party; (vii) is disclosed pursuant to judicial order, requirement of a governmental agency or by operation of law.

    **9.3**    The receiving party agrees that it will not disclose any Confidential Information to any third party and will not use Confidential Information of the disclosing party for any purpose other than for the performance of the rights and obligations hereunder, without the prior written consent of the disclosing party. The receiving party further agrees that Confidential Information shall remain the sole property of the disclosing party and that it will take all reasonable precautions to prevent any unauthorized disclosure of Confidential Information by its employees. No license shall be granted by the disclosing party to the receiving party with respect to Confidential Information disclosed hereunder unless otherwise expressly provided herein. For the purpose of this agreement, confidential information does not include the statistics pertaining to the performance of the program, or the details of the agreement that where such knowledge could be easily gained by requesting said information, such as the terms of the contract itself. The receiving party may disclose such information with the intent of doing so for the purpose of generating additional Licensors for the program.

    **9.4**    Upon the request of the disclosing party, the receiving party will promptly return all Confidential Information furnished hereunder and all copies thereof.

    **9.5**    The Parties agree that all publicity and public announcements concerning the formation and existence of this Agreement shall be planned and coordinated in the sole and absolute discretion of Licensee. Licensor shall not disclose any of the specific terms of this Agreement to any third party without the prior written consent of Licensee. Notwithstanding the foregoing, any Party may disclose information concerning this Agreement as required by the rules, orders, regulations, subpoenas or directives of a court, government or governmental agency, after giving prior notice to the other party.

    **9.6**    If a Party breaches any of its obligations with respect to confidentiality and unauthorized use of Confidential Information hereunder, the non-breaching Party shall be entitled to equitable relief to protect its interest therein, including but not limited to injunctive relief, as well as money damages notwithstanding anything to the

contrary contained herein.

9.7    Except as otherwise set forth in this Agreement, Licensor shall not make any public statement, press release or other announcement relating to the terms of this Agreement without the prior written approval of Licensee.

**10.    Miscellaneous.**

10.1 Notices.    All notices, requests and demands shall be in writing and shall be sent via personal delivery, mail, registered or certified, return receipt requested, or by overnight courier and addressed to the party at the address listed below. As an alternative, all notices, requests and demands may be sent via electronic mail (email) provided that the receipt of any such email is confirmed by the receiving party.

10.2 Relationship of the Parties.    The relationship of Licensor and Licensee is that of an independent contractor. Neither Party shall have the right to bind the other to any obligation to third parties.

10.3 Assignment.    Licensor is precluded from assigning this Agreement without the prior written consent of Licensee. Licensee may assign this Agreement without consent to an affiliate, parent, or subsidiary, or to a successor or purchaser of substantially all of its assets in connection with a merger, acquisition or consolidation. This Agreement shall be binding upon, inure to the benefit of, and be enforceable by and against the successors and permitted assigns of the parties to this Agreement.

10.4 Waivers.    The waiver by either party of a breach or default under this Agreement, shall not be construed as a waiver of any subsequent breach of the Agreement, nor shall any delay or omission on the part of either party to exercise or avail itself of any right or remedy that it has or may have hereunder operate as a permanent waiver of any right or remedy.

10.5 Choice of Law.    This Agreement shall be governed by and construed in accordance with the laws of Barbados, without regard to conflicts of law principles. Any legal action arising out of or relating to this Agreement must be instituted in a court located in Barbados and the Parties submit to the jurisdiction of any such court. In any action or suit brought by a party to enforce the terms of this Agreement, the prevailing party shall be entitled to the payment of reasonable attorneys' fees and costs. If any provision of this Agreement shall be held to be invalid, illegal or unenforceable, the remaining provisions of the Agreement shall not be affected or impaired thereby.

10.6 Entire Agreement; Amendment.    This Agreement constitutes the complete and entire agreement of the parties with respect to the subject matter herein, and supersedes all prior and contemporaneous understandings or agreements of the parties. This Agreement may only be amended, modified, or waived by Licensee in its sole and absolute discretion. In the event that Licensee does amend, modify or waive and of the terms contained in this Agreement, Licensee shall notify you by email. Headings in this Agreement are for convenient reference only and shall not affect the interpretation or construction hereof.

10.7 Force Majeure.    Neither party will be liable for or be in default under this Agreement due to any delay or failure to perform an obligation required by this Agreement if such delay was due to a cause or condition beyond such party's reasonable control.

10.8 Contract Interpretation.    Any rule of construction that states that ambiguities shall be construed against the drafting party shall not apply in interpreting this Agreement.

10.9 Acceptance.    Licensor hereby agrees to by legally bound by all of the terms contained in this Agreement by attempting to become a member of the Program.

**EXHIBIT "A"**

The following outlines minimum content requirements and ideal submission materials that pertain to content coming from DVD's, delivery necessities for content with other origins may vary and can be discussed with the administrators of the program, or details can be found on paidperview.com.

**MINIMUM CONTENT REQUIREMENTS**

Content provided by Licensor shall, minimally, include the following:

a.    The DVD's in their entirety including art work, (Box Art);

PaidPerView.com

    **b.**   All supporting documentation as required under Title 18, United States Code, Section 2257, and any other records required in the United States.

## IDEAL SUBMISSION MATERIALS

*Providing any or all of the following will help to expedite the content processing procedure.*

    **a.**   The full, individual scenes in high quality file format, (VOB or MP4 - H264);

    **b.**   A list of all actors in each scene with a way to identify all actors, (list in order of appearance, or attach named headshots);

    **c.**   High Resolution images of the Content, (for headshots of the actors, sample images, and promotional design);

    **d.**   High Resolution scan or copy of the Box Art, or the original design file; or any applicable artwork

    **e.**   The primary Niche of the Content as well as any secondary Niches it may cover;

    **f.**   A Fact Sheet listing any other pertinent information, including but not limited to: Date of Production, Release Date, Scene Descriptions, DVD Description, Producer, Director, Keywords and/or Tags.

    **g.**   At least one banner and description of the applicable pay site(s) related to the Content.

## EXHIBIT "B"

## ACCEPTABLE METHODS OF DELIVERY

Licensor shall have the sole responsibility for providing, at its own expense, the Content to Company via one of the acceptable methods of delivery set forth below:

    **a.**   File Transfer Protocol, (FTP). Licensor may provide Licensee access via FTP to a specified location on Licensor's servers where the Content can be downloaded;

    **b.**   Physical Copy Delivery. Licensor may ship physical copies of the Content to the address of Licensee along with supporting documentation and other materials;

    **c.**   Hard Drive Copy. Licensor may place all required items on a PC formatted hard drive and ship the hard drive to the address of Licensee. Licensee may make 1 copy of the Content and ship the drive back to Licensor within 45 days of the receipt of the drive.

    **d.**   Use of the PaidPerView Uploader. Licensor may use the uploader located in Licensor's PaidPerView account to upload the Content. The uploader will instruct the Licensor as to what is required to complete a submission.

© 2016 PaidPerView.com — Content Partner Revenue Sharing Agreement



# EXHIBIT C

## TrafficForce Terms of Service at Time Litigation Filed

• TrafficForce ⟨⟩

Sign In (signin.html)

About (about.html)   |   Sign Up (signup.html)   |   Help (help.html)   |   Publishers (publishers.html)   |

Our Team (team.html)   |   Language ⌄

# Terms & Services

PLEASE READ THESE TERMS AND CONDITIONS ("TERMS" OR "AGREEMENT") CAREFULLY BEFORE REGISTERING OR USING THE SERVICES ("PROGRAM") OFFERED BY GLP 5 Inc. ("TRAFFIC FORCE"). PARTICIPATION IN THE PROGRAM INDICATES THAT YOU AGREE TO BE BOUND BY THE TERMS AND CONDITIONS OF THIS AGREEMENT. IF YOU DO NOT AGREE TO THE TERMS AND CONDITIONS OF THIS AGREEMENT, YOU MUST NOT REGISTER OR PARTICIPATE IN THE PROGRAM.

## 1. Parties

Pursuant to this Agreement, GLP 5 Inc. ("Network") and you ("You", "Publisher" or "Advertiser") agree to the following terms and conditions for the participation in the Program.

## 2. Program Participation

Participation in the Program is subject to Network's prior approval and Your continued compliance with the Acceptable Use Policies ("Acceptable Use Policies"). Network reserves the right to refuse participation to any applicant or participant at any time in its sole discretion. Network may change, suspend or discontinue the Program at any time without notice or liability. Network reserves the right, at its discretion, to modify this Agreement at any time by posting a notice on the Site, or by sending a notice via email or postal mail. Participation in the Program following such notification constitutes Your acceptance of the modified terms and conditions. You certify to Network that if You are an individual (i.e., not a corporation) You are at least 18 years of age. You also certify that You are legally permitted to use the Program, and takes full responsibility for the selection and use of the Program. This Agreement is void where prohibited by law, and the right to access the Site is revoked in such jurisdictions.

## 3. Participation As Publisher

You agree to comply with the specifications provided by Network to enable proper delivery, display, tracking, and reporting of ads in connection with your Websites, including without limitation by not modifying the JavaScript or other programming provided to You by Network in any way, unless expressly authorized in writing by Network.

## 4. Participation As Advertiser

Advertiser is solely responsible for all: (a) ad targeting options and keywords ("Targets") and all ad content, ad information, and ad URLs ("Creative"), whether generated by or for Advertiser; and (b) websites, services and landing pages which Creative links or directs viewers to, and advertised services and products (collectively "Services"). Advertiser shall protect any Advertiser passwords and takes full responsibility for Advertiser's own, and third party, use of any Advertiser accounts. Advertiser understands and agrees that ads may be placed on (a) any content or property provided by Network, and, unless Advertiser opts out of such placement in the manner specified by network, (b) any other content or property provided by Publishers upon which Network places ads. Advertiser authorizes and consents to all such placements. Advertiser agrees that all placements of Advertiser's ads shall conclusively be deemed to have been approved by Advertiser unless Advertiser produces contemporaneous documentary evidence showing that Advertiser disapproved such placements in the manner specified by Network. Advertiser grants Network permission to utilize an automated software program to retrieve and analyze websites associated with the Services for ad quality and serving purposes. Network or Publishers may reject or remove any ad or Target for any or no reason.

## 5. Representation As Publisher

Publisher represents and warrants that the Websites: (1) are owned by or licensed to Publisher and Publisher has the right to use the entire contents and subject matter contained in the Websites; (2) do not violate any law, statute, ordinance, treaty or regulation; (3) do not infringe in any manner any copyright, patent, trademark, trade secret or other intellectual property right of any third party; (4) do not breach any duty toward or rights of any person or entity including, without limitation, rights of publicity or privacy, and have not otherwise resulted in or are not likely to result in any consumer fraud, product liability, tort, breach of contract, injury, damage or harm of any kind to any person or entity; (5) are not false, deceptive or misleading; (6) are not defamatory, libelous, slanderous or threatening; and (7) are free of viruses, Trojan horses, trap doors, back doors, Easter eggs, worms, time bombs, cancelbots, "spyware" and other computer programming routines that may potentially damage, interfere with, intercept, or expropriate any system, data or personal information. Publisher also represents, warrants and covenants that: (i) Publisher has the power and authority to enter into and perform its obligations under this Agreement; (ii) Publisher shall not be in violation of any obligation, contract or agreement by entering into this Agreement, by performing its obligations hereunder or by authorizing and permitting Network to perform the services hereunder; (iii) Publisher shall comply with all of the terms and conditions of this Agreement, as amended from time to time; (iv) all information provided by Publisher to Network is truthful, accurate and complete, and is not misleading in any way; (v) Network is hereby authorized by Publisher to perform all the services described hereunder with respect to Publisher and the Websites; (vi) upon request by Network, Publisher shall promptly provide a written statement in form acceptable to Network confirming Network's authority hereunder; and (vii) Publisher shall not upload, post, email, transmit or otherwise make available any content, material, data, work, designation, trade or service mark, tradename, link, advertising or services that actually or potentially (a) violates any applicable law or regulation, including, without limitation, false advertising or unfair competition under the law of any jurisdiction, (b) infringes or misappropriates any proprietary, intellectual property, contract or tort right of any person, or (c) to a reasonable person, may be abusive, defamatory, invasive of privacy, harassing, threatening, malicious, otherwise objectionable or in way derogatory about Network or any other party. Publisher grants Network and the Advertiser the right and license to transmit the Ads to the Websites.

# 6. Representation As Advertiser

Advertiser represents and warrants that (a) it is authorized to act on behalf of and has bound to this Agreement any third party for which Advertiser advertises ("Principal"), (b) as between Principal and Advertiser, the Principal owns any rights to Program information in connection with those ads, and (c) Advertiser shall not disclose Principal's Program information to any other party without Principal's consent.

# 7. Communications Solely With Network

You agree to direct to Network and not to any advertiser or publisher, as the case may be, all communications regarding any matter arising out of participating in Program.

# 8. Acceptable Use Policy

To participate in the Program as a Publisher, you must abide by the Publishers Acceptable Use Policy. To participate in the Program as an Advertiser, you must abide by the Advertisers Acceptable Use Policy. It is your responsibility to keep up to date and adhere to those policies. Failure to comply with these policies may warrant us limiting ad serving or terminating this agreement.

# 9. Payments As Publishers

Publisher shall receive as payment a percentage of the sale price of advertisements displayed in connection with Publisher's website as determined by Network for Publisher's use of the Program. Advertiser's payable revenue shall be determined twice a month on the first day and sixteenth day of each month for the period covering the two previous weeks. Payments to the Publisher shall be sent by Network within approximately ten (10) days if Publisher's earned balance is greater than or equal to Publisher's minimum payable amount. If Publisher's earned balance is less than Publisher's minimum check amount, no payment shall be made. In addition, Publisher agrees that (i) any payments that may become due to Publisher are specifically conditioned upon Network's receipt of full payment from the applicable advertiser and (ii) if Network does not receive the applicable payment in full from any such advertiser, or Network's payment from advertiser is later reversed at any time, Network may deduct such amount from Publishers future payments. If Publisher disputes any payment made in connection with the Program, Publisher must notify Network in writing within thirty (30) days of any such payment. Failure to notify Network shall result in the waiver by Publisher of any claims related to such disputed payment. Payment shall be calculated solely based on records maintained by Network. No other measurements or statistics of any kind shall be accepted by Network or have any effect under this Agreement. Network shall not be liable for any payment based on (i) any fraudulent impressions or clicks generated by any person, robot, automated program or similar device or for fraudulent impressions or clicks similarly generated on any advertisements, as reasonably determined by Network; (ii) advertisements delivered to end users whose browsers have JavaScript disabled; or (iii) impressions commingled with a significant number of fraudulent impressions or fraudulent clicks described in (i) above, or as a result of another breach of this Agreement by Publisher for any applicable pay period. Network reserves the right to withhold payment or charge back Publisher's account due to any of the foregoing or any breach of this Agreement by Publisher. In addition, if Publisher is past due on any payment to Network in connection with the Program, Network reserves the

right to withhold payment until all outstanding payments have been made. To ensure proper payment, Publisher is solely responsible for providing and maintaining accurate contact and payment information associated with Publisher's account in the Program. Any bank fees related to returned or cancelled checks due to a contact or payment information error or omission may be deducted from the newly issued payment.

# 10. Payments As Advertisers

Advertiser shall be responsible for all charges up to the amount of each IO, or as set out in an online account, and shall pay all charges in U.S. Dollars or in such other currency as agreed to in writing by the parties. Unless agreed to by the parties in writing, Customer shall pay all charges in accordance with the payment terms in the applicable IO or online campaign settings, including any applicable taxes. Late payments bear interest at the rate of 1.5% per month (or the highest rate permitted by law, if less). Charges are exclusive of taxes. Advertiser is responsible for paying all taxes, government charges, and reasonable expenses and attorneys fees Network incurs collecting late amounts. To the fullest extent permitted by law, Advertiser waives all claims relating to charges (including without limitation any claims for charges based on suspected invalid clicks) unless claimed within 60 days after the charge (this does not affect Advertiser's credit card issuer rights). Charges are solely based on Network's measurements for the Program, unless otherwise agreed to in writing. Nothing in these Terms or an IO may obligate Network to extend credit to any party. Advertiser acknowledges and agrees that any credit card and related billing and payment information that Advertiser provides to Network may be shared by Network with companies who work on Network's behalf, such as payment processors and/or credit agencies, solely for the purposes of checking credit, effecting payment to Network and servicing Advertiser's account. Network reserves the right to withhold deposit or charge Advertiser's account due to any breach of this Agreement by Advertiser.

# 11. Advertiser Refund Policy

Network strives to offer the best service possible to its Advertisers. Once an Advertiser makes an initial deposit in the Program, it has thirty (30) days to ask for a refund of the account balance if they are not satisfied with the Program and have remained in compliance with this agreement. As soon as an Advertiser makes a second deposit in the Program, it is hereby understood that a refund will only be issued for a balance greater than $50 and a processing fee of 10% will be deducted from the refund. Advertisers cancelled / terminated by Network for violating these Terms and Conditions are not entitled to a refund.

# 12. Termination; Cancellation

Network may at any time, in its sole discretion, immediately terminate the Program, terminate this Agreement, or cancel any Ad(s) or your use of any Target. Network will make commercially reasonable efforts to notify you via email of any such termination or cancellation within a reasonable period of time. You may cancel any Ads and/or terminate this Agreement with or without cause at any time by deactivating a campaign or by removing the Program Ad Code from your website. Upon termination for any reason: (a) you shall remain liable for any amount due for Ads already delivered; and (b) all provisions of this Agreement which by their nature should survive termination shall survive termination, including, without limitation, warranty disclaimers, and limitations of liability.

## 13. Prohibited Uses

You shall not, and shall not authorize or encourage any third party to: (i) directly or indirectly generate queries, Referral Events, or impressions of or clicks on any Ad (including without limitation by clicking on "play" for any video Ad) through any automated, deceptive, fraudulent or other invalid means, including but not limited to through repeated manual clicks, the use of robots or other automated query tools and/or computer generated search requests, and/or the unauthorized use of other search engine optimization services and/or software; (ii) edit, modify, filter, truncate or change the order of the information contained in any Ad, or remove, obscure or minimize any Ad in any way without authorization from Network; (iii) frame, minimize, remove or otherwise inhibit the full and complete display of any Web page accessed by an end user after clicking on any part of an Ad; (iv) redirect an end user away from any Advertiser Page; provide a version of the Advertiser Page that is different from the page an end user would access by going directly to the Advertiser Page; intersperse any content between the Ad and the Advertiser Page; or otherwise provide anything other than a direct link from an Ad to an Advertiser Page; (v) display any Ad(s) on any Web page or any Web site that contains any hate-related, violent, or illegal content; (vi) directly or indirectly access, launch, and/or activate Ads through or from, or otherwise incorporate the Ads in, any software application, Web site, or other means other than Your Property(ies), and then only to the extent expressly permitted by this Agreement; (vii) "crawl", "spider", index or in any non-transitory manner store or cache information obtained from any Ads, or any part, copy, or derivative thereto; (viii) act in any way that violates any other agreement between You and the Network (ix) disseminate malware; (x) Use any type of .apk, .msi or any other executable file or other means to auto install any type of spyware / malware or any other software or application that hijacks, maliciously changes or otherwise adversely affects any end user device (xi) Use the Traffic Force Network to distribute any type of malicious or misrepresented JavaScript, application or software whatsoever (xii) create a new account to use the Program after the Network has terminated this Agreement with You as a result of your breach of this Agreement; or (xiii) engage in any action or practice that reflects poorly on the Network or otherwise disparages or devalues the Network's reputation or goodwill. You acknowledge that any attempted participation or violation of any of the foregoing is a material breach of this Agreement and that we may pursue any and all applicable legal and equitable remedies against You, including an immediate suspension of Your account or termination of this Agreement, and the pursuit of all available civil or criminal remedies.

Certain violations of aforementioned prohibited uses represent a blatant attempt to irreparably harm the good will and public image of the service. Therefore any advertiser found using the tactics outlined in points (iv)(v)(ix)(x)(xi)(xiii) will forfeit all outstanding sums held in their advertising account(s) as well as facing all other forms of remedy as outlined in the previous paragraph.

## 14. Publicity

You agree that the Network may use Your name and logo in presentations, marketing materials, customer lists, financial reports, Web site listings of customers or ads. If You wish to use Network's trade names, trademarks, service marks, logos, domain names, and other distinctive brand features ("Brand Features"), You may do so, so long as such use is in compliance with this Agreement.

## 15. Disclaimers

You acknowledge and agree that the Network has no special relationship with or fiduciary duty to You and that the Network has no control over, and no duty to take any action regarding: which users gain access to the Site, Services or Program; what Content You access or receive via the Site or Services; what Content other advertisers and publishers may make available, publish or promote in connection with the Program; what effects any Content may have on Advertisers or Publisher or their users or customers; how You or your users or customers may interpret, view or use the Content; what actions You or your users or customers may take as a result of having been exposed to the Content, or whether Content is being displayed properly in connection with the Program. Further, (i) if You are a publisher, Publisher specifically acknowledges and agrees that Network has no control over (and is merely a passive conduit with respect to) any Content that may be submitted or published by any advertiser, and that Publisher is solely responsible (and assumes all liability and risk) for determining whether or not such Content is appropriate or acceptable to Publisher, and (ii) if You are an advertiser, Advertiser specifically acknowledges and agrees that Network has no control over any Content that may be available or published on any publisher website (or otherwise), and that Advertiser is solely responsible (and assumes all liability and risk) for determining whether or not such Content is appropriate or acceptable to Advertiser. You release Network from all liability in any way relating to Your acquisition (or failure to acquire), provision, use or other activity with respect to Content in connection with the Site or Services. The Site may contain, or direct You to sites containing, information that some people may find offensive or inappropriate. Network makes no representations concerning any content contained in or accessed through the Site or Services, and Network will not be responsible or liable for the accuracy, copyright compliance, legality or decency of material contained in or accessed through the Site or Services.

THE SERVICES, CONTENT AND SITE ARE PROVIDED ON AN "AS IS" BASIS, WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT. NETWORK DOES NOT WARRANT THE RESULTS OF USE OF THE SERVICES, INCLUDING, WITHOUT LIMITATION, THE RESULTS OF ANY ADVERTISING CAMPAIGN, AND YOU ASSUME ALL RISK AND RESPONSIBILITY WITH RESPECT THERETO. SOME STATES DO NOT ALLOW LIMITATIONS ON HOW LONG AN IMPLIED WARRANTY LASTS, SO THE ABOVE LIMITATIONS MAY NOT APPLY TO YOU. NETWORK MAKES NO GUARANTEE OF CONFIDENTIALITY OR PRIVACY OF ANY COMMUNICATION OR INFORMATION TRANSMITTED ON OR THROUGH THE SITE, SERVICES OR ANY WEBSITE LINKED TO THE SITE. Network will not be liable for the privacy of e-mail addresses, registration and identification information, disk space, communications, confidential or trade-secret information, or any other Content stored on Network's equipment, transmitted over networks accessed by the Site, or otherwise connected with Your use of the Services.

## 16. Confidentiality

You agree not to disclose Network Confidential Information without Network's prior written consent. "Network Confidential Information" includes without limitation: (i) all Network software, technology, programming, technical specifications, materials, guidelines and documentation You learn, develop or obtain that relate to the Program; (ii) click-through rates or other statistics relating to performance in the Program provided to You by Network; and (iii) any other information designated in writing by Network as "confidential" or any designation to the same effect. Network Confidential Information does not include information that has become publicly known through no breach by You or Network, or information that has been (i) independently developed without access to Network Confidential Information, as evidenced in writing; (ii) rightfully received by You from a third party with no obligation of

confidentiality; or (iii) required to be disclosed by law or by a governmental authority.

## 17. Information Rights

Network may retain and use, subject to the terms of the Privacy Policy (located at http://www.trafficforce.com /policy..html, or such other URL as Network may provide from time to time), all information You provide, including but not limited to Property demographics and contact and billing information. You agree that Network may transfer and disclose to third parties personally identifiable information about You for the purpose of approving and enabling Your participation in the Program, including to third parties that reside in jurisdictions with less restrictive data laws than Your own. Network may also provide information in response to valid legal process, such as subpoenas, search warrants and court orders, or to establish or exercise its legal rights or defend against legal claims. Network disclaims all responsibility, and will not be liable to You, however, for any disclosure of that information by any such third party. Network may share non-personally-identifiable information about You, including Property URLs, Property-specific statistics and similar information collected by Network, with advertisers, business partners, sponsors, and other third parties. In addition, You grant Network the right to access, index and cache the Property(ies), or any portion thereof, including by automated means including Web spiders or crawlers.

## 18. No Guarantee

Network makes no guarantee regarding the level of impressions of ads or clicks on any ad, the timing of delivery of such impressions and/or clicks, the completion of Referral Events, or the amount of any payment to be made to You under this Agreement. In addition, for the avoidance of doubt, Network does not guarantee the Program will be operable at all times or during any down time (i) caused by outages to any public Internet backbones, networks or servers, (ii) caused by any failures of Your equipment, systems or local access services, (iii) for previously scheduled maintenance or (iv) relating to events beyond Network's control such as strikes, riots, insurrection, fires, floods, explosions, war, governmental action, labor conditions, earthquakes, natural disasters, or interruptions in Internet services to an area where Network or Your servers are located or co-located.

## 19. Indemnification

You agree to indemnify, defend and hold Network, all relevant Publisher(s), all relevant Advertiser(s) and their licensors, licensees, affiliated companies, consultants, contractors, agents, attorneys and employees harmless from and against any and all liability, loss, damages, claims or causes of action, including internal and external legal fees and expenses, arising out of, related to or which may arise from your use of the Program, your Ads, your selection and use of Targets, and/or your breach of any term of this Agreement.

## 20. Governing Law

This Agreement shall be governed by the laws of the Canada, without reference to any conflict of laws principles. Any claim or controversy arising out of or related to this Agreement, or the products or services we provide and/or distribute shall be heard in the courts of Canada. You agree to pay any/all direct and/or indirect costs arising out or related to the claim and/or controversy, including but not limited to legal costs, transportation, accommodation,

telephone calls. The foregoing shall not preclude Network from seeking any injunctive relief for protection of Network, intellectual property rights.

## 21. Miscellaneous Terms And Conditions

The currency used for purposes of this Agreement shall be United States Dollars (USD). Network requires all advertisers to provide proof of identification before advertising in the Program. Network reserves the right to refuse any advertiser for any reason including but not limited to: country of residence, reputation and associations. These Terms and Conditions constitute the entire agreement between you and the Network in respect to your use of the Program and supersede and replace all prior or contemporaneous understandings or agreements, written or oral, regarding such subject matter. Any changes that we make to these Terms and Conditions will be posted at http://www.trafficforce.com/terms.html. Your use of our Programs and Services will always be governed by the TERMS AND CONDITIONS in effect at the time of use.

GLP 5 Inc.
30150 Telegraph Rd., Suite 444
Bingham Farms, MI 48025

### CREATE AN ACCOUNT NOW!
### (SIGNUP.HTML)

**HOME (/)**    **ABOUT (ABOUT.HTML)**    **SIGN UP (SIGNUP.HTML)**    **HELP (HELP.HTML)**

**PUBLISHERS (PUBLISHERS.HTML)**    **OUR TEAM (TEAM.HTML)**    **SIGN IN (SIGNIN.HTML)**



**Twitter (http://twitter.com/trafficforce1)**



**Facebook (http://www.facebook.com/trafficforce)**

Terms & Services (terms.html)

Copyright © 2015 Traffic Force. All Rights Reserved.