ERICA J. VAN LOON (admitted *Pro Hac Vice*)
evanloon@glaserweil.com
GLASER WEIL FINK HOWARD
  AVCHEN & SHAPIRO LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, California 90067
Telephone:  (310) 553-3000
Facsimile:   (310) 556-2920

*Attorney for Defendants Cyberweb Ltd., David Koonar,*
*Sagan Limited, GLP 5, Inc. and Netmedia Services Inc.*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| AMA MULTIMEDIA LLC, a Nevada limited liability company,<br><br>                    Plaintiff,<br><br>v.<br><br>SAGAN LIMITED, a Republic of Seychelles company, individually and d/b/a PORN.COM; CYBERWEB LTD., formerly MXN LTD., a Barbados Company, individually and d/b/a PORN.COM; NETMEDIA SERVICES INC., a Canadian Company, individually and d/b/a PORN.COM; GLP 5, Inc., a Michigan Company individually and d/b/a Trafficforce.com; DAVID KOONAR, an individual; and John Does 1-20,<br><br>                    Defendants. | CASE NO.: CV16-1269 PHX DGC<br><br>Hon. David G. Campbell<br><br>**DEFENDANTS' RESPONSE TO AMA'S MOTION FOR LEAVE TO FILE SUR-REPLY** |

GlaserWeil

**Glaser Weil**

# I.      __INTRODUCTION__

AMA has outdone itself this time. Citing the declaration of its President, Adam Silverman, AMA boldly states that Defendants' inclusion of user-uploaded content within the CPA program must be a fabrication because AMA has never heard of it:

> AMA has never before been advised that Netmedia was 'assigning' any content into AMA's account [and has] never before been advised that revenue was being generated on any AMA content other than that which AMA uploaded itself.

ECF No. 78 ("Mot.") at 3. This is the crux of AMA's proposed Sur-Reply. And it is a blatant lie.

As early as June 24, 2015, AMA's President, Adam Silverman, was advised multiple times that AMA user-uploaded videos were being "assigned" to AMA's account and included in the CPA, thereby generating revenues. Mr. Silverman expressly agreed. As Skype chat logs show, Adam Silverman even thanked Defendants for including user-uploaded content under the CPA's "paideperview.com" revenue sharing program:

> **Hitman b52 (Glen Camara of Netmedia):** If you have a list of content that is yours, but was uploaded by users, we will happily add it to your account, as this is the main purpose of the program
>
> **biggyfuckyoucash (Adam Silverman):** much appreciated

Declaration of Kristen Richardson In Support of David Koonar's Motion To Dismiss Or Stay ("Richardson Declaration"), Ex. A, starting at time-stamp 3:39:12.

These chat logs remove any potential doubt as to which sides' interpretation of the CPA is correct. AMA is simply wrong when it contends that the CPA is limited to content uploaded directly by AMA, because the parties knowingly treated content uploaded by third-party users as subject to the CPA and its revenue sharing provisions. Accordingly, Defendants do not oppose AMA's Motion For Leave To File A Sur-Reply, provided this Response and its supporting Declarations are also deemed part of the record with respect Defendants' motions to dismiss or stay.

DEFENDANTS' RESPONSE TO AMA'S MOTION FOR LEAVE TO FILE SUR-REPLY

1235146

**Glaser Weil**

## II.    <u>ARGUMENT</u>

### A.    <u>AMA Was Fully Aware Of The Assignment Program And Agreed To It</u>

AMA has repeatedly lied to the Court. For example, AMA told the Court that it was not a party to the CPA. The truth is AMA itself has admitted on at least six other occasions that it *is* a party. AMA told the Court that a rogue AMA agent agreed to the CPA without authorization. In truth, AMA's own emails show that this agent acted at the direction of AMA's President, Adam Silverman. AMA told the Court that it was not a successor to SSC Group. In truth, AMA's own public filing with the State of Nevada show that AMA has assumed all rights and obligations of SSC Group. Now, AMA has blatantly lied about the parties' course of performance under the CPA.

In its proposed Sur-Reply, AMA unequivocally states that it was never advised that Netmedia was assigning any content into AMA's CPA account or that revenue was being generated on any AMA content other than that which AMA uploaded itself. Mot. at 3. And in his supporting declaration, AMA's President, Adam Silverman asserts at least **six times** that AMA was unaware of the assignment program, and accuses Defendants of "manufacturing" this defense:

> 6. **<u>AMA was not aware of any such scheme</u>** to take AMA content from other sources, whether third party users or the Defendants themselves, and have those videos assigned to the CPA account. Had AMA been presented with the scheme, AMA would have specifically and clearly denied such use of those videos.
>
> 8. If Netmedia found infringing material from a content partner that was not uploaded by a content partner, rather than deleting the illegal video, Netmedia made the unilateral decision to treat it as licensed under the CPA. Netmedia is not even a party to the CPA.
>
> 9. **<u>Netmedia never actually disclosed this practice</u>** to the AMA, and it directly contradicts the CPA.
>
> 12. Because **<u>the Repl(ies) were the first time I had ever heard of this policy</u>** or alleged feature, I believe it to be a manufactured defense in this litigation.
>
> 23. Even if somehow Defendants paid AMA for the use of third-party-uploaded content (somehow "assigned" to AMA's account), AMA still did not know about this scheme or agree to

2

1235146

it. AMA did not ratify the CPA or accept these unilateral terms. **AMA was certainly never advised of this scheme** or any such "payments" made to it.

25. **AMA had absolutely no knowledge** or understanding that **it was being compensated for illegal uploads** at any time and still questions Defendants' new story.

26. AMA does not concede that it was ever compensated for the illegally uploaded or "assigned" videos. **AMA would have absolutely never allowed** or permitted the distribution of illegal videos or the **assignment of these videos to its account**.

ECF No. 78-1, Ex. A (Silverman Declaration).

However, on June 24, 2015 Mr. Silverman contacted Netmedia via a Skype chat to complain about AMA content that had been uploaded to the Wankz.com website by users of that website. Mr. Silverman wanted the AMA brand removed from the Wankz.com website, but did not want it removed from the Porn.com website. During the course of the ensuing discussion, Kris Richardson (a Cyberweb Director) and Glen Camra (of Netmedia) repeatedly assured Mr. Silverman that any user-uploaded AMA content identified on the Porn.com website was "assigned" to AMA's paidpperview.com account, and thus would be subject to the CPA and its advertising revenue sharing provisions. Mr. Silverman agreed to, and at one point insisted upon, this treatment of user-uploaded AMA content:

| | | |
|---|---|---|
| 2:42:49 | kris10.richardson: Understood, and **anytime there is content that belongs to you we assign it to your account** anyway . . . |
| 2:43:01 | biggyfuckyoucash (Silverman): id prefer an ad revshare |
| 2:43:12 | biggyfuckyoucash (Silverman): like you offer on the legal stuff, why shouldn't we get paid on it? |
| 2:43:14 | kris10.richardson: **same result** |
| 2:43:48 | kris10.richardson: No I meant your content coming from unauthorized sources on our site |
| 2:43:55 | biggyfuckyoucash (Silverman): **you assign it to our account?** |
| 2:44:19 | kris10.richardson: **Is assigned to you, your ad revshare**. . , |
| 2:53:13 | biggyfuckyoucash (Silverman): [t]he **ad revshare program needs to be extended to our pirated** |

3

1235146

**clips**. . . .

| | |
|---|---|
| 3:39:12 | hitman b52 (Glen Camra): 3) if you have a list of content that is yours, but was uploaded by users, **we will happily add it to your ppv account, as this is the main purpose of the program**. |
| 3:39:40 | biggyfuckyoucash (Silverman): **much appreciated**. |

Richardson Declaration, Ex. A (intervening messages omitted). The terms "PPV" and "ad revshare" and "account" in these chat excerpts refer to the paidperview.com revenue sharing account that is the subject of the CPA. Richardson Declaration at ¶¶5-8; ECF No. 27-3, Ex. 5 at Background Section C ("Licensor desires to make the Content available to Licensee for use on the Website(s) in order to be eligible to take part in the Content Partner Advertising Revenue Sharing Program (currently located on http://www.paidperview.com)."); *see also id.* at Preamble, Sections 1.3, 3.6, 6.3, 9.3, 10.9, and Exhibits A and B (also referencing the "paidperview.com program," the "Program," or the "paideperview.com account").

Later that day, Mr. Silverman engaged in a Skype Chat with Ross Allan, the advertising director of Netmedia, in which he was again assured that any user-uploaded AMA content found on the Porn.com website would continue to be "assigned" to AMA's paidperview.com account, and thus would be subject to the advertising revenue sharing provisions of the CPA.

| | |
|---|---|
| 4:22:22 | Ross Allan [after Mr. Silverman requested a share of any revenue generated by AMA user-uploaded content]: **we would pay you out at the rates that you qualify for in PPV** |
| 4:22:26 | Ross Allan: so **if your rate is** 30% or whatever |
| 4:22:23 | biggyfuckyoucash (Silverman): on the stuff we submit legally dude - you won't hear a peep |
| 4:22:28 | Ross Allan: **thats what we do** |
| 4:28:25 | Ross Allan: keep in touch about this |
| 4:28:31 | biggyfuckyoucash (Silverman): will do |
| 4:28:37 | Ross Allan: and meanwhile, **if there is active** |

1235146

**content on there, I can move it to under your PPV account**, I think

4:28:54        biggyfuckyoucash (Silverman): **thats fine**

Declaration of Ross Allan In Support Of Defendants David Koonar's Motion To Dismiss Or Stay ("Allan Decl."), Ex. A. The term "PPV account" is a reference to the CPA's paidperview.com revenue sharing account. *Id.* at ¶ 5. And the reference to the "30 percent or whatever" is a reference to the maximum revenue sharing rate under Section 3.1 of the CPA. *Id.* at ¶ 6.

In these chats, Mr. Silverman proposed that AMA receive more than a thirty percent share of the revenue generated by user-uploaded content. But as shown in the 4:28:37 and 4:28:54 Silverman-Allan exchanges, the parties agreed to treat revenue generated by user-uploaded content under the terms of the CPA, and subject to the CPA rates. The parties never discussed this issue again. *Id.* at ¶ 8. And at all times, AMA has been paid its share of revenue generated by its user-uploaded content in accordance with Section 3.1 of the CPA and its revenue allocation rates. *Id.* at ¶ 9. The revenues paid are (and were) specifically disclosed in AMA's CPA account, which marks each item of user-uploaded content and shows the revenue paid on each such item. ECF No. 74-1 at ¶ 4.

These chat logs unequivocally demonstrate that Defendants' interpretation of the CPA is correct. Contrary to AMA's assertion, the CPA is not limited to content uploaded directly by AMA, because the parties knowingly treated content uploaded by third-party users as subject to the CPA and its revenue sharing provisions. The parties' course of performance constitutes powerful evidence of the parties' intent.

## B.        The Assignment Program Has Been Well-Received By The Industry

Citing two non-party Declarations, AMA argues that the assignment program "is illogical and would not be tolerated by actual content producers in the industry." Mot. at 4. This is simply not true.

As Defendants have explained, when AMA's user-uploaded videos were assigned to its CPA account, the assigned videos were marked on AMA's CPA account statement. ECF

DEFENDANTS' RESPONSE TO AMA'S MOTION FOR LEAVE TO FILE SUR-REPLY

1235146

No. 74-1 at ¶ 4. The assigned videos of other paidperview.com partners were marked in the same manner. Second Supplemental Declaration Of Philip Bradbury In Support Of David Koonar's Motion To Dismiss Or Stay, ¶ 3. Forty-one (41) of these partners have subsequently made specific requests regarding the treatment of their assigned videos. *Id.*

Thirty-four (34) of these partners have requested that specific assigned videos remain in their CPA accounts, including ten (10) partners who requested that **all** assigned videos remain active in their accounts. *Id.* at ¶ 4. Only seventeen (17) partners have ever requested that any assigned videos be deleted from their CPA accounts, and ten (10) of these partners also specifically requested that others assigned videos remain in their CPA accounts. *Id.* And while two (2) partners requested that all of their assigned videos be deleted from their accounts, these partners nonetheless accepted their revenue sharing payments that accrued before their videos were removed from their accounts. *Id.* Through the program, partners have specifically requested that over 1400 assigned videos remain in their CPA accounts while only 175 assigned videos have been deleted by partners. *Id.*

Thus, 95 percent (39 of 41) of partners who have made specific requests with respect to their assigned videos have chosen to leave some assigned content in their CPA accounts. *Id.* at ¶ 5. And no partner has rejected or returned CPA revenue sharing payments based on assigned content. *Id.*

**C.      Defendants Have Met Their Burden Of Establishing That The Forum Selection Applies To AMA's Claims**

As Defendants have explained, the CPA's forum selection clause applies to AMA's claims for four reasons, each one sufficient by itself to compel application of the forum selection clause to AMA's claims: 1) AMA's claims relate to the relationship between AMA and Defendants, and thus under Ninth Circuit authority fall within the scope of the parties' broad forum selection, 2) AMA's claims arise under the CPA's indemnification and limitation of liability clauses, and thus fall within the "arising from" language of the forum selection clause, 3) under *Manetti-Farrow* the forum selection clause applies because AMA's claims cannot be resolved without interpreting the CPA, and 4) even if Defendants

6

Glaser Weil

1235146

1  were (erroneously) required to present a non-frivolous defense under the CPA, Defendants

2  can easily meet that burden because Defendants' interpretation of the CPA is supported by

3  the CPA's plain language and evidence of the parties' course of performance.

4        In its proposed sur-reply, AMA contests none of these arguments.

5        Even if one assumes (contrary to Ninth Circuit authority) that Defendants are

6  required to present a non-frivolous defense under the CPA, AMA in its Sur-Reply does not

7  even attempt to argue that Defendants license defense is frivolous. Instead, AMA merely

8  questions the **credibility** of Defendants' course of performance evidence. But again, it is

9  important to keep in mind the very low hurdle Defendants must clear. Defendants do not

10  need to prove that they have a valid license defense as a matter of law, or that their license

11  defense is valid by a preponderance of evidence, or even that a jury question exists as to

12  their license defense. At most, Defendants need only prove that their license defense is non-

13  frivolous. Defendants have easily cleared this hurdle, especially when one takes into account

14  the course of performance evidence reflected in the chat logs discussed above.

15  **D.   AMA's Arguments Concerning Personal Jurisdiction Are Misplaced**

16        AMA asserts that Defendants have somehow conceded that jurisdiction exists over

17  Netmedia because Netmedia administered the watermark-checking program at issue here.

18  Mot. at 2. AMA is mistaken. First, the assignment process did not entail uploading anything.

19  Rather it was a review process that merely allocated pre-existing user-uploaded content so

20  that it was properly accounted for under the CPA. Second, as Netmedia has explained, it

21  neither owns nor operates the Porn.com website. It provides services to the owners and

22  operators of the Porn.com website. AMA's claims are not based on the automated

23  watermark review process administered by Netmedia. AMA cites no authority, and

24  Netmedia is aware of none, finding personal jurisdiction over a company that has provided

25  services to a website owner or operator but has not participated in any alleged wrongdoing.

26  Such a result would be absurd.

27        AMA is similarly off base when it asserts that jurisdiction now exists over Mr.

28  Koonar. Sur-Reply at 4. None of the course of performance evidence at issue here involves

*Glaser Weil*

DEFENDANTS' RESPONSE TO AMA'S MOTION FOR LEAVE TO FILE SUR-REPLY

1235146

Mr. Koonar, and there is no evidence that Mr. Koonar participated in any alleged wrongdoing. There is no basis for jurisdiction over Mr. Koonar.

**E.    Defendants' Submission Of Course Of Performance Evidence Was Timely**

AMA suggests that Defendants' course of performance evidence is somehow suspect because it was not presented in earlier briefing. AMA has a lot of nerve.

Defendants have had to address a vast array of issues in connection with Defendants' Motions to Dismiss Or Stay, and unlike AMA, Defendants have taken great pains to support their positions with admissible evidence and citations to relevant authority. Among the issues Defendants have had to address are the many frivolous arguments and outright untruths that AMA has asserted with respect to the forum selection clause issue, including its arguments that Barbados law (not Ninth Circuit law) governs the interpretation of the forum selection clause, that related parties (such as Defendants) cannot enforce the forum selection clause, that the forum selection clause does not apply to tort claims, that forum selection clauses in form agreements are unenforceable, that discovery limitations are a proper basis to invalidate a forum selection clause, that AMA is not a successor to SSC Group, that AMA is not a party to the CPA, that a rogue agent accepted the CPA without authority, and that the CPA's assignment clause does not actually permit assignment of the CPA. Each of these arguments is squarely rebutted by established Ninth Circuit law or AMA's own evidence, or both, yet Defendants have had to respond in detail to each one. This has necessarily limited Defendants' ability to focus on any single issue.

It was the Court's recent October 6, 2016 Order (ECF No. 64) that alerted Defendants to the apparent primacy of CPA contract interpretation issues. In that Order, the Court specifically requested that Defendants focus on the issue of their license defense. That is exactly what Defendants have done. And in focusing on this issue, Defendants have uncovered additional evidence that supports their position, and have promptly submitted it. This is in no way surprising.

Moreover, the evidence speaks for itself. There can be no doubt that AMA was aware that Defendants were assigning user-uploaded content to AMA's CPA account and

DEFENDANTS' RESPONSE TO AMA'S MOTION FOR LEAVE TO FILE SUR-REPLY

1235146

Glaser Weil

tendering revenue share payments to AMA pursuant to the CPA. There can be no doubt that AMA agreed to this course of performance. AMA's diversionary tactics cannot change these facts.

## III.   <u>CONCLUSION</u>

The chat logs discussed above, together with the history of payment, show a clear course of performance regarding the type of content included under the CPA. The evidence shows that the parties knowingly applied the CPA and its revenue sharing provisions to content that was **not** uploaded by AMA. AMA's assertion to the contrary is simply false. Accordingly, Defendants do not oppose AMA's Motion For Leave To File A Sur-Reply, provided this Response and its supporting Declarations are also deemed part of the record with respect to Defendants' motions to dismiss or stay.

DATED: November 7, 2016                    Respectfully submitted,

GLASER WEIL FINK HOWARD
  AVCHEN & SHAPIRO LLP

By:  /s/ Erica J. Van Loon
ERICA J. VAN LOON

*Attorney for Defendant Cyberweb Ltd., David Koonar, Sagan Limited, GLP 5, Inc. and Netmedia Services Inc.*

Glaser Weil

DEFENDANTS' RESPONSE TO AMA'S MOTION FOR LEAVE TO FILE SUR-REPLY

1235146