1

LAW OFFICES
**MANOLIO & FIRESTONE, PLC**
8686 E. San Alberto Dr., Suite 200
Scottsdale, Arizona  85258
(480) 222-9100
vmanolio@mf-firm.com
Veronica L. Manolio, SBN 020230
*Attorneys for Plaintiff*

2

3

4

5

6

7            **IN THE UNITED STATES DISTRICT COURT**

8            **IN AND FOR THE DISTRICT OF ARIZONA**

9

| | |
|---|---|
| AMA Multimedia, LLC, a Nevada limited liability company | Case No.:  2:16-cv-1269-PHX-DGC |
| Plaintiff, | **PLAINTIFF AMA MULTIMEDIA, LLC'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PURSUANT TO *FORUM NON CONVENIENS*** |
| vs. | |
| Sagan Limited, a Republic of Seychelles company, individually and d/b/a Porn.com; Cyberweb Ltd. formerly MXN Ltd., a Barbados Company, individually and d/b/a Porn.com; Netmedia Services, Inc., a Canadian Company, individually and d/b/a Porn.com; *et al.,* | |
| Defendants. | |

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1

## I.   INTRODUCTION

This Court previously dismissed this copyright infringement complaint on a *forum non conveniens* theory, finding that the defendants were entitled to take advantage of a forum selection clause in a content partnership agreement ("the CPA") as affiliates and assignees of a party to that CPA.   The Ninth Circuit vacated and remanded, finding insufficient evidence of assignment of the CPA to defendants.   The matter is now back before the Court to revisit defendant's motion to dismiss for *forum non conveniens.*   The Court should deny the motion.   Defendants' purported "evidence" of assignment of the CPA is specious and does not meet the standard articulated by the Ninth Circuit.   Their alternative arguments for why strangers to the CPA are entitled to take advantage of the forum selection clause ("FSC") – agency relationships, third party beneficiary status, or "implied license" -- are all patently specious.

Very simply put, the Defendants have engaged in blatant copyright infringement by posting AMA's copyrighted, full-length videos to the Porn.com web site.   In this regard, the Defendants have acted on their own – without the involvement of GIM, a party to the CPA – and, in all events, well outside of the conduct permitted by the CPA.   The Defendants are not entitled to benefit from the FSC to cloak this improper conduct. Tellingly, the Defendants have failed to assert any evidence of an agency relationship with GIM so as to entitle the Defendants' to enforce the FSC – in fact, Netmedia is *expressly* not an agent of GIM.   Further, the actual language of the CPA precludes a third party from fulfilling GIM's obligations.   The Defendants cannot, accordingly, argue access to the FSC as third party beneficiaries.   Defendants also claim an implied license relying on untrue facts and present no legal support for the extension of the FSC as part of such implied license.   Finally, Defendants continue to argue that the CPA was assigned, in direct contradiction of the Ninth Circuit's clearly stated ruling.

## II.   STATEMENT OF FACTS

### A.   The Parties and Their Involvement with Porn.com

AMA produces adult audiovisual material, which it distributes through DVD sales and the World Wide Web via its paid membership websites.  AMA permits and provides promotional materials to third-party marketers and websites for the sole purpose of promoting AMA paid membership properties.  Samples that AMA provides help market full-length, high-definition videos on paid membership sites.  *Declaration of Adam Silverman ("Decl. A. Silverman"),* attached as **Exhibit 1**, p 2, ¶¶ 3-7.

AMA began its relationship with Cyberweb (owner of Porn.com) in 2007, *five years before the CPA was entered between AMA and GIM (**the contract at issue here**)*, when Cyberweb signed up with AMA as a marketer.[1]  *The explicit terms of the program prevent Cyberweb from utilizing any AMA intellectual property without express written permission.*  Cyberweb acted (and was paid) under this contract prior to the execution of the CPA.  The marketing relationship is governed by the program's Terms of Service.  **Exhibit 1**, p 2-3, ¶¶ 8-11 and at **Ex. A**.

Each of the Defendants is either an owner or operator of Porn.com.  Dkts. 16, p 9-10; 67-1; 67-3.  In November 2015, 64 of AMA's copyrighted full-length videos and numerous AMA images were unlawfully displayed on Porn.com, put there by the owners and operators of Porn.com. Dkt. 16, p 11-14; **Exhibit 1**, p 3-6, ¶¶ 12-20.  It is undisputed that both Sagan and Cyberweb are owners of Porn.com. Dkts. 51-1; 38-4.  Cyberweb takes little action in actually operating Porn.com.  Dkts. 27-3; 70-1; 70-2; 117; 117-1, pp 43-44, 49; 117-2; 117-3, pp 7-8.

Defendants improperly rely on a separate contract with GIM, not a party to this lawsuit, which is a Barbados entity. In the Barbados case, Defendants described GIM as a

---

[1] Paragraph 63 of the First Amended Complaint references this relationship, not the CPA as alleged by Defendants.

licensing entity, licensing content from third-parties.  Dkts. 33-3 at Ex. E; 117-2, pp 17, 23-24, 38-39.  GIM owns and/or operates *many* web sites, including Pimproll.com, TrafficForce.com, Wankz.com, and HostedTube.com.  HostedTube.com is a turnkey platform that allows companies to "Build your own hosted tube in under 5 minutes." Companies register a domain and point it to HostedTube's servers, and GIM builds and hosts a video site and streams GIM licensed content under the CPA to end users.  DMCA Agent filings with the U.S. Copyright Office show at least a few hundred GIM web sites, many of which legally display AMA content provided to GIM under the CPA.  Porn.com is **<u>NOT</u>** one of these GIM web sites.  **Exhibit 1**, p 11, ¶ 35.  Netmedia does the following related to the Porn.com web site: (1) programming, design, reviewing content, commenting, advising, technical changes/upgrades, uploading content; (2) day-to-day business operations; (3) accounting; (4) testing/diagnostics; (5) weekly meetings with Cyberweb regarding technical aspects; (6) monthly reporting to Cyberweb regarding changes, revenues, traffic performance, industry issues, server use, and IP changes; (7) exclusive full access to servers; and, (8) exclusive control over pricing negotiations.  Dkts. 117-1, p 91-92; 117-3, pp 33-36, 76, 80-85, 108-09, 129-31; 117-5; 117-6; 117-7; 124-3 at Ex. D p 41, 87-88; 124-7.  None of these duties implicate GIM Corp, GIM Corp does not control these duties, and does not own Porn.com.  Netmedia, in a suit filed in Barbados, admits that it operates Porn.com directly under its own agreement with Cyberweb and provides services to Porn.com including uploading content (¶¶1.2.1 and 4.4.3 of the Claim Form). Dkt. 38-3, Ex. F.

Cyberweb claims that it connects with Netmedia through a "Technical Services Agreement" between Cyberweb and GIM Corp (never produced, and in contradiction to the Barbados suit).   Cyberweb allegedly subcontracts with GIM, and then GIM subcontracts this very same work with Netmedia. The Agreement between GIM and Netmedia explicitly states that it is NOT an agent of GIM.  **Exhibit 2**, GIM-Netmedia

Agreement at Section 11.1.  Neither Netmedia nor Cyberweb reports to GIM any duties on Porn.com.  GIM has no control over Cyberweb or Netmedia in the operation of Porn.com.

Koonar is closely involved with Porn.com.  Dkts. 117-2, p 43; 117-3, p 18.  Koonar claimed to have negotiated a "Technical Services Agreement" (never produced, in contradiction to the Barbadian lawsuit) that allows GIM to render services to Cyberweb. Dkt. 117-2, p 43.  Koonar formed both GIM and Holding Corp. No. 1, the company that is a 100% shareholder of GIM and 50% shareholder of both Cyberweb and Sagan, and Koonar is the President and sole Director of Holding Corp. No. 1.  Dkt. 117-2, p 17-19, 32-36, 38-41, 45-47.  Koonar is also the President and director of Netmedia, and he is separately the president of GIM. Dkts. 100-1; 124-6.

**B.    The CPA**

Defendants argue that the 2012 CPA between AMA and GIM governs Defendants' unlawful acquisition and display of AMA's infringed content on Porn.com.  In September 2012, AMA predecessor SSC Group LLC entered into the CPA with GIM for revenue-sharing on content provided **to GIM**.  Dkts. 52-1; 49-2; 33-2.[2]  Called PaidPerView, this revenue sharing program was operated by GIM through the website PaidPerView.com. None of the *limited* promotional sample videos provided by AMA to GIM is at issue in this case. Dkt. 16, p 10-11.

The CPA explicitly states "with respect to any and all Content that" AMA submits or provides to GIM, AMA grants *GIM* a **nontransferable** license "to use, publish, display, and distribute the Content on the Websites(s), solely for the Purpose," CPA § 1.01; CPA Background § B.  The "Purpose" carefully limited only GIM the ability to stream provided video content to end users only on those Website(s) ("*Licensee* can provide…").  The

---

[2] In December 2012, GIM signed up the AMA's affiliate program just as Cyberweb did in 2007.  AMA pays GIM for revenue generated by Internet traffic directed to Plaintiff's paid membership sites.  This enabled GIM to be paid for traffic sent to AMA web sites, and was done separate from Cyberweb. Dkt. No. 33-2, Ex. B.

license does not include images, and revenues are only earned on videos.  In addition, §
1.01 states that the license is subject to the terms and conditions of the agreement. Section
5.1 of the CPA placed an obligation on GIM to "establish, build, maintain, and develop the
Websites featuring the content," as well as "market access to the Content via the
Website(s), *all under the Licensee's [GIM's] brand.*" Dkts. 49-2, Ex. A; 33-2, Ex B.  GIM
is required to perform all encoding, processing, and uploading of the content, CPA § 5.5,
which necessarily requires GIM to operate the sites. GIM warrants that it will perform all
obligations.  CPA § 6.2(iv).  1.4 states "Licensee agrees that it will only provide streaming
of the content in both the public and private areas of the Website(s)." The license does not
cover third parties who acquire illegal content on their own and stream it for themselves,
just by using Traffic Force ads.[3]

The CPA included specific provisions that dictate the manner and form that AMA
would provide content **to GIM** for use on GIM's websites.  The CPA states AMA may
provide content through GIM's PaidPerView.com, or physically mail content to GIM.
Paragraph 4.1 of the CPA states explicitly that Licensor, AMA, shall provide content in a
"*mutually agreed form.*" Submitted videos under 6 minutes are rejected by GIM.  Dkt. 49-
2, Ex. A; Dkt. No. 33-2, Ex. B.  **The CPA only licenses video and audio content, not
image content.**

Importantly, Paragraph 4.6 dictates that Licensor (AMA) "shall have the *sole*
responsibility for providing" (emphasis added) the content *to Licensee* in one of the
acceptable methods of delivery set forth in Ex. B.  Every Acceptable Method of Delivery
requires an "affirmative action" of AMA to deliver content **to GIM,** including by mailing
content to GIM's address.  *Id.*  Because this content was obtained by Defendants and
displayed by Defendants on Porn.com, this content was **never provided to GIM Corp**,
and falls squarely **outside** the license under the CPA.  Defendants have focused on AMA
"indirectly" providing content, but it is to the wrong party (Cyberweb/Sagan).

---

[3] Traffic Force is just an advertising platform.  **Exhibit 1**, p 15, ¶ 52.

As consideration for the license, GIM pays AMA a share of advertising revenue generated on the pages of its websites that streamed the content. The CPA provided a mechanism for GIM to earn money from AMA. Per § 3.9, if the content *provided by AMA* to GIM originated from or is associated with an AMA web site, and the display of the content resulted in Internet traffic to AMA's websites, GIM shared in revenue generated from such traffic. § 3.9 does not grant a license to third parties for *any* AMA content originating from or associated with AMA paid membership sites. *Id*.

In sum, the *nontransferable* license applies only to: (1) content *provided by AMA;* (2) content received and streamed *by GIM*; (3) on web sites established, built, maintained, and developed *by GIM*; (4) where the web site advertisements are controlled by Traffic Force.[4] Section 1.1 forecloses the existence of *any* additional licenses to third-parties and to any content not provided by AMA ("No license to any other intellectual property of Licensor is provided hereby.") Section 1.3 reserved all rights not licensed to GIM back to AMA. The license is only for the term, commencing on the Effective Date.[5]

**None of the infringed content in this case was provided by AMA, provided to GIM, streamed by GIM, or streamed on a web site that was established, built, maintained, or developed by GIM.** None of the GIM owned and operated web sites, e.g. Pimproll.com and Hostedtube.com, display this same infringed content. **Exhibit 1**, p 11, ¶ 36. The illegal material only appeared on Porn.com.

The CPA clearly does not purport to grant licenses to third-parties to illegally acquire and stream AMA videos located throughout the Internet and treat them as provided by AMA to GIM and, therefore, "licensed." Such would contradict Sections 1.1, Clause B, 4.1, 4.3, 4.4, and 4.6 of the CPA. Defendants assert they assigned, for reporting or

---

[4] Defendants' assertion that the only requirement for display of CPA related content is for a web site advertisement to be controlled by Traffic Force is wrong.

[5] This is important since some of the infringed videos have posting dates which pre-date the commencement of the CPA.

statistical purposes only (not distribution), illegally displayed AMA videos on Porn.com not actually provided by AMA (full length videos they or third parties uploaded) and that AMA acquiesced to such actions.  Specifically, they assert that, since 2012, Netmedia manually reviewed all third-party user uploaded content on Porn.com (AMA alleges the videos in question were not uploaded by third-party users), evaluated watermarks (or copyright notices) to determine whether they were unauthorized uploads, and thereafter assigned unauthorized illegally uploaded videos to a content producer's promotional account. Dkt 89-1; Dkt. 127-1, Ex. A; Dkt. 72-1; Dkt. 74-1.  This evidence shows that the infringed videos were never assigned and AMA never acquiesced:

- The infringed videos fail to include AMA advertising links. *Declaration of Jason Tucker*, attached as **Exhibit 3**, pp 3-4, 11-15, Exs. B-E.

- Defendants' own AMA account summary establishes that the infringed videos are not included. **Exhibit 1**, p 7, ¶ 24.

- Defendants' factual position changed over time as a result of court ruling, and the ending position contradicted their starting position.[6] **Exhibit 1**, p 7-8, ¶¶ 25-27.

- The red asterisk designation of assigned videos did not exist.  Dkt. 89-1, Ex A; Dkt. 127-1, Ex A; Dkt. 72-2; Dkt. 74-1; **Exhibit 1**, p 8, ¶ 28.

- The full text of the Skype logs establish that all parties understood and agreed that Defendants would delete and remove pirated AMA content from Porn.com *and* that Defendants clearly stated there was no review process. **Exhibit 1**, p 8-12, ¶¶ 29-39; Dkts. 83:2, 4-6; 83-1:2-3 & Ex. A; 83-3:2-3 & Ex. A; and 100:10-12 (Skype chat logs).

    In addition: a series of AMA's infringed content on Porn.com were posted before the CPA commenced and thus cannot be a part of the CPA; and Defendants' "assignment scheme" does not include images posted on Porn.com, and cannot be a part of the CPA.

---

[6] The Ninth Circuit recognized Defendants' changing positions, as Judge Wardlaw stated at oral argument, "Actually, you changed your position multiple times and finally landed at the end of this series of positions you took on the Koonar declaration that there was an assignment of rights without any detail about this whatsoever."  *Declaration of Spencer Freeman,* attached as **Exhibit 4**, p 2, ¶ 7, and at Ex. E, Trans. 19:11-16.

1   **III.   ARGUMENT**

2          Courts considering a motion to dismiss based upon a forum selection clause must

3   resolve factual disputes and make all reasonable inferences in favor of the nonmoving

4   party, unless and until it holds an evidentiary hearing.  *Murphy v. Schneider Nat'l Inc.,* 362

5   F.3d 1133, 1138-39 (9th Cir. 2004).  Here, Defendants' motion is premised entirely on the

6   false assertion that they can take advantage of the CPA's FSC under various specious

7   theories.  Each one fails.

8          **A.      Defendants Are NOT Agents of GIM.**

9          Defendants argue, falsely, that they can take advantage of the FSC as agents.

10  Agency is the fiduciary relationship that arises when one person (a "principal") manifests

11  assent to another person (an "agent") that the agent shall act *on the principal's behalf* and

12  subject to the principal's control, and the agent manifests assent or otherwise consents so

13  to act.  *Rest. 3d of Agency*, § 1.01.  To establish an agency relationship, a party must set

14  forth evidence: (1) that the agent holds power to alter legal relations between the principal

15  and third persons and between the principal and himself; (2) that the agent is a fiduciary

16  with respect to matters within the scope of the agency; and (3) that the principal has right

17  to control the conduct of the agent for matters entrusted to him. *Solid Host, NL v.*

18  *Namecheap, Inc.*, 652 F. Supp. 2d 1092, 1111 n.53 (C.D. Cal. 2009).

19         Each defendant claims to be an agent of GIM having standing to enforce the CPA

20  and the FSC.  In examining each defendant individually, it is clear that there is no agency

21  relationship with GIM, *not as it relates to Porn.com or AMA's infringed content*.  None of

22  the Defendants present any facts supporting a conclusion that GIM is their principal, that

23  they hold power to alter relationships between third parties and GIM, that they are

24  fiduciaries with respect to matters within the scope of the agency, or that GIM retains the

25  right to control them with respect to their duties.  Defendants were operating Porn.com

26  separate from GIM and the CPA, and on their own behalf.

There is simply no evidence that Sagan is an agent of GIM. Sagan is Cyberweb's agent. *See,* **Exhibit 5**, Cyberweb-Sagan Agreement. With regard to Cyberweb, the evidence disclosed by the Defendants was that Cyberweb hired GIM in a technical services agreement (copy never produced). If true, Cyberweb would be the principal, not the agent.

It is clear that Cyberweb engages in acts regarding Porn.com that have nothing to do with GIM or the CPA. Cyberweb owns and operates Porn.com, GIM is only involved in that GIM sells Porn.com advertising through Traffic Force. GIM misrepresented to AMA that Porn.com was a GIM website (it is not). While content that was submitted to GIM did appear on Porn.com, these were the exact program materials AMA provided to Cyberweb via its affiliate marketing program (sample videos). Cyberweb joined as an AMA affiliate in 2007, with a contract governing that material – an act that was clearly on behalf of Cyberweb and not GIM (the CPA was not even signed until 2012). Cyberweb regularly confers directly with Netmedia on the operations of Porn.com, not GIM, under their own agreement independent of GIM.

The operation of Porn.com is *not* on behalf of GIM. Cyberweb is not GIM's agent at all and certainly not in operating Porn.com. Cyberweb's act of stealing and displaying AMA's copyrighted works was on its own, not on behalf of GIM.

Netmedia Services does have a technical services contract with GIM specific to the operation of GIM's many web sites. However, this contract expressly states that Netmedia *is not an agent of GIM.* Since the contractual relationship clearly states it is not an agency relationship, Netmedia cannot now come forward and claim to be an agent.

Interestingly, while the Netmedia-GIM services contract exists, it does not explicitly state for work on Porn.com. In the Barbados suit, in Paragraph 1.2.1 of the Claim, Defendants expressly assert that **Cyberweb employs Netmedia *directly* under a different Technical Services Agreement relating to Porn.com.** Thus, there is no Netmedia-GIM agreement pertaining to Porn.com; Netmedia works for Cyberweb independently of GIM.

Koonar's actions relating to the operation of Porn.com are not as an executive of GIM.  Since GIM does not own Porn.com the operations of the site cannot be for its benefit or on its behalf.  Thus he cannot be an agent of GIM relating to the operation of Porn.com, especially when Netmedia has its own contract with Cyberweb.

Defendants now assert that AMA alleged they are all agents of GIM, and thus they are able to enforce the FSC.  However, AMA has not alleged the Defendants to be *legal agents* of GIM, and certainly not in the scope of operation of Porn.com.  To the extent that any prior AMA briefing is interpreted as making such assertions, it is of great importance to recognize that such assertions were made prior to jurisdictional discovery, at which time it was made clear that Defendants are not agents of GIM.  Koonar is alleged to have taken action in the infringement, but on his own behalf, and on behalf of the Defendants (not GIM).  AMA has not alleged GIM has anything to do with the operation of Porn.com or the infringements, and has not alleged GIM controls actions of Defendants or that Defendants can legally bind GIM.  The assertion of agency relationships between any of the defendants and GIM is not supported.

Defendants cite this Court's ruling in *Hillis v. Heineman*, 2009 U.S. Dist. LEXIS 64868 as controlling in this case.  It isn't.  In *Hillis,* a corporation's president/CEO and corporate counsel were each determined to have access to the FSC in a stock subscription agreement after each were alleged to have engaged in fraudulent sale of stock.  The CEO was the signatory to the agreement and the corporate counsel drafted the agreement.  Both were involved in the fraudulent sale of company stock.  *Id*. at 6-9.  Both were agents of the company and both directly involved *in their roles as agents for the company*, in the unlawful act.  (Agency was not merely based upon plaintiff's allegation.)  The facts here are distinguishable.  Defendants operate a third-party website separate and independent of GIM's websites, and the illegal acts occurred on the website – having nothing to do with licensed content AMA delivers to GIM on GIM websites for GIM's use.

In *Pat Pellegrini Flooring Corp. v. Itex Corp,* 2010 U.S. Dist. LEXIS 25801, quoted by Defendants, the court determined that personal jurisdiction pursuant to an FSC existed over non-signatories to a contract.  The non-signatories were brokers and clients of the contract *and* the contract explicitly stated all provisions of the contract applied equally to the brokers and clients.  Adding that the acts of the non-signatories were all conducted pursuant to the underlying contract, the court found personal jurisdiction due to the FSC. *Id.* at 29.  The CPA at bar does not extend the FSC (or any of its terms) to the Defendants. Further, the content was acquired by the Defendants illegally and independently of AMA and GIM for use on a third-party website.

Even if the Defendants are agents of GIM (they are not), that alone is not sufficient to grant them access to the FSC.  In order for an agent to gain access to such a clause, the key is whether the actions of the agent actually relate to or arise out of the contract containing the clause. *Britton v. Co-Op Banking Group, Inc.* 4 F.3d 742, 747 (1993). **Here, the CPA grants a nontransferable license only for GIM to stream AMA provided content on web sites that GIM established, developed, and maintained, and which utilize Traffic Force**.  The Defendants are accused of stealing AMA content (thus not AMA provided, nor delivered to or streamed by GIM) and displaying it on Porn.com (not established, developed, or maintained by GIM).  The infringement does not relate to or arise out of the CPA or any alleged scope of supposed duties for GIM or the CPA.

Non-signatory agents can only enforce a forum selection clause ("FSC") if there is evidence that the contractual parties intended for the agent to benefit from the clause. *Morgan Tire of Sacramento, Inc. v. Goodyear Tire & Rubber Co.*, 60 F. Supp. 3d 1109, 1119 (E.D. Cal. 2014).  No such intent is manifested here.

**B.   Defendants Are NOT Third Party Beneficiaries of CPA.**

Defendants also argue they may take advantage of the FSC as third party beneficiaries of the CPA.  Not so.  If parties to a contract had no intention to benefit a third

party, that third party has no rights under the contract.  *Britton,* 4 F.3d at 745*; Sherman v. British Leyland Motors, Ltd.,* 601 F.2d 429, 440, n. 13 (9th Cir. 1979).  The fundamental goal of contractual interpretation is to effect *mutual* intention of the parties.  *Foad Consulting Group, Inc. v. Musil Govan Azzalino,* 270 F.3d 821, 829 (2001).

The CPA between AMA and GIM is simple:  AMA submits promotional content **to GIM** through PaidPerView.com, and **GIM** is permitted to provide streaming and downloading on websites **GIM** established, developed, and maintained and whose advertisements are operated by TrafficForce.  AMA and GIM share in generated revenue.  GIM performs under the CPA exactly as prescribed on many GIM websites having nothing to do with Porn.com, and none of the Defendants are considered crucial to the function of the CPA in those instances.

A review of the CPA quickly illustrates that there were no third parties intended to benefit from the CPA. The agreement itself expressly contemplates GIM to perform all necessary acts under the contract.  GIM is required to stream the content.  GIM is required to establish, build, develop, and maintain the web sites where the content is streamed. AMA has the sole responsibility for providing content to GIM.  GIM explicitly warrants that it has the ability to meet all obligations.  The license is nontransferable, and therefore cannot be conveyed or sublicensed to others.  There cannot be third parties intended to benefit from this contract, when all tasks to fulfill the contract are expressly delegated to the actual parties of the contract.

There is no evidence that AMA **intended** to benefit any third party under the CPA, and certainly there is no evidence that AMA wished to benefit Defendants under the CPA. The fact that GIM utilized others (non-agents) to assist (as independent contractors) with the administration of the PaidPerView.com program does not translate to AMA intending to confer benefits to anyone other than GIM.  Without AMA's mutual assent to benefit Defendants, those parties simply cannot be deemed third party beneficiaries as a matter of

law. *Britton, supra; Foad, supra.*  Moreover, since the CPA has nothing to do with images, Defendants' infringement of AMA's images could not be governed by a theory of third party beneficiaries, nor could Defendants' infringement prior to the execution of the CPA.

## C.   Defendants Do NOT Have Standing To Enforce The CPA Under *Manetti-Farrow*.

Defendants cite *Manetti-Farrow* as if the Ninth Circuit Court of Appeals created a new class, defined only as "transaction participants," permitting enforcement of a forum selection clause as non-signatories to an agreement.  The Court did no such thing.  Instead, the Ninth Circuit Court of Appeals simply discussed existing law regarding the application of forum selection clauses to non-signatory, third-party beneficiaries.  In a footnote, the Court stated, "a range of transaction participants, parties, and non-parties, should benefit from and be subject to forum selection clauses."  Importantly, the Ninth Circuit cites *Coastal Steel Corp. v. Tilghman Wheelabrator, Ltd.,* 709 F.2d 190 (3rd Cir. 1983) for this proposition.  The *Coastal* Court relied expressly and solely upon the law of third party beneficiaries.  Thus, again, this "*Manetti-Farrow* issue" is one of third party beneficiary status, not a new or separate class of "transaction participants."

Even if *Manetti-Farrow* created a new class that can enforce forum selection clauses (it does not), the FSC in the CPA would not extend to the Defendants.  The CPA is a contract whereby AMA provided a nontransferable license to GIM for content AMA provides to GIM, and GIM streams that content on sites created and maintained by GIM whose advertising is controlled by Traffic Force.  Thus, the CPA ensures that GIM hosts and serves the video content it receives to end-users by limiting the streaming/downloading to only GIM.  This is explicitly reinforced by Sections 1.4 and 5.1 of the CPA.  (GIM "shall" be the party to establish, build, develop and maintain the websites that are to feature AMA's licensed content.).

Defendants cite *Holland Am. Line Inc. v. Wartsila N. Am., Inc.,* 485 F.3d 450 (9th

Cir. 2007) and *Manetti-Farrow,* 858 F.2d 509 (9th Cir. 1988) (neither copyright license cases) arguing that a non-signatory defendant can enforce a contract's FSC if the defendant's conduct relates to the contractual relationship at issue.  While these cases granted non-signatories access to an FSC, the limited circumstances there do not apply here.  The Defendants' conduct sounds in outright infringement, not the limited use rights granted by the CPA to GIM.

In *Manetti-Farrow,* the plaintiff asserted tort claims after Gucci Parfums terminated an exclusive dealership agreement.  The non-signatory defendants included the parent corporation Guccio Gucci, and sibling corporation Gucci America (each expressly ratified the contract), as well as directors of the same corporations.  In a footnote, the Court dismissed plaintiff's argument that only Gucci Parfums had access to the FSC, stating that a range of *transaction participants* benefit from the FSC, including non-parties, citing third party beneficiary law.  *Manetti-Farrow,* 858 F.2d at fn. 5.

In *Holland,* the non-signatory defendants, BVNA and BV Canada, successfully asserted an FSC in a contract between plaintiff and Bureau Veritas.  Therein, BVNA and BV Canada performed the same services for plaintiff that Bureau Veritas was contracted to provide.  Bureau Veritas, BVNA, and BV Canada were related entities providing the same services to the same clients.  The Court, citing *Manetti-Farrow*, found that the FSC in plaintiff's contract with BV applied equally to BVNA and BV Canada because any transactions between either BVNA or BV Canada and plaintiff took place <u>as part of the larger contractual relationship between</u> plaintiff and Bureau Veritas.  *Id.* at 456.

In both *Holland* and *Manetti-Farrow*, the non-signatory transactional participants were active participants in performing the purpose of the contract – known at the time of the contracts and throughout performance, and the subject of the lawsuits.  They were necessary and clearly a part of the overall contractual relationship.  This case differs because Defendants are not active participants or necessary parts of the contractual

relationship between AMA and GIM for the use of promotional videos. In fact, based upon the plain language of the contract, they are not even contemplated as being involved. Moreover, they operate Porn.com on their own, clearly not as a part of GIM or the CPA and having nothing to do with either.  And, Cyberweb has its own direct contract with AMA governing AMA's content.

This dispute is about whether a license granted by AMA to GIM covers AMA content illegally obtained by third-parties Koonar, Netmedia, Cyberweb and Sagan which they then streamed to end users on Porn.com - having nothing to do with and separate from GIM.  The Defendants attempt to relate GIM to their infringement through an alleged assignment of the infringements to AMA's CPA account.  While it may be that the Defendants were hired to provide certain services to the CPA program (only Netmedia can make such a claim), they also operate Porn.com, a completely separate venture and web property.  Cyberweb/Sagan acts on its own behalf in the operation of Porn.com, and separately hired Netmedia to perform work for Porn.com.

Further, their attempt to link the infringements to AMA's CPA account is nefarious. Defendants' intentional misrepresentation can be summed as follows: they say the infringed works only appearing on Porn.com were assigned to AMA's CPA account and that AMA knew and consented to such assignment, a scheme they claimed was going on for years.  These allegations are wholly unfounded.  It is undisputable that the infringed works were never assigned to AMA's CPA account.  A review of the videos themselves shows the lack of an AMA advertising banner (under Section 3.9) adjacent to the video, while all videos associated with AMA's CPA account are displayed with such a banner. Since these do not, they were not assigned/associated.

Bradbury's declarations early in this litigation presented a full summary of AMA's CPA account.  The summary comports with AMA's own records proving only content AMA directly submitted to GIM was treated as licensed.

Thus, Defendants' own evidence established that the infringed works were not part of the CPA account.  And, AMA never consented to licensing of the infringed works to the CPA account.  *In fact*, AMA *explicitly* instructed Defendants to delete all infringed works (which they affirmed).  Moreover, it is clear from Mr. Ross's Skype logs that Defendants *were not* reviewing third party uploads and assigning them, as, per his words, such review would open them up to substantial legal liability.[7]

The previous finding that Defendants are affiliates of GIM does not mean that their actions were closely related to the CPA.  It is clear and undisputable the Defendants operate Porn.com on their own for their own benefit.

Defendants' attempt to closely relate their operations of Porn.com with the operation of the GIM contract fails.  Defendants' actions in acquiring illegal AMA content and displaying to the public for free on Porn.com does not relate to the CPA.  Defendants further fail to address how their conduct of infringing AMA images and content posted before the CPA ever commenced are closely related to the CPA.

### D.    Defendants Do NOT Have Standing To Enforce CPA as Implied Licensees.

Defendants assert that they are implied licensees of GIM, and thus entitled to enforce the FSC,for the following reasons: the CPA would be worthless without an implied license on Porn.com because GIM has no websites; AMA knew of GIM material being displayed on Porn.com; and AMA knew the Defendants were performing tasks under the CPA as GIM's agents.  They're wrong.  First, even if these assertions were true (they are not), Defendants have presented no case law or logical argument supporting that an implied

---

[7] The Ninth Circuit was troubled by Defendants' misrepresentations of the Skype logs in an attempt to show AMA knew of and consented to such assignments, Judge Wardlaw stating:  "But that was kind of misleading, wasn't it? . . .  When you didn't have them omitting certain sections and it was read in full, it kind of told a different story." **Exhibit 4**, p 2, ¶ 7, and at Ex. E, Trans. Oral Argument 20:2-8.

license to display GIM submitted content on Porn.com means the implied license automatically attaches under the CPA.  The explicit language of the CPA explicitly states after granting GIM a nontransferable license, "No license to any other intellectual property of Licensor is provided hereby." Thus, no additional licenses can be created under the CPA. Yet the Defendants are arguing for the creation of additional licenses for AMA intellectual property, to third parties, under the CPA, in violation of this language.  Worse still, the CPA only encompasses material provided *by AMA to GIM*.  The copyrighted works at bar were ***not*** provided by AMA.  Instead, these full-length videos (instead of promotional clips) were obtained through improper means and without AMA's knowledge or consent.

The CPA would also *not* be worthless without an implied license on Porn.com. Content that AMA submits to GIM is displayed on literally hundreds of web sites established, developed, and maintained by GIM – completely separate from Porn.com.  The CPA has clear value separate from and regardless of Porn.com and any actions on Porn.com.   The claim GIM has no websites is demonstrably false.

AMA was aware that GIM submitted content was streamed on Porn.com (with the belief that GIM was streaming). AMA also knew this was the exact same program materials AMA provided to Cyberweb via its affiliate program where AMA and Cyberweb had their own contractual relationship.  Likely, if AMA were to sue these Defendants for display of promotional content AMA submitted to GIM, they may have an implied license defense, but not arising under or relating to the CPA, and thus not subject to the FSC. There is no valid argument or case law to support an implied license extends further or grant access to another's FSC based upon an independent course of conduct where a contract forecloses additional licenses.  Further, AMA's contact with the Defendants, as represented in Skype chat logs, *was not* regarding the CPA account as Defendants allege, but rather with regard to illegal content displayed on Porn.com.

In *Foad,* 270 F.3d at 821, an implied license was found in favor of an architectural

firm using engineering plans to develop a final site plan.  The contract with the engineering firm granted an implied license to the architect in order to complete the project it was designed for.  *Id.* at 832.  (There was no issue, and thus not finding, that the implied license carried with it an FSC.)  Here, the content was illegally pirated online, separate and apart from GIM and the CPA, and nothing to do with GIM allowing a "subsequent" entity fulfilling the requirements or purpose of the CPA on GIM websites.  In *Effects Assocs v. Cohen*, 908 F.2d 555 (9th Cir. 1009), upon verbal contract, plaintiff granted an implied license based upon plaintiff creating the work at the defendant's verbal request intending that the defendant copy and distribute it.  *Id.* 558-59. Here, AMA has its own contract with Defendants (without a FSC) *and* specifically demanded that Defendants NOT use or display any unauthorized AMA content.  Because AMA expressly objected and the content was illegally obtained, *Effects* does not support an implied license under the CPA.  In *Keane Dealer Servs. V. Harts*, 968 F. Supp. 944 (S.D.N.Y. 1997), parties disputed over a software program after defendant purchased retail branches and software that contained an interface developed in part by plaintiff.  Smith Barney's purchase resulted in an implied license for the interface as there was no objection to its known use.  **Objection** there meant ***revocation*** of any implied license.  *Id.* at 947.  Such facts are simply not analogous to the instant case, *and*, quite importantly, AMA did object to Defendants' use of any content that AMA had not submitted to GIM.  AMA demanded that the content be deleted/removed.  In *Field v. Google, Inc.*, 412 F. Supp. 2d 1106 (D. Nev. 2006), absent any explicit agreement between the parties, the Court looked to conduct to determine the existence of an implied license.  The Court decided that by requesting Google to index/crawl his website and not taking standard procedures to opt out, Field had acquiesced to Google caching his images.  *Id.* at 1115-16.  Once again, this case is not instructive here.  AMA specifically objected to Defendants' use of illegally provided material, and AMA made it clear that Defendants were not granted license to use any other content for any purpose. A perceived

implied license would be revoked.  Therefore, the "implied" license argument fails entirely.

In *Gen. Protect Group, Inc. v. Leviton Mfg. Co.,* 651 F.3d 1355 (Fed. Cir. 2011), an FSC was triggered by an implied license arising from a continuation patent stemming from a settlement agreement, *between the parties*.  *Id.* at 1358.  The instant matter is clearly distinguishable.  Here, third parties are baselessly arguing for an implied license based upon a different company's restrictive *nontransferable license*, a manufactured and provably false course of conduct, the existence of a direct contract between the relevant parties (the FYC Terms & Conditions), and language in the CPA that explicitly stated the document does not provide for any other licenses.  Simply put, no implied license exists.

### E.    The CPA was NOT Assigned to Defendants.

Finally, Defendants return to the assignment argument the Ninth Circuit specifically rejected: "[o]n this record, we are unable to conclude that Defendants were valid assignees of GIM's rights under the CPRA."  Now, Defendants present a cursory assignment argument based upon the exact record.  On its face, Defendants argument must be denied.

Defendants argue that based solely upon two references from prior pleadings wherein AMA supposedly admitted to assignment of rights, the Court should find assignment based upon the same record the Ninth Circuit reversed such a finding.  First, Defendants point to Para. 63 of the First Amended Complaint.  However, AMA's reference to Defendants as an affiliate specifically and solely refers to the affiliate relationship established by Cyberweb in 2007, noting Paragraph 13 of AMA's terms.  There simply is no admission or allegation that GIM rights were assigned to Defendants.

Second, Defendants point to one sentence in a brief filed by AMA's counsel wherein a statement was asserted that GIM granted Netmedia rights to AMA's content.  Even if a comment by counsel were valid evidence of any assignment (it is not), the statement hardly alleges that GIM assigned the CPA, inclusive of the FSC to Netmedia.  <u>The Defendants admitted in Barbados no assignment of rights took place</u>.  *Declaration of Tariq Khan,*

attached hereto as **Exhibit 6**, p 6, ¶ 29.  Moreover, it's a matter of impossibility under law for the license to be assigned absent an assignment of the *entire* Agreement, since the license is "nontransferable" (an express transfer restriction) which blocks its independent assignment as a right.  *See Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1107 (9th Cir. 2010).

Defendants have the burden of setting forth actual evidence that an assignment of the **CPA** (***obligations***, not just rights) took place.  Defendants have wholly failed to do so, even after the clear guidance by the Ninth Circuit regarding what was required.

### F.      Mr. Koonar Does NOT have Standing.

This Court previously allowed Koonar to enforce the FSC *after finding assignment* to the Defendants.  The Court then allowed him to enforce as an executive of Netmedia, and as a shareholder of Cyberweb.  That assignment has been vacated.

The allegations against Koonar are *not* in relation to his role with GIM, but rather in his role as president of Netmedia services and his personal role with Porn.com.  To find that Koonar has access to the CPA's FSC would be to find that the contracts follow Koonar *personally* regardless of whatever company he is acting under.  The CPA is NOT with Koonar, but with GIM and belongs solely to GIM.  Koonar is NOT involved because of his position as President of GIM.  GIM is not involved in this case.

Koonar's alleged actions pertaining to infringement simply do not closely relate to the CPA.  Koonar is president of Netmedia, which performs all technical and daily operations of Porn.com, including uploading content.  Koonar's oversight of the tasks performed at Netmedia on Porn.com is for the benefit of Netmedia and Porn.com, not GIM.  They are separate and distinct entities with different purposes.

## IV.      CONCLUSION

For the reasons stated herein, AMA respectfully requests that the Court deny Defendants' Motions to Dismissed based upon Forum Non Conveniens.

DATED this 31st day of August, 2018.

MANOLIO & FIRESTONE, PLC

By: _/s/ Veronica L. Manolio_
Veronica L. Manolio
8686 E. San Alberto  Dr., Suite 200
Scottsdale, Arizona 85258
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of August, 2018, I electronically transmitted the foregoing document to the Clerk's office using the CM/ECF system for filing.  Copies will be transmitted via CM/ECF to the following recipients:

Erica J. Van Loon
Glaser Weil Fink Howard Avchen & Shapiro LLP
10250 Constellation Blvd.
Los Angeles, CA 90067
evanloon@glaserweil.com
*Attorneys for Defendants*

Steven Basileo sbasileo@glaserweil.com
Glaser Weil Fink Howard Avchen & Shapiro LLP
10250 Constellation Blvd.
Los Angeles, CA 90067
*Attorneys for Defendants*

Valentin Gurvits vgurvits@bostonlawgroup.com
Boston Law Group, PC
825 Beacon St.
Newton Centre, MA 02459
*Attorneys for Defendants*

Spencer Freeman sfreeman@freemanlawfirm.org
Freeman Law Firm, Inc.
1107 ½ Tacoma Ave. S.
Tacoma, WA 98402
*Attorneys for Plaintiff (pro hac vice)*

By: _/s/ Janel Rubert_