1   ERICA J. VAN LOON (admitted *Pro Hac Vice*)
    Erica.VanLoon@LathropGPM.com
2   LATHROP GPM LLP
    1888 Century Park East, Suite 1000
3   Los Angeles, California 90067
    Telephone:   (310) 789-4600
4   Facsimile:   (310) 789-4601

5   *Attorneys for Defendants Sagan Limited,*
    *Cyberweb Limited, GLP 5, Inc.,*
6   *1890933 Ontario, Inc., formerly known as*
    *Netmedia Services, Inc., and David Koonar*
7

8               IN THE UNITED STATES DISTRICT COURT

9                        DISTRICT OF ARIZONA

10

11  AMA MULTIMEDIA LLC, a Nevada          CASE NO. 2:16-cv-01269-PHX-
    limited liability company,            DGC
12
                    Plaintiff,            Hon. David G. Campbell
13
    v.
14
    SAGAN LIMITED, a Republic of
15  Seychelles company, individually and  **JOINT SUBMISSION OF BRIEFS**
    d/b/a PORN.COM; CYBERWEB LTD.,
16  formerly MXN LTD., a Barbados         **FROM MOST RECENT NINTH**
    Company, individually and d/b/a
17  PORN.COM; NETMEDIA SERVICES           **CIRCUIT APPEAL**
    INC., a Canadian Company individually
18  and d/b/a PORN.COM; GLP 5, Inc., a
    Michigan Company individually and
19  d/b/a/ Trafficforce.com; DAVID
    KOONAR, an individual; and John Does
20  1-20,

21                  Defendants.

22

23

24

25

26

27

28

32939832

LATHROP GPM LLP
1888 CENTURY PARK EAST, SUITE 1000
LOS ANGELES, CA 90067

1    Pursuant to the Court's July 21, 2020 Order (Docket No. 181), Plaintiff AMA
2   Multimedia, LLC ("AMA"), and Defendants Sagan Limited, Cyberweb Limited, GLP
3   5, Inc., 1890933 Ontario, Inc., formerly known as Netmedia Services, Inc., and David
4   Koonar (collectively, "Defendants"), hereby jointly submit the briefs filed by AMA
5   and Defendants in the most recent Ninth Circuit appeal in this case, *AMA Multimedia,*
6   *LLC, v. Sagan Limited, et al.*, No. 18-17117:

7        Exhibit A:    Appellant's Opening Brief, filed on March 6, 2019

8        Exhibit B:    Answering Brief of Defendants-Appellees, filed on May 6, 2019

9        Exhibit C:    Appellant's Reply Brief, filed on June 26, 2019

10

11   DATED: July 22, 2020                     LATHROP GPM LLP

12                                            By: /s/ Erica J. Van Loon
13                                                Erica J. Van Loon

14                                            *Attorneys for Defendants Sagan*
15                                            *Limited, Cyberweb Limited,*
16                                            *GLP 5, Inc., 1890933 Ontario,*
                                             *Inc., formerly known as Netmedia*
17                                            *Services, Inc., and David Koonar*

18

19   DATED: July 22, 2020                     MANOLIO & FIRESTONE, PLC

20                                            By: /s/ Veronica L. Manolio
21                                                Veronica L. Manolio

22                                            *Attorneys for Plaintiff AMA*
23                                            *Multimedia, LLC*

24

25

26

27

28

# EXHIBIT A

NO. 18-17117

# United States Court of Appeals
# For the Ninth Circuit

AMA Multimedia, LLC,
Plaintiff–Appellant,

v.

Sagan Limited, et al.,
Defendants–Appellees.

Appeal from the United States District Court for Arizona, Phoenix
Judge David G. Campbell, Presiding
Case No. 2:16-cv-01269-DGC

# Appellant's Opening Brief

Spencer D. Freeman (25069)          Veronica L. Manolio (020230)
sfreeman@freemanlawfirm.org        vmanolio@mf-firm.com
Freeman Law Firm, Inc.              Manolio & Firestone, PLC
1107 ½ Tacoma Ave. South           8686 E. San Alberto Dr., Suite 200
Tacoma, WA  98402                  Scottsdale, AZ  85258
(253) 383-4500                     (480) 222-9100

*Attorneys for Plaintiff-Appellant, AMA Multimedia, LLC*

# Corporate Disclosure Statement

AMA Multimedia, LLC has no parent corporation or company, is not publicly traded, and does not have a publicly traded corporation owning ten percent (10%) or more of its stock or ownership/membership interest.

# Table of Contents

Table of Authorities..................................................................................iv

Jurisdictional Statement.........................................................................vi

Issues Presented.........................................................................................1

Statement of Case and Facts....................................................................2

    Appellees......................................................................................4

    The Claims and "Alleged Conduct" of Appellees..........................7

    The GIM Contract – "CPA"..........................................................10

    Revenue Sharing under the CPA..................................................11

    Content Covered by the CPA........................................................11

    The Full Scope of the CPA...........................................................13

    Appellees' Attempt to "Closely Relate" their Alleged Conduct
    to the CPA...................................................................................15

Summary of Argument……………………………………………………19

Argument...................................................................................................21

    I.    A Mixed Standard of Review Applies in this Matter........................21

    II.    The District Court erred in determining its previous ruling
        that the forum selection clause applies to AMA's claims was
        "not disturbed" on appeal .................................................................23

    III.    Appellees are *not* "transaction participants" under a
        *Manetti-Farrow* Analysis, and do not have standing to enforce
        the FSC................................................................................................26

        A.  *Manetti-Farrow* standard for non-signatory access
            to FSC……………………………………………..……...28

        B.  Appellees' conduct in copyright infringement does
            not "closely relate" to the CPA…………………..……..33

C.  Appellees present false bare assertions in attempt
to "closely relate" their alleged infringement
conduct to the CPA……...………………………….…42

IV.    Appellees are *not* third party beneficiaries of the CPA……………..48

V.     Appellees are *not* agents of GIM…...........…………………………51

VI.    Appellees are *not* implied licensees…...............................................54

Conclusion....................................................................................................58

# Table of Authorities

*Adams v. Raintree Vacation Exch., LLC,* 702 F.3d 436
  (7th Cir. 2012)....................................................................................31, 32

Argueta v. Banco Mexicano, S.A., 87 F.3d 320 (9th Cir. 1996)……....................21

*Britton v. Co-op Banking Grp.,*
  4 F.3d 742 (9th Cir. 1993)...............................................................40, 49

*Clinton v. Janger,* 583 F.Supp. 284 (N.S. I11. 1984)........................................28, 29

*Coastal v. Janger Wheelabrator Ltd.,* 709 F.2d. 190
  (3rd Cir. 1983)......................................................28, 29, 30, 32, 48

*Cooter & Gell,*
  496 U.S. 385 (1990)..............................................................................21

*Effects Assocs v. Cohen,* 908 F.2d 555 (9th Cir. 1009)...........................................56

*Field v. Google, Inc.,* 412 F. Supp 2d 1106 (D. Nev. 2006)...................................56

*Foad Consulting Group, Inc. v. Musil Govan Azzalino,* 270
  F.3d 821 (2001).........................................................................49, 55

*Gen. Protecht Grp., Inc. v.* Leviton *Mfg. Co.*,
  651 F.3d 1355 (Fed. Cir. 2011)..........................................................57

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 91 L.Ed. 1055,
  67 S.Ct. 839 (1947)............................................................................. 33

*Holland Am. Line, Inc. v. Wartsila N. Am. Inc.,* 485 F.3d 450
  (9th Cir. 2007).........................................................................30, 31, 47

*Keane Dealer Servs. v. Harts,* 968 F. Supp. 944 (S.D.N.Y. 1997).........................56

*Koon v. United States*,
   518 U.S. 81, 135 L. Ed. 2d 392, 116 S. Ct. 2035 (1996)......................................21

*Kukje Hwajae Ins. Co. v. M/V Hyundai Liberty*,
   294 F.3d 1171 (9th Cir. 2002)......................................21

*Manetti-Farrow, Inc. v. Gucci America, Inc.*,
   858 F.2d 509 (9th Cir. 1988)...........................7, 10, 15, 23, 26, 27, 28, 29, 31, 48

*Morgan Tire of Sacramento, Inc. v. Goodyear Tire & Rubber Co.*,
   60 F.Supp. 3d 1109 (E.D. Cal. 2014)......................................53

*Murphy v. Schneider Nat'l, Inc.*,
   362 F.3d 1133 (9th Cir. 2003)......................................21, 22, 23

*Sherman v. British Leyland Motors, Ltd.,* 601 F.2d 429, 440,
   n.13 (9th Cir. 1979)......................................49

*Solid Host, NL v. Namecheap, Inc.,* 652 F.Supp. 2d 1092
   (C.D. Cal. 2009)......................................51

*Tribank Capital Invs. v. Orient Paper,* 523 Fed. Appx. 484
   (9th Cir. 2013)......................................31

*United States v. Hinkson*,
   585 F.3d 1247 (9th Cir. 2009)......................................21, 23

## Rules and Regulations

Fed. R. Civ. P. 12(b)(1)......................................22

Fed. R. Civ. P. 12(b)(2)......................................22

Fed.R.Civ.P. 12(b)(3)......................................21, 22

17 U.S.C. § 101......................................vii

28 U.S.C. § 1291......................................vii

28 U.S.C. § 1331......................................vii

28 U.S.C. § 1338......................................vii

# Jurisdictional Statement

AMA sued the owners and operators of Porn.com in federal court, and the United States District Court, District of Arizona had jurisdiction over this matter under 28 U.S.C. § 1331 as this was a civil action arising out of the laws of the United States, specifically 17 U.S.C. § 101 *et seq*., and 28 U.S.C. § 1338 because it was a civil action involving allegations of copyright infringement.

This Ninth Circuit Court of Appeals has jurisdiction over this matter under 28 U.S.C. § 1291 because this appeal arises from a final decision rendered by the United States District Court, District of Arizona.

The date of the decision of the District Court decision was October 24, 2018. The Notice of Appeal was timely filed on October 26, 2018.

# Issues Presented

1.     Did the District Court incorrectly apply the law and facts in determining that the content partnership agreement ("CPA"), and thus the forum selection clause, applied to AMA's claims?

2.     Did the District Court incorrectly determine that Appellees have standing to enforce a forum selection clause as non-signatory "transaction participants" to the CPA?

3.     Do Appellees have standing to enforce the forum selection clause as "agents" of a party to the CPA?

4.     Do Appellees have standing to enforce the forum selection clause as "third-party beneficiaries" to the CPA?

5.     Do Appellees have standing to enforce the forum selection clause as "implied licensees" to the CPA?

## Statement of Case and Facts

This case originated in a copyright infringement dispute between Petitioner AMA Multimedia, LLC ("AMA") and Appellees Sagan, Ltd., Cyberweb, Ltd., Netmedia Services, Inc., and David Koonar – the owners and operators of the web site www.Porn.com.

The District Court previously dismissed this copyright infringement complaint on a *forum non conveniens* theory, finding that Appellees were entitled to take advantage of a forum selection clause ("FSC") in a content partnership agreement ("CPA") between AMA and GIM Corp. as "assignees" of the CPA. This Ninth Circuit Court of Appeals reversed the dismissal, finding there was no evidence of assignment of the CPA. *AMA v. Sagan Limited, et al.,* Ninth Circuit Court of Appeals Case No. 17-15178.

Upon remand, the District Court again dismissed AMA's complaint on a *forum non conveniens* theory, this time finding that Appellees had standing to enforce the FSC as "transaction participants" to the CPA.

AMA, a Nevada Limited Liability Company, produces adult audiovisual material which it distributes through DVD sales and the Internet via its paid membership websites. AMA engages in extremely limited licensing of its full-length content to other entities or websites for viewing. AMA does permit and provides promotional materials in the form of *sample* videos (*not* full-length) to

2

third-party marketers and websites for the sole purpose of promoting AMA paid membership properties. 6 ER 1064-66. The AMA business model is that a user must be a paid member to an AMA site to view AMA full-length works. 2 ER 62-63; 6 ER 1064-66. AMA provides promotional samples to help market the product so users sign up with AMA paid membership websites to access full-length, high-definition videos. 6 ER 1064.

AMA's promotional marketing contracts include one with Cyberweb (Appellee) and a different one with GIM, allowing each company to use promotional material AMA provided to them. In 2007, Cyberweb and AMA entered into an affiliate contract wherein Cyberweb was provided AMA limited promotional material to display on Cyberweb websites (including Porn.com, at issue here). No further licenses were granted, and the AMA/Cyberweb contract did **not** have an FSC. 2 ER 63-64, 79. Separately, in September of 2012, AMA executed a licensing agreement with GIM (the CPA), allowing a license to GIM *for promotional content that AMA provided to GIM on GIM websites*. 6 ER 929-930, 945-52. It is this CPA, an AMA-GIM contract with an FSC that is central to the conflict in this appeal.

Appellees have attempted to attach themselves to the GIM contract (CPA) to access the FSC and force AMA's copyright infringement claims in Barbados. However, a review of GIM, the CPA, and Appellees' conduct in copyright

3

infringement make clear the true separation between Appellees' infringement conduct and the CPA.

GIM Corp., not a party to this lawsuit, is a Barbados entity which owns and/or operates hundreds to thousands of adult websites, including HostedTube.com, a turnkey platform that allows anyone to instantly generate an adult site featuring free adult videos. A site owner simply registers a domain name and points it to GIM's HostedTube servers, and GIM will create an adult site populated with adult videos, and stream that content to end users of those websites. Porn.com is *NOT* a GIM website. 2 ER 74-5, 152.

GIM also owns Traffic Force, an advertising platform, and operates the PaidPerView program located at PaidPerView.com. 6 ER 1001-03; 7 ER 1261-62. AMA's promotional contract with GIM (CPA) is the PaidPerView program, which allows HostedTube websites (which change over time) to stream promotional material AMA provides to GIM. AMA provides promotional content by uploading it directly via PaidPerView.com. GIM is then permitted to stream what AMA has provided. 6 ER 929-930, 945-52.

**Appellees**

Each Appellee is either an owner or operator of Porn.com. 4 ER 580, 617; 6 ER 1066-69. Appellees have a complicated set of relationships with each other, further complicated by Netmedia's (Appellee) contractual relationship with GIM to

4

provide technical services for the operation of GIM's PaidPerView program. However, Appellees' operation of Porn.com and conduct in infringement of AMA's copyright works on Porn.com are separate and distinct from their relationship or any work for GIM, a fact and distinction lost on the District Court.

Sagan Ltd. is an owner of Porn.com, acting as an agent of Cyberweb with the United States Copyright Office and Porn.com Terms of Service, providing no other functions. 3 ER 673-81; 5 ER 808, 817. Cyberweb is also an owner and an operator of Porn.com. 4 ER 578; 5 ER 808; 7 ER 1243, 1298, 1314-15. However, Cyberweb takes little action in operations, not providing any technical work or functions on Porn.com. 6 ER 1028; 3 ER 578; 7 ER 1243-47, 1297-1303. Porn.com's operations are performed by Netmedia through a Cyberweb-Netmedia "Technical Services Agreement." 5 ER 799; 7 ER 1303.

All technical aspects and day-to-day business operations of Porn.com and day-to-day business operations are done by Netmedia employees via the Cyberweb-Netmedia Technical Services Agreement. 6 ER 1028; 3 ER 578; 7 ER 1243-47, 1258-62, 1297-1306, 1320-22. Specific to Porn.com, Netmedia does: (1) programming, design, reviewing content, commenting, advising, technical changes/upgrades, uploading content; (2) day-to-day business operations; (3) accounting; (4) testing/diagnostics; (5) weekly meetings with Cyberweb regarding implementation of technical aspects; (6) monthly reporting to Cyberweb regarding

changes, revenues, traffic performance, industry issues, server use, and IP changes;
(7) exclusive full access to servers; and, (8) exclusive control over pricing
negotiations. 7 ER 1165, 1169-70, 1197-1206, 1211-39, 1303-1310, 1319-1325,
1339-40, 1350-52, 1373-1407. In Barbados, Netmedia admits that it operates
Porn.com, including uploading content to Porn.com directly under its Technical
Services Agreement with Cyberweb (¶¶1.2.1 and 4.4.3 of the Claim Form). 2 ER
261-70; 5 ER 798-805.

Mr. Koonar is the common force behind Sagan, Cyberweb, Netmedia, and
GIM. Mr. Koonar is the President and Sole Director of a holding corporation,
which is a 100% shareholder of GIM and 50% shareholder of both Cyberweb and
Sagan. Koonar is President of GIM and President and Director of Netmedia. 2 ER
308; 7 ER 1270-83. Koonar's actions are distinct and separate, specific to the
corresponding position/directorship of the corporation responsible for the alleged
conduct at issue.

Each company has different assets, different contracts, and different duties/
obligations. None of Appellees' duties in the operation of Porn.com implicate
GIM; GIM does not control these duties, GIM does not benefit directly from the
operation of Porn.com, and *GIM does not own nor operate Porn.com*. GIM's
operations are separate and distinct from Porn.com.

Netmedia separately contracts with GIM under a different Technical Services Agreement. Under that contract, Netmedia assists GIM with GIM's websites, such as HostedTube, Traffic Force, and the PaidPerView.com program. The Agreement between GIM and Netmedia explicitly states that *Netmedia is NOT an agent of GIM*. 7 ER 1147-1152. Neither Netmedia nor Cyberweb reports to GIM for any duties performed on Porn.com. GIM has no control over Cyberweb or Netmedia in the operation of Porn.com, as Netmedia contracts with each company separately under separate Technical Services Agreements.

## The Claims and "Alleged Conduct" of Appellees

The "*alleged conduct*," as outlined below, is AMA's accusation of specific infringement conduct; this *alleged conduct* is crucial in the Ninth Circuit's determination for allowing a non-signatory to access an FSC. *Manetti-Farrow v. Gucci America, Inc.,* 858 F.2d 509 (9th Cir. 1988).

Beginning in 2008, Appellees engaged in blatant copyright infringement by scouring the internet and directly acquiring and displaying 64 of AMA's copyrighted full-length videos on Porn.com without AMA's knowledge or consent. Appellees attached false user and upload information to the infringed videos to hide their actions and give the appearance that third-party users illegally uploaded the videos on Porn.com. Appellees acted on their own and for their own purpose

7

and benefit in the operation of Porn.com and in their infringement, completely separate from GIM and the CPA. 2 ER 113-49; 6 ER 1068-077.

AMA has clear evidence of Appellees' scheme of creating false users/ uploading information to steal AMA's quality content and display it illegally on Porn.com:

To upload videos on Porn.com, a user must be registered as a member, requiring a user name, password, and email address. 2 ER 65; 6 ER 1071. User registration creates a "profile page," including basic user information and listing any videos they uploaded. 2 ER 65; 3 ER 584-85; 6 ER 1071. Videos displayed on Porn.com are accompanied by the user name for the member that uploaded the video, as well as the uploaded/published date of the video. 2 ER 66, 115, 125-32; 3 ER 584-85; 6 ER 1072-76. The "uploader" information is a clickable link, which leads to that uploader's profile page. 2 ER 66; 6 ER 1071-72.

For *illegal* AMA videos displayed on Porn.com, represented to be third-party user uploads, AMA is able to glean that the operator (Porn.com itself) actually uploaded/stole this content by, at least:

1. Certain AMA videos contain no member names or identified "uploader" associated with the video. Since Porn.com upload process requires a user to be registered, lack of member associated with these videos illustrates

they were not uploaded by independent third parties.  2 ER 66; 4 ER 584-85; 6 ER 1072-73.

2. On certain AMA videos, the user name associated as the uploader of the video *changes* on different days.  One day, "User X" is identified as video uploader while shortly thereafter, that very same video on the very same URL will identify "User Y."  Neither User X nor User Y appear to be registered members of Porn.com, as their dedicated profile pages display, **"No Such Member."**  Random switching of user names, neither of which exist on Porn.com, illustrates that the video is not uploaded by legitimate, independent third-party users.  2 ER 66; 6 ER 1072-73.

3. On certain AMA full-length videos, the supposed "user" uploaded the video before technically joining the Porn.com website. Further, some videos show a video "uploaded date" years *before* AMA even produced the video, showing the upload video information is a discernible falsehood.  2 ER 66-67; 6 ER 1074.

In total, this evidence shows that Appellees, as owners/operators of Porn.com, created a ruse to disguise the origination of videos that they acquired and uploaded.

Additionally, some of the upload dates of infringed AMA full-length on Porn.com **predate** September 2012, when AMA entered the CPA with GIM.

Appellees began acquiring and stealing videos in 2008, years before the CPA was executed. 2 ER 115, 125-32

Also, AMA claims Appellees infringed certain high resolution still *images* on Porn.com and also located video and converted them to images which they exploited for use in advertising banners for competing products, without the knowledge or consent of AMA. 2 ER 115, 133-49; 6 ER 1076-77.

To summarize, there is both image and video infringement on Porn.com. This content was not provided by AMA as a licensor, and GIM did not obtain this content as a licensee via the CPA. As explained more fully below, this infringing material was **_never_** treated as licensed/part of the CPA. AMA's *alleged conduct* against Appellees must be evaluated to allow them standing to enforce the FSC as a "transaction participant." *Manetti-Farrow, supra.*

### *The GIM Contract – "CPA"*

The Court will need to determine whether the conduct alleged (above) against Appellees "closely relates" to the "*contractual relationship,"* requiring review of the CPA.

10

In September 2012, AMA predecessor SSC Group, LLC entered into the CPA with GIM to share in revenue generated from promotional content[1] *AMA provides to GIM.* 4 ER 661, 708-16; 5 ER 532; 6 ER 929-31, 945-52, 1028, 1050-56. *The CPA created a Licensor in AMA, and a Licensee in GIM*. The CPA has an FSC choosing Barbados as the proper forum for legal disputes "arising out of or related" to the CPA.

## Revenue Sharing under the CPA

Called "PaidPerView," this revenue-sharing program granted a license solely for material that AMA provided to GIM, as operated through the website PaidPerView.com. The premise of the CPA is that AMA and GIM would share in revenue generated when a user signed up for AMA's paid membership after viewing AMA's promotional content as displayed by GIM. The CPA expressly states, and AMA agreed and understood, only GIM would be streaming the promotional content that *AMA provided to GIM.* None of the *limited* promotional sample videos provided by AMA to GIM are at issue here. 2 ER 76; 6 ER 929-31, 945-52.

## Content Covered by the CPA

The CPA explicitly states, "with respect to any and all Content that" AMA submits or provides to GIM, AMA grants *GIM* a **nontransferable** license "to use,

---

[1] "Promotional content" is videos that contain specific and small portions of full-length video designed to entice viewers to purchase access to the full-length video.

publish, display, and distribute the Content on the Websites(s), solely for the Purpose," CPA § 1.01; CPA Background § B. The "Purpose" carefully limited only GIM the ability to stream *audio and video* content to end users only on those Website(s) ("*Licensee* can provide…"). **The license does not include images.** The CPA explicitly states, **"No license to any other intellectual property of Licensor is provided hereby,"** foreclosing any license to other AMA material (material that AMA does not provide to GIM, e.g. the alleged infringement here). 6 ER 929-31, 945-52.

Further, the CPA includes specificity dictating the manner and form that AMA must *provide content* to GIM for use. The CPA instructs AMA to provide content through PaidPerView.com or physically mail content to GIM's offices. Section 4.1 of the CPA states explicitly that AMA, as Licensor, shall provide content in a "*mutually agreed form.*" 6 ER 929-31, 945-52. Section 4.6 then dictates that Licensor (AMA) "shall have the *sole* responsibility for providing" (emphasis added) the content *to Licensee (GIM)* in one of the acceptable methods of delivery set forth in Ex. B. Every Acceptable Method of Delivery requires an "affirmative action" of AMA to deliver content *to GIM,* including by mailing content to GIM's address. AMA provided all the videos to GIM that were treated as part of the contract by directly uploading it to GIM's PaidPerView.com website. 6 ER 929-31, 945-52.

12

None of these provisions allow GIM to exceed use of AMA content beyond that which AMA provided. All parties agree that the infringed content at issue in this suit was **not** provided by AMA to GIM; Porn.com took/used the content directly, without AMA's knowledge or permission. 2 ER 76. Because this infringed content was **never provided by AMA to GIM**, it falls outside the license and is precluded under the CPA *and completely outside and unrelated to the CPA itself*.

## The Full Scope of the CPA

CPA §1.01 states that the license is subject to the terms and conditions of the agreement. CPA §5.1 placed an obligation on GIM to "establish, build, maintain, and develop the Websites featuring the content," as well as "market access to the Content via the Website(s), *all under the Licensee's [GIM's] brand.*" GIM is required to perform all encoding, processing, and uploading of the content, which necessarily requires GIM to operate the web sites. CPA §5.5. GIM warrants that it will perform all obligations. CPA §6.2(iv). CPA §1.4 states, "Licensee agrees that it will only provide streaming of the content in both the public and private areas of the Website(s)." This license does not cover third parties that acquire illegal content on their own and stream it for themselves, simply because they utilize ads through GIM's Traffic Force.[2] 6 ER 929-31, 945-52.

---

[2] Traffic Force is just an advertising platform. 2 ER 76.

The CPA provided a mechanism for GIM to earn money from AMA. Per §3.9, if the content *provided by AMA* to GIM originated from or is associated with an AMA web site, and an advertising banner displayed by GIM resulted in Internet traffic to AMA's websites, GIM shared in revenue generated from such traffic. §3.9 does not grant a license to third parties (or GIM for that matter) for *any* AMA content irrespective of AMA providing it to GIM. §3.9 is a right and obligation between AMA and GIM. 6 ER 929-31, 945-52.

In sum, the *nontransferable* license applies only to: (1) content *provided by AMA;* (2) content received and streamed *by GIM*; (3) on web sites established, built, maintained, and developed *by GIM*; (4) where the web site advertisements are also controlled by Traffic Force.[3] CPA §1.1 *expressly* forecloses the existence of *any* additional licenses to third-parties and to any content not provided by AMA to GIM. CPA §1.3 reserved all of AMA's rights not licensed to GIM. The license is only for the term ("during the Term"), commencing on the Effective Date. 6 ER 929-31, 945-52.

---

[3] While it was known by AMA when signing up for PaidPerView that content AMA *directly* submitted to GIM may be displayed on Porn.com, due to Porn.com use of Traffic Force, such was only under the construct that GIM would be streaming AMA's content on Porn.com.

## Appellees' Attempt to "Closely Relate" their Alleged Conduct to the CPA.

Appellees, recognizing no connection between their alleged infringement conduct and the enumerated terms of the CPA, introduced a demonstrably false course of conduct to "closely relate" their infringement to the CPA.[4]  This false "course of conduct" is their only connection between the *alleged conduct* and the *contractual relationship. Manetti-Farrow, supra.*

On October 5, 2016, the District Court ruled on the issue of *forum non conveniens* in AMA's favor.  1 ER 46-58.  In that ruling, the Court fully explained,

> "The license granted by this section is expressly limited to content that AMA "submits or provides" to the Porn.com Entities. Section 1.1 then makes clear that "[n]o license to any other intellectual property of Licensor . . . is provided hereby." Id. A later provision states that "[a]ll rights in and to the Content not expressly licensed to Licensee under Section 1.1 are reserved to Licensor…
>
> Section 4 of the CPRA is titled "Provision of Content." Doc. 27-3 at 27. It makes clear that AMA is to provide material to the Porn.com Entities for their subsequent distribution. See, e.g., § 4.1 ("Licensor shall provide the content," "Licensor shall provide all the materials"); 4.3 ("Licensor reserves the right not to provide Licensee with any item of Content"); 4.6 ("Licensor shall have sole responsibility for providing, at its own expense, the Content to Licensee"). Exhibit B to the CPRA is titled "Acceptable Methods of Delivery," and states that "Licensor shall have the sole responsibility

---

[4] As fully explained later, in order to access the FSC as transaction participants, Appellees' alleged conduct must closely relate to the CPA.

for providing, at its own expense, the Content." It then provides four methods by which AMA may deliver the content to the Porn.com Entities – file transfer, delivery of physical copies, delivery on a hard drive, or by uploading material to the Porn.com Entities' PaidPerView account. Id. Each method involves an affirmative action by AMA to provide the content.

> *AMA does not assert claims in this case related to content it provided to the Porn.com Entities under the CPRA. AMA instead alleges that the Porn.com Entities published AMA content that they took from other locations on the Internet without AMA's knowledge or consent. The Porn.com Entities do not argue that AMA knew of or consented to the publication of this content. Nor do they present any evidence that they acted in accordance with the CPRA in handling this content by, for example, paying royalties to AMA. Thus, AMA's copyright infringement claims are wholly unrelated to content provided under the CPRA, and the contract's forum selection clause is inapplicable."*

1 ER 54-55 (Emphasis added.). The ruling was stricken by the District Court as premature.

After the stricken ruling, Appellees asserted *for the first time* an alleged course of conduct where they claimed to manually review all third-party user uploaded videos on Porn.com and "assign" these illegal (infringing) videos to the proper content producer(s) account, like AMA, under GIM's PaidPerView program. Relying on this fabricated defense, Appellees argued that the GIM contract applied to the parties in this litigation based on this "course of conduct." This scheme was concocted only **after** Appellees had received the District Court's

express reasoning why the CPA could not apply.  2 ER 329-30; 3 ER 451-56, 533-78.

This newly-disclosed alleged course of conduct directly contradicted prior testimony of Philip Bradbury, Vice President of Netmedia.  In declaration, Mr. Bradbury fully detailed AMA's PaidPerView account summary, confirming that the 2,116 videos in the account were *directly uploaded by AMA*.[5]  6 ER 1028, 1059.  Mr. Bradbury failed to mention any additional or "assigned" videos in the account (because none existed).[6]  In the post-ruling Declaration, Mr. Bradbury claimed "over a thousand AMA videos" containing illegal user-uploaded content were assigned to AMA's account, claiming the videos were delineated with an asterisk, giving AMA opportunity to reject having those videos licensed under the CPA.  3 ER 534-35.  Appellees provided a new printout of AMA's PaidPerView account with a single video marked by a red asterisk, a video uploaded to Porn.com *after* the lawsuit was filed (May 2016).   2 ER 69, 3 ER 454-55, 537.  There is no actual evidence to support the bare assertion of their "review and assign" scheme dating back to 2012.   Rather, their own submitted evidence established the review/assignment scheme to be false.

---

[5] This conforms to AMA records/number of promotional videos it had uploaded.

[6] Mr. Bradbury also testified in declaration that he had knowledge of the complete history of AMA's PaidPerView account, including when AMA staff members logged in, change account details, and uploaded videos.  4 ER 634-37, 659.  Even in giving this type of detail, Mr. Bradbury never mention any alleged program of "assigning" videos provided by third parties to AMA's account.

With Appellees needing evidence to overcome the District Court's initial ruling, they manufactured false assertions that they had paid AMA for the videos in dispute and had treated the content as part of the CPA. These new defenses were "supported" only by Declarations, claiming "thousands" of other videos treated in this manner, but there was no detail included, no proof of payment(s), and a screenshot of *one video* allegedly assigned in May 2016 (after lawsuit filed). 3 ER 534-35, 537.

The actual evidence shows that the infringed videos were never "assigned" nor treated as part of the CPA:

- Appellees' own AMA account summary establishes that the infringed videos (or any videos AMA did not provide to GIM) are not included. 2 ER 68, 81-82.

- The full text of the Skype chat logs establish that there was no review process on Porn.com. Without a review process, Appellees could not have been reviewing videos to "assign" and treat them as licensed. 2 ER 69-74, 83-95; 3 ER 415-33, 442-48. (Skype chat logs).

- The infringed videos fail to include AMA advertising links that they claimed AMA received. 2 ER 115, 126-32. These videos were not treated in the same way as their "example" video from May 2016 that was attached as a printout to Mr. Bradbury's false declaration claiming videos were being reviewed and then assigned.

## Summary of Argument

Appellees unilaterally and unlawfully acquired AMA full-length videos and displayed them, without authorization, for free on Porn.com. Aware of their unlawful actions, they manufactured false upload data, attempting to shield themselves from liability (creating the façade that others illegally uploaded the videos).

Appellees seek to further cover their illegal acts by hiding behind a forum selection clause in an agreement (CPA) between Licensor AMA and Licensee GIM. GIM is not a party here; Appellees are not party to the CPA. Specific to their infringement conduct, Appellees claim to be "transaction participants" to the CPA.

The operation of Porn.com and Appellees' conduct in infringing AMA's works are not "so closely related" to the CPA (or related at all), but rather separate and distinct conduct. The infringement conduct in no way involved nor benefitted either GIM, AMA, or the CPA. Recognizing the clear lack of relationship, Appellees tried to connect their infringement conduct to the CPA by asserting a demonstrably false course of conduct.

The District Court, granting Appellees access to a forum selection clause in the CPA, omitted a material/substantive analysis of "transaction participant." The District Court looked solely at Appellees' connection with GIM and the CPA

(which is separate and distinct from the operation of Porn.com and the infringement conduct), failing to even consider whether Appellees' infringement conduct was "closely related" to the CPA. Analysis of Appellees' infringement conduct, compared to the provisions of the CPA, establishes that there is absolutely no connection between the infringement conduct and the CPA. Appellees cannot garner protection from the FSC by misstating facts and fabricating evidence. The District Court abused its discretion by failing to complete the analysis.

Further, Appellees are not agents of GIM, third-party beneficiaries to the CPA, nor implied licensees to the CPA. There are no legitimate grounds by which Appellees can attach themselves to the CPA or enforce the FSC.

# Argument

## I. A Mixed Standard of Review Applies in this Matter.

A motion to dismiss based upon a forum selection clause is treated as an improper venue motion under Fed.R.Civ.P. 12(b)(3). *See, Argueta v. Banco Mexicano, S.A.,* 87 F.3d 320, 324 (9th Cir. 1996). A district court's decision to enforce a forum selection clause is reviewed for an abuse of discretion. *Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1137 (9th Cir. 2003), *citing Kukje Hwajae Ins. Co. v. M/V Hyundai Liberty*, 294 F.3d 1171, 1174 (9th Cir. 2002). A district court abuses its discretion when it makes an error of law. *Cooter & Gell*, 496 U.S. 385, 405 (1990); *Koon v. United States*, 518 U.S. 81, 100, 135 L. Ed. 2d 392, 116 S. Ct. 2035 (1996).

The first step of an abuse of discretion test is to determine *de novo* whether the District Court identified the correct legal rule to apply to the relief requested. If the District Court failed to do so, the District Court abused its discretion. *United States v. Hinkson*, 585 F.3d 1247, 1261-62 (9th Cir. 2009).

If the District Court identified the correct legal rule, the Court moves to the second step of the abuse of discretion test, a determination whether the District Court's application of the correct legal standard was (1) "illogical," (2) "implausible," or (3) without "support in inferences that may be drawn from the

facts in the record." If any three apply, the district court abused its discretion.
*Hinkson,* 585 F.3d at 1261-62.

The effect of enforcing a forum selection clause is similar to that of granting
dismissal under Fed.R.Civ.P. 12(b)(1) (subject-matter jurisdiction) or Fed.R.Civ.P.
12(b)(2) (personal jurisdiction): It "forecloses suit in the jurisdiction of plaintiff's
choice." *Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1139 (9th Cir. 2003).
Plaintiff's forum choice justifies that, "a party seeking to avoid enforcement of [a
forum selection clause] is . . . entitled to have the facts viewed in the light most
favorable to it, and no disputed fact should be resolved against that party until it
has had an opportunity to be heard." *Id.* at 1139.

Absent an evidentiary hearing, *any facts in genuine dispute must be viewed
in a light favorable to the non-moving party. Murphy*, 362 F.3d at 1144.
(Emphasis added).

The District Court dismissed AMA's underlying action pursuant to the
doctrine of *forum non conveniens* and Fed.R.Civ.P. 12(b)(3) as the result of a
forum selection clause in the CPA. No evidentiary hearing was held, thus *all
disputed facts should have been viewed in the light most favorable to AMA*. None
of Appellees were parties to the CPA but argued access to the forum selection
clause as "transaction participants," third party beneficiaries, agents, and/or
implied licensees. The District Court found them to be transaction participants.

22

Here, the District Court erred in determining that its previous (overturned) ruling that the FSC applied to AMA's copyright claims was not disturbed on appeal. Moreover, the District Court erred in the application of law by improperly applying the standard of "transaction participant" asserted in *Manetti-Farrow v. Gucci America, Inc.,* 858 F.2d 509 (9th Cir. 1988). Thus, this Court should determine *de novo* if the District Court applied the correct legal rule, and then determine if the District Court's application of the rule(s) were illogical, implausible, and/or without support drawn from the facts in the record, such that the court abused its discretion. *Hinkson,* 585 F.3d at 1261-62. This application requires this Court to hold all disputed facts in a light favorable to AMA. *Murphy,* 362 F.3d at 1144.

Further, the Ninth Circuit should now rule on Appellees' assertion of third-party beneficiaries, agents, and implied licensees. These theories are all properly analyzed under the *Manetti-Farrow* analysis, have been fully briefed, and will likely be presented to this Court in the future if not resolved now.

## II.   The District Court erred in determining its previous ruling that the forum selection clause applies to AMA's copyright claims was not disturbed on appeal.

First, it must be determined whether the CPA applies to AMA's copyright claims.

In its October 24, 2018 ruling, the District Court stated:

> The Court previously found that the CPRA's forum selection clause applied to AMA's copyright claims and otherwise is valid and enforceable. Doc. 126 at 5-11, 14-17. These findings were not disturbed on appeal.

Order 3:20-22. 1 ER 3. The District Court was wrong that its determination that the CPA's forum selection clause applied to AMA's copyright claims was not disturbed on appeal.

The District Court determination that the FSC applied to AMA's copyright claims was expressly premised on the determination that the CPA had been "assigned" to Appellees, making them the "licensees." Specifically, it stated:

> The clause in this case … includes any legal action "arising out of or relating to" the CPRA. Under the liberal approach taken in *Schoendeuve Corp.* and *Manetti-Farrow*, the clause plainly applies to this case. The CPRA is a license agreement created precisely because the licensor holds copyrighted material the *licensee* desires to use. The contract authorized the use of the material and *protects the licensee from infringement claims of the licensor.* When the licensor alleges infringement against the licensee, *as AMA does here*, the Court must interpret the license agreement to determine whether the *licensee's actions* are authorized by the agreement and therefore non-infringing. As in *Manetti-Farrow,* each of the copyright claims in this case "relates in some way to rights and duties enumerated in the [CPRA]," and "[t]he claims cannot be adjudicated without analyzing whether the parties were in compliance with the contract."

Order 7:6-17 (emphasis added), 1 ER 22.

The District Court expressly stated that the CPA, and therefore FSC, applied to an analysis of the *licensees'* actions, with the license protecting the *licensee* from AMA's infringement claims, holding Appellees as "licensees" by way of

24

assignment of the CPA.  This Ninth Circuit soundly rebuked the District Court's determination that Appellees had been assigned the CPA, finding that Appellees' statements of assignment were "self-serving and made only after the district court ruled in AMA's favor on a motion to dismiss."  1 ER 14.  This Court found Appellee's evidence of assignment was "conspicuously scarce," and ruled that the District Court abused its discretion in finding that Appellees were assignees of the CPA.  Id.

Because this Court found that Appellees were not assigned the CPA, they are not licensees, and the District Court's determination of licensees by assignment was unequivocally "disturbed" on appeal.   The District Court failed to provide any further reason why the CPA would apply to AMA's claims.

In fact, the CPA would not apply to AMA's claims as: (1) the CPA expressly precluded the disputed material from being licensed because none of the infringed content in this case was provided by AMA to GIM (undisputed), while CPA §1.1 expressly excludes license to any other intellectual property (2) the CPA does not cover/license images, and (3) some of the claims of infringement occurred *years* before the license was even created (Term of the CPA begins at its execution)*;*  (4) the CPA essentially required GIM to stream licensed content (GIM did not stream the infringed content); (5) Appellees are not the licensee; and (6) the CPA license granted to GIM is nontransferable and only for their use.

This case does not involve *any conduct by the signatories to the agreement.*
*GIM played no role in the alleged conduct.  AMA played no role in the conduct.*
There is simply no applicability of the CPA and its FSC to this dispute.  Not only
was the District Court's previous ruling overturned and unequivocally disturbed on
appeal, it is clear that the CPA does not apply to AMA's infringement claims.  If
the Court were to determine that the CPA does apply to Appellees' infringement, it
must then determine whether Appellees have standing to *access* the FSC in the
CPA.

### III.    Appellees are *not* "transaction participants" under a *Manetti-Farrow* analysis, and do not have standing to enforce the FSC.

As outlined above, the CPA does not apply to AMA's infringement claims.
However, if the Court determines otherwise, the Court must determine whether
*non-signatory* Appellees have standing to enforce the CPA's FSC.  In the Ninth
Circuit, the test to determine whether a non-party (non-signatory) can assert an
FSC is whether the *alleged conduct of the non-signatory so closely relates to the*
*contractual relationship* that the FSC applies to non-parties. *Manetti-Farrow*, 858
F.2d at 514 n.5[7]

---

[7] It is important to not confuse the *Manetti-Farrow* "so closely relates" standard
with an analysis of the common FSC language "arise out of or *relate* to."  The
*Manetti-Farrow* standard is unique on its own, and should not be granted the
expansive interpretation that "relate to" is granted in the context of a forum

In the instant matter, the "alleged conduct" that must be "so closely related" to the CPA is Appellees' conduct in infringement of AMA's copyrighted works, including scouring the Internet to locate and obtain AMA's videos, posting the videos on Porn.com, and taking steps to falsely create the façade that the videos were posted illegally by third parties. The District Court failed to review or analyze this alleged conduct in relation to the CPA.

The District Court dismissed AMA's complaint after determining Appellees had "standing" to enforce the FSC as "transaction participants" to the CPA pursuant to *Manetti-Farrow* and its progeny. The District Court enunciated the correct rule:

> In *Manetti-Farrow*, however, the Ninth Circuit held that a "range of transaction participants, parties and non-parties," can benefit from a forum selection clause *where their alleged conduct is "closely related to the contractual relationship."* 858 F.2d at 514 n.5 (citations omitted). In *Holland America Line*, the Ninth Circuit similarly held that a forum selection clause applied to non-parties *where their actions were "part of the larger contractual relationship"* between the parties to the agreement. 485 F.3d at 456 & n.2 (citing *Manetti-Farrow,* 858 F.2d at 514 n.5).

Order 4:23-5:2 (emphasis added), 1 ER 4-5. However, in the next line of the analysis, the District Court conspicuously omits a key point:

> The evidence in this case, even when construed in AMA's favor, shows that Defendants are so closely related to the contractual

---

selection clause. Inherently, *Manetti-Farrow* "so closely relates" is a significantly narrow standard, whereby the alleged conduct is closely tied to the terms and/or performance of a contract.

relationship between AMA and GIM that they have standing to invoke the CPRA's forum selection clause.

Order 5:2-5, 1 ER 5.

The District Court fatally omitted Appellees' *alleged conduct (infringement)* as being closely related to the CPA.  Throughout the entire Order, there is not a scintilla of analysis or consideration of Appellees' infringement conduct as alleged and whether that conduct relates closely to the CPA; i.e. whether the *alleged infringement conduct* was part of the larger contractual relationship (CPA) between AMA and GIM.

### A.    *Manetti-Farrow* **standard for non-signatory access to FSC.**

Each case granting a non-signatory "transaction participant" access to an FSC involves determination of specific alleged conduct by the non-signatory, that is at issue in the dispute, which *closely related* to the transaction or contractual relationship containing the FSC.

*Manetti-Farrow* was the Ninth Circuit's preeminent application of the concept that a non-signatory could access an FSC.  There, this Court addressed the issue by way of footnote, limiting the analysis to:

> We agree with the district court that the **alleged conduct** of the non-parties is so closely related to the contractual relationship that the forum selection clause applies to all defendants.

*Manetti-Farrow*, 858 F.2d at 514 n.5 (emphasis added), citing *Clinton v. Janger,* 583 F.Supp. 284, 290 (N.S. Ill. 1984) and *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190, 202-03 (3rd Cir. 1983).

In *Manetti-Farrow,* the plaintiff asserted tort claims after Gucci Parfums terminated an exclusive dealership agreement. Plaintiff sued three entities – Gucci America, Gucci Parfums, and Guccio Gucci S.p.A. Plaintiff entered into a contract (FSC in Florence) with Gucci Parfums, for exclusive distribution rights in the U.S. Gucci America signed a Consent and Ratification Agreement to the contract. Guccio Gucci is the parent company to both Gucci America and Gucci Parfums. Plaintiff alleged that certain factions of the Gucci family sought to have its distribution agreement terminated in order to bring U.S. distribution within the Gucci corporate structure. *Id.* at 511.

After the distribution agreement was terminated, plaintiff sued the three entities alleging tortious actions for the termination of the contract. The Court found that the non-signatory defendants' alleged actions closely related to the distribution agreement, thus granting access to the FSC. *Id.* at 514. The alleged conduct was tied closely to the performance of the contract.

In *Clinton v. Janger*, 583 F. Supp. 284 (N.D. Ill. 1984), cited by the Ninth Circuit, plaintiff (the beneficiary of a trust) claimed that defendants (as trustees) violated provisions and duties of the trust. Plaintiff filed in Illinois, while the language of the trusts asserted FSC elsewhere. In finding that the non-signatory trustees could assert the FSC, the Court, citing *Coastal Steel*, stated that a range of

transaction participants should benefit from and be subject to an FSC, especially when a non-party is a third-party beneficiary of the contract. *Id*. at 290.

In *Coastal Steel*, 709 F.2d 190 (3rd Cir. 1983), plaintiff entered into a contract with an English manufacturer to build a steel factory. In turn, the manufacturer sub-contracted with defendants, also English, for a "blast unit" that was integral to the factory. The contract between the manufacturer and sub-contractor/defendants included an FSC for England. The Court of Appeals determined that plaintiff was a transaction participant, specifically a third-party beneficiary, to the sub-contract. When plaintiff sued for damages caused by the blast unit, plaintiff was subject to the FSC. *Id.* at 203.[8] The Court found that as a third-party beneficiary to the contract, plaintiff could not benefit from the contract between the manufacture and sub-contractor while avoiding an FSC. *Id.*

In *Holland Am. Line, Inc. v. Wartsila N. Am. Inc.*, 485 F.3d 450 (9th Cir 2007), non-signatory defendants, BVNA and BV Canada, asserted an FSC in a contract between plaintiff and Bureau Veritas. BVNA and BV Canada performed the same services for plaintiff that Bureau Veritas was contracted to provide. Plaintiff submitted orders to BVNA and BV Canada, subject to the contract

---

[8] Importantly, the Court also found that in a *forum non conveniens* analysis, the merits of the underlying case must be reviewed and assessed. *Coastal*, 709 F.2d at 195, *citing Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839 (1947).

plaintiff had with BV.  *Id.* at 455-56.  BV, BVNA, and BV Canada were related entities providing the same services to the same clients.

Plaintiff alleged that defendants failed to properly conduct services requested, contracted between BV and Holland, which resulted in loss of a ship. *Id.* at 454.  Citing *Manetti-Farrow*, the Court found that the FSC in plaintiff's contract with BV applied equally to BVNA and BV Canada because any transactions with either BVNA or BV Canada and plaintiff took place *as part of the larger contractual relationship between plaintiff and Bureau Veritas*.  Thus, BVNA and BV Canada were transaction participants to the contract between BV and plaintiff.  *Id.* at 456.  The alleged conduct of BVNA and BV Canada were part of the larger contractual relationship, and the subsidiaries' alleged conduct was closely related to the performance of the contract.

In contrast, in *Tribank Capital Invs. V. Orient Paper,* 523 Fed. Appx. 484, 486 (9th Cir 2013), this Court affirmed the rule for a non-signatory to be bound by an FSC is that the **alleged conduct** be so closely related to the contract that the FSC should apply.  This Court reversed dismissal based on the FSC and remanded for an evidentiary hearing to discern the relationship of the defendants.  *Id*.

Other circuits follow this same reasoning.  In *Adams v. Raintree Vacation Exch., LLC*, 702 F.3d 436 (7th Cir. 2012), the Seventh Circuit stated that "there has to be a reason, rather than mere fact of affiliation, for a nonparty to a contract to be

able to invoke, or to be bound by, a clause in it." *Id.* at 440. Therein, class action plaintiffs sued a number of corporate entities that were alleged to have used a subsidiary to sell timeshares. The timeshare contracts contained an FSC, which the non-signatory corporate defendants invoked. The Seventh Circuit presented the following illustrative analysis:

> But suppose instead that *A* and *B* have unrelated disputes with C. *A* and *B* are still "closely related" – they are parent and subsidiary – but there is now no reason to allow *A* to thwart *C*'s choice of forum by invoking a contract to which *A* is not a party.

*Id.* at 441.

Such analysis clearly illustrates that the close relation of a signatory and non-signatory is not *the* issue in determining whether a non-signatory may invoke a FSC. Rather, the issue is whether the *alleged conduct* of the non-signatory closely relates to the contract.

Unequivocally, the correct issue is *not* whether Appellees have a close relationship with GIM or the CPA based upon *any* conduct. Rather, in order to invoke the FSC here, Appellees must establish, with facts interpreted most favorably to AMA, that their *alleged conduct in this case was so closely related to the CPA's enumerated provisions* that they can invoke the FSC. They cannot do so, as their actions in scouring the internet for AMA's full-length videos and images (videos that were not provided by AMA and are expressly precluded from the CPA) were separate and distinct from the CPA and not related to carrying out

32

the CPA.  The District Court simply failed to conduct any analysis of the **_alleged_**

**_conduct_** at issue.[9]  A review of the alleged conduct and the CPA clearly establishes

that the alleged conduct does not closely relate to the CPA.

### B.  Appellees' conduct in copyright infringement does not "closely relate" to the CPA.

Given the *Manetti-Farrow* standard, the Court must review the terms of the

CPA and compare the terms, rights, and obligations of the CPA with the alleged

infringement conduct of Appellees to determine if the conduct "so closely relates"

to the CPA.  A *forum non conveniens* analysis, under which an FSC is determined,

requires review and assessment of the merits of the underlying case.  *See, Coastal*,

709 F.2d at 195, *citing Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 91 L.Ed.

1055, 67 S.Ct. 839 (1947).

It cannot be ignored that AMA has a direct contractual relationship with

Cyberweb, signed in 2007, specific to Cyberweb's use of AMA content on

Cyberweb's websites.[10]  Without an FSC, the Cyberweb/AMA contract governs

Cyberweb's use of AMA's content.   (And Cyberweb continues to be paid under

this contract, to this day, showing that the contract is still in effect.)  *The District*

*Court ignored this contract entirely*.

---

[9]  In all of the case cited that actually applied the FSC, the underlying contract was a direct issue in the claims brought by each plaintiff(s).  That is not the case here.

[10]  Porn.com is a Cyberweb owned and operated website.

33

Separately, the CPA governs GIM's use of AMA's content.[11]  In addition to failing to review Appellees' alleged conduct, the District Court focused solely on the CPA and ignored the 2007 agreement of Cyberweb/AMA.  The existence of that contract, alone, should result in reversal of the dismissal because it clearly separates Appellees' actions specific to Porn.com from the CPA.  At a minimum, the District Court should have determined which contract governed Cyberweb's actions in displaying the disputed AMA content on Porn.com.  *See. e.g., Holland*, 485 F.3d at 456.  Because the infringed content was not provided by AMA to GIM and the account summaries prove that the content was never treated as part of the CPA, Appellees' conduct should be attributed to the Cyberweb/AMA agreement (not the CPA).  The District Court failed to consider this analysis.

The District Court determined it would be required to interpret the CPA (claiming Appellees were licensees) in order to rule on Appellees' defenses, therefore the case must "relate" to the CPA.  1 ER 26.  That conclusion flatly ignores the court's duty to review and assess the underlying case, inclusive of the *Manetti-Farrow* analysis.  By ignoring the alleged conduct, the District Court blatantly disregarded whether the conduct was "so closely related" to the CPA in granting Appellees access to the FSC.

---

[11] GIM has hundreds to thousands of its own websites.  These websites change as users add or delete websites from the HostedTube platform (not a static list).

Properly analyzed, the **infringement conduct** here is not "closely related" to the CPA:

**1.**    Appellees each own and/or operate Porn.com and are separate entities from GIM. Porn.com operates separate and distinct from GIM, the PaidPerView program, and the CPA. Porn.com acquires content in ways completely independent of the CPA, AMA, and GIM. Appellees may happen to utilize the PaidPerView program and provide services to GIM, but their affiliation to GIM does not automatically impose a relationship to the CPA in this dispute.

**2.**    AMA alleged that Appellees scoured the Internet and found/posted at least 64 AMA full-length videos (which AMA copyrighted and makes available only upon purchase) and images on Porn.com, displaying them for free. These acts solely benefit Appellees, not GIM, AMA, or PaidPerView.

**3.**    The CPA only creates a nontransferable license for material that AMA provides to GIM so that GIM can stream this promotional material on websites that it controls. That promotional material is intended to generate revenue for GIM and AMA to share. If third parties (Appellees) steal *other* material, AMA/GIM derives zero benefit/ revenue under the CPA, making stolen content unrelated to the CPA's terms.

**4.**    The CPA grants a nontransferable license to material AMA provides to GIM, but the CPA expressly states that "No license to any other intellectual

property of Licensor ("*Licensor Intellectual Property*") is provided hereby." CPA § 1.1. The CPA expressly precluded GIM from "licensing" any content that AMA has not provided, and Appellees do not even dispute that the full-length content at issue was not provided by AMA. Appellees simply argue that "third parties" uploaded the content; AMA believes Appellees **are** those third parties, disguised as fake users. The alleged conduct, acquiring and distributing *other* videos that AMA has not provided cannot be connected to the CPA as agreed-upon/licensed content.

5. Appellees' argument that the CPA allows them to go scour the Internet and find/use AMA videos anywhere, uploading/using them under the CPA is a self-serving assertion of the CPA, contradicted by their own submitted evidence.

CPA §1.1 only allows GIM to license content that AMA provides, and §4.1 requires **mutual** agreement on the manner that content is provided. AMA clearly did not agree to allow Appellees to steal/obtain full-length AMA videos from elsewhere on the Internet, and Appellees presented zero evidence that AMA agreed to **anyone** using its full-length videos.

Appellees cite CPA §3.9 for the ability to obtain any AMA content and utilize such content on their site(s). That section applies to one way that Licensee *GIM* may earn compensation for directing traffic to AMA. Section 3, in its entirety, covers the "Compensation" provisions. §3.9 specifically allows GIM (as Licensee) to earn compensation from directing traffic to any existing website

where AMA's "Content" originated and/or sites associated with AMA. §3.9 is a provision that the license *"with respect to any and all Content that [AMA] submits and/or provides to [GIM],"* is "subject to." This provision does not, either expressly or by inference, expand GIM's authority to use material beyond what AMA provides to GIM, *especially random content illegally-acquired by third parties*. Such an assertion would violate the express preclusion in §1.1.

Extending such language to mean that *any third party* could use *any* AMA content it so chooses does not correspond to the words inside the four corners of the contract. Moreover, §3.9 does not need to even be analyzed or interpreted because Appellees' assertion that a "course of conduct" *altered the contractual relationship by way of* §3.9 to include the precluded material to *third-parties* is based on a discernibly false bare assertion (their "review and assign" scheme, discussed in Section III.C.). Whatever advertising Appellees claimed AMA received from §3.9 via this course of conduct *never occurred,* and Appellees *never acted* under §3.9, so they cannot rely on this provision for the alleged conduct being closely related to the CPA.

CPA §4.4 also expressly states that AMA is under no obligation to provide any content; AMA retains sole discretion to provide any content under the CPA. CPA §4.6 then reiterates that AMA has the "sole responsibility" for providing content to GIM, and any AMA content had to be provided in an acceptable method

of delivery (which GIM defined in its Exhibit B, limiting delivery to 4 specific manners, none of which were GIM taking/stealing from anywhere online). These provisions would be rendered void if third parties could simply obtain AMA content anywhere online and consider it "provided by" AMA to GIM. AMA provided **no** role in supplying the stolen/infringed content, and it was obtained by the wrong party (Cyberweb, not GIM), and these clearly are not acts that "closely relate" to the contractual relationship.

**6.** Multiple additional provisions prove that the conduct at issue is not governed by the CPA.

CPA §5.5 requires GIM to perform all processing and uploading of content submitted to the PaidPerView program, inclusive of AMA-submitted content. AMA content infringed by Appellees was not processed or uploaded by GIM.

CPA §5.1 requires GIM to build and maintain the web sites where CPA-submitted content is used. Unbeknownst to AMA, Porn.com is not a website maintained by GIM. Appellees operate Porn.com, which was unknown and not connected to the CPA.

CPA §6.2 requires GIM to perform all obligations. As Appellees are not agents (*see* Section IV below), Appellees are not authorized to post any content on Porn.com under the CPA and doing so cannot be connected to the CPA.

CPA §1.4 requires GIM to do the streaming of AMA-submitted content to end users. Appellees' actions in displaying and streaming AMA's stolen content cannot be connected to the CPA.

**7.** The District Court ignored that a number of AMA videos at issue were posted *years before* the CPA was executed. The CPA expressly limits the rights and obligations of the contract to the contract "Term," which began upon execution in September 2012. Thus, videos obtained by Appellees and posted years prior to that date simply cannot be "so closely related" to a contract that did not exist.

Because Appellees infringed/took content *years* prior to the existence of the CPA, those actions were clearly for the benefit of Porn.com and Appellees, bearing no relationship to the CPA or GIM. The District Court inexplicably entirely ignored the *timing* of Appellees actions when determining Appellees' supposed connection with the CPA.

**8.** The CPA is expressly limited to video/audio material and omits licensing of still images. There is no compensation mechanism for using images. Mr. Bradbury's Account Summary confirms images were never treated as licensed. Appellees posted still images of AMA content on Porn.com, yet none of Appellees' defenses or false, self-serving declarations even addressed infringement of images. The District Court outright ignored the claims of image infringement in its analysis. These images clearly cannot "closely relate" to the CPA, and it was an

abuse of discretion to ignore these claims when granting Appellees' motion to dismiss.

In summary, Appellees' alleged conduct fails to comport with the CPA, even upon cursory review. AMA did not provide the content; the content was not provided to GIM, but to Cyberweb; the CPA expressly excludes licensing material unless it is AMA-provided to GIM; GIM did not stream the content; GIM does not control Porn.com; there was no shared revenue for the illegal/stolen content; the CPA does not cover "images" as content. Appellees' theft of AMA content was for the benefit of Porn.com, without any benefit to or subject to any terms of the CPA and lacking a meaningful connection to the terms/obligations of the CPA.

If Appellees' conduct was truly in connection with the CPA, GIM would have displayed the stolen/infringed videos on GIM's own websites in the PaidPerView program. The videos only appeared on Porn.com.

For these reasons, Appellees' scouring the internet and posting videos and images starting *years prior* to the CPA, videos that AMA *never provided through the CPA,* and then falsifying user data to mask their conduct from AMA can not be considered as "so closely related" to the CPA.

The instant matter is analogous to *Britton v. Co-Op Banking Group*, 4 F.3d 742 (9th Cir. 1993), which involved an ongoing conflict around a securities fraud scheme. The securities contract contained an arbitration clause, covering "any

controversy arising out of or relating to" the agreement. Defendant Liebling, who purchased the corporate entity defendant, attempted to compel arbitration (similar analysis to FSC) pursuant to the securities contract. In the lawsuit, Liebling was not accused of anything having to do with the fraudulent sales of the securities. Rather, it was alleged he had set up an "investor's assistance group," which was a deceptive ploy to discourage the investors from litigating against Liebling's companies, who conducted the fraudulent sale of securities. The Ninth Circuit found Liebling to be an agent of the corporate defendant; however, the Ninth Circuit determined that none of Leibling's acts as agent in the dispute had anything to do with the securities contracts as his *alleged conduct* of setting up an investor's assistance group were independent acts of fraud, unrelated (*not closely related*) to any provision of the securities sales contract, and Liebling could not invoke the arbitration clause as a *non-signatory*. Setting up the phony investor's assistance group was not *closely related* to the contractual relationship of selling the securities, so he had no access to the arbitration clause.

Here, though Appellees may be affiliated with GIM, they are *non-signatories* and their conduct in scouring the internet for videos they acquired independently and illegally is *not closely related to the contractual relationship*. They were not carrying out the contract vis-à-vis their alleged conduct. Just like Liebling as a *non-signatory* was denied the ability to enforce the arbitration clause

41

of the company's securities sales agreement, Appellees should be denied the privilege of the FSC because their actions are independent acts of infringement that do not closely relate to the enumerated provisions of the CPA.

Unique and distinct from *Manetti-Farrow* cases granting non-signatories access to an FSC, the instant matter involves a licensing agreement, the alleged conduct does not implicate the signatory (licensee GIM), and the contract expressly precludes such conduct. Appellees are simply seeking to avoid facing judgment in the United States and presented discernibly false bare assertions of their alleged conduct being "closely related to" the CPA.

As analyzed below, Appellees' attempt to closely relate their infringement conduct to the CPA is based upon false assertions, which was categorically disregarded by the District Court.

### C. Appellees present false bare assertions in attempt to "closely relate" their alleged infringement conduct to the CPA.

Appellees introduced fake conduct, a "review and assign scheme," via false declarations containing bare assertions to establish their infringement conduct "closely relates" to the CPA, as a means to obtain standing under *Manetti-Farrow* and access the FSC. Appellees falsely assert they were carrying out performance of the CPA with respect to the alleged conduct via their false "course of conduct."

42

Aware that their infringement conduct does not "closely relate" to the CPA, and only immediately after the District Court issued an Order denying Defendants *forum non conveniens* argument pointing out the infringement conduct and the CPA are not "closely related" (later stricken as premature), Appellees asserted a new "course of conduct" defense in an attempt to connect their infringement conduct to the CPA. This assertion of the "course of conduct" set forth by Appellees attempted to alter the *contractual relationship* beyond the enumerated provisions and is contradicted by all of their submitted *actual* evidence, in addition to AMA's evidence.

To get around the clear constructs of the CPA, Appellees claimed that AMA was paid monies pursuant to the CPA for the infringed content via a review and assignment program to which AMA consented. Starting in 2012, Appellees supposedly reviewed third-party uploads on Porn.com for illegal and unauthorized videos (and outside the CPA). Appellees claimed that starting in 2015, via this review process, when an illegally provided video was located that belonged to a member of the PaidPerView program, such as AMA, they assigned the video to the member's PaidPerView account, denoting the video in the account with a red asterisk and a link that notified the rights-holder (AMA) of the assignment with an option to delete the video. Appellees claimed to have assigned "over a thousand" of such videos to AMA's PaidPerView account dating back to 2012, with no

43

supporting details, such as specific count or proof of payment, as such payment never occurred.

The assertion contradicted sworn testimony from Mr. Bradbury, Netmedia's Vice President, where he had provided a "complete" detailed account summary of AMA's PaidPerView account. Mr. Bradbury confirmed that the account contained solely 2,116 videos uploaded by AMA to GIM. AMA's records confirmed that 2,132 promotional videos had been uploaded directly by AMA to GIM, effectively matching Mr. Bradbury's account summary (any discrepancy was truly minimal.) At that time, Mr. Bradbury never even mentioned *other* videos assigned to the PaidPerView account from Porn.com, particularly the thousand-plus videos "assigned" by this newly claimed "course of conduct." Bradbury's PaidPerView account summary for AMA establishes that the only videos licensed under the CPA were promotional videos that AMA provided to GIM, and any other new/undisclosed videos were made up *after* the District Court found the CPA did not apply to AMA's claims.

At the time Mr. Bradbury disclosed this new "course of conduct" theory/ defense,[12] he submitted *one* screen shot of AMA's PaidPerView account, which showed *one* video with a red asterisk assigned via this "review and assign"

---

[12] Mr. Bradbury had also disclosed the assignment of the CPA for the first time within 24 hours of the new "course of conduct" disclosure. On appeal, the Ninth Circuit concluded Mr. Bradbury's evidence was "conspicuously scarce" and "self-serving," striking down the assignment.

scheme. This sole example video was posted on Porn.com and assigned *after* the litigation ensued. There is no evidence of thousand-plus *illegal* AMA videos being assigned to AMA's account because there was no assignment program, and none of AMA's full-length videos were assigned to the PaidPerView Account.

In a "Skype" chat between AMA and Ross Allan, *submitted by Appellees* (the subject of which was AMA's concerns about piracy on Porn.com), Mr. Allan expressly confirmed that they *did not* review third party uploads on Porn.com in order to assign them. The conversation is as follows:

> 4:17:21 Ross Allan: *you guys have an account with us [PPV] right*
> 4:17:23 Ross Allan: you submit to us
> 4:17:25 Silverman: *yes, not that*
> 4:17:28 Silverman: *3rd party users*.
> 4:17:31 Ross Allan: right ok
> 4:17:32 Ross Allan: so the issue with that
> 4:17:54 Ross Allan: *I know you understand the dmca law, if we moderate user uploads, and miss something, we're liable for HUGE lawsuits*
> 4:19:52 Ross Allan: any videos on our site that are yours, we are happy to move to under your PPV account
> 4:20:18 Ross Allan: *but we need to see the content, we need the links to it*
> 4:20:23 Ross Allan: in order to act

3 ER 72, 91-92. (emphasis added). Mr. Allan clearly states that they were NOT "moderating" third party uploads and could not do so due to liability. If AMA wanted unauthorized videos assigned to the PaidPerView account, AMA had to affirmatively act by locating the videos itself, and making such request (thus

providing it) to have the videos assigned, inclusive of URL links to the videos. Thus, Appellees' new defense and its assertion that they had a "review and assignment" program that they unilaterally enforced were intentional and discernible misrepresentations. They were not reviewing videos, in order to assign them.

In addition, AMA was constantly monitoring its PaidPerView account and never observed any red asterisk nor discovered any videos in the account other than the promotional videos AMA uploaded itself, directly to GIM. Other content producer members of PaidPerView similarly confirmed that they had never observed or knew of any such assignment program for unauthorized videos posted on Porn.com. 2 ER 336-83; 3 ER 385-94.

AMA further established that the review/assignment scheme did not occur, including a review of screenshots of AMA infringements on Porn.com, showing they were *never assigned* to AMA's PaidPerView account. AMA's full-length videos at issue in this case *did not* include advertising or direct links to AMA's paid membership sites under §3.9. Any argument that Appellees "reviewed and assigned" precluded material and conferred advertising benefits under §3.9 to AMA is wholly unrelated to the conduct at issue, because the evidence shows this never actually happened (further confirmed by Account Summary).

Appellees went further in their deception by asserting that AMA knew about the assignment program (which never happened) and "enthusiastically consented" to assignment of unauthorized videos on Porn.com. Appellees supported their false contentions by presenting *partial* Skype chats between Cyberweb, Netmedia, and AMA. Appellees *intentionally omitted* key portions of the conversation that prove this review program did not exist at all, and that AMA *expressly demanded* that all unauthorized videos be taken down and "removed" from the site:

> 4:20:29 silverman: so let me rephrase
> 4:20:37 silverman: *we find illegal piracy on your site uploaded by 3rd party users*
> 4:20:39 silverman: *you remove the content*
> 4:22:12 Ross Allan: yeah
> 4:22:22 Ross Allan: we would pay you out at the rates that you qualify for in PPV
> 4:22:26 Ross Allan: so if your rate is 30% or whatever
> 4:22:28 Ross Allan: that's what we do
> 4:22:32 Silverman: 30% wouldn't cut it either
> 4:22:40 Silverman: because it's illegal
> 4:22:44 Silverman: why should you get to keep 70%
> 4:22:50 Silverman: *it's stolen*
> 4:22:53 Silverman: *and unauthorized*

2 ER 72-73, 91-92 (emphasis added).

It is Appellees' burden to establish that *as transaction participants* their alleged conduct in this case (scouring the internet for videos and images on its own independent of the Licensee and Licensor) is *closely related* to the contractual relationship. As the plaintiff in *Holland* was not permitted to establish the existence of a forum selection clause based upon scant self-serving affidavits with

no real evidence, *Holland*, 485 F.3d at 456, Appellees herein should not be permitted to connect their unlawful actions to the CPA by way of self-serving, contradictory, and discernibly false bare assertions. Such assertions must not stand.

"Transaction participant," under *Manetti-Farrow* cases, has almost always meant the non-signatory was found to be an agent or third-party beneficiary. Here, the District Court failed to determined whether Appellees are either agents or third-party beneficiaries *before* analyzing whether their alleged conduct "closely relates" to the CPA.

## IV.   Appellees are *not* third-party beneficiaries of the CPA.

Most cases in the Ninth Circuit where a non-signatory is permitted access to an FSC were actually third-party beneficiaries of the underlying contract. Such is not the case here. At District Court, Appellees argued they may take advantage of the FSC as third-party beneficiaries of the CPA. Third-party beneficiaries are a class of "transaction participants" contemplated as non-signatories that may have access to an FSC. *See Manetti-Farrow*, 858 F.2d at 514 n. 5; *Coastal Steel,* 709 F.2d at 203. Even if Appellees were third-party beneficiaries, in cannot be emphasized enough that, under the *Manetti-Farrow* reasoning, they still would not have access to the forum selection clause because their *alleged conduct* is not

closely related to the CPA, as explained in Section III.A-C.  And, Appellees are not even third-party beneficiaries to the contract.

If parties to a contract had no intention to benefit a third party, that third party has no rights under the contract.  *Britton,* 4 F.3d at 745*; Sherman v. British Leyland Motors, Ltd.,* 601 F.2d 429, 440, n. 13 (9th Cir. 1979).  The fundamental goal of contractual interpretation is to give effect to the *mutual* intention of the parties.  *Foad Consulting Group, Inc. v. Musil Govan Azzalino,* 270 F.3d 821, 829 (2001).

The CPA between AMA and GIM is simple:  AMA submits promotional content *to GIM* through PaidPerView.com, and *GIM* is permitted to provide streaming and downloading on websites *GIM* established, developed, and maintained and whose advertisements are operated by TrafficForce.  AMA and GIM share in generated revenue.  GIM performs under the CPA on many GIM websites having nothing to do with Porn.com, and none of the Defendants are considered crucial to the function of the CPA in those instances.

Review of the CPA illustrates that there were no third parties intended to benefit as it expressly contemplates GIM to perform all necessary acts under the contract.  GIM is required to stream the content; and establish, build, develop, and maintain the web sites where the content is streamed. AMA has the sole responsibility for providing content to GIM.  GIM explicitly warrants that it has

49

the ability to meet all obligations. The license is nontransferable, and therefore cannot be conveyed or sublicensed to others. There cannot be third parties intended to benefit from this contract, when all tasks to fulfill the contract are expressly delegated to the actual parties of the contract.

There is no evidence that AMA *intended* to benefit any third party under the CPA, and certainly there is no evidence that AMA wished to benefit Appellees under the CPA. Without AMA's mutual assent to benefit Appellees, those parties simply cannot be deemed third party beneficiaries as a matter of law. *Britton, supra; Foad, supra.*

That AMA knew that content provided to GIM would be ultimately displayed on Porn.com does not confer intent to benefit the owners and operators of Porn.com. Such argument is yet another red herring. The CPA permits only GIM to stream PaidPerView Content – and through this contract AMA believed that GIM would be streaming PaidPerView content on Porn.com, for the benefit of GIM.[13] AMA had absolutely no intention for Appellees benefit from the terms and conditions of the CPA. AMA entered the CPA for the sole benefit of GIM.

---

[13] Until this litigation ensued, AMA was unaware that GIM was not streaming videos on Porn.com. This litigation educated AMA that Appellees were doing the actual streaming.

## V.  Appellees are *not* agents of GIM.

Appellees argued that they had access to the FSC as agents of GIM (pointing only to a singular out of context allegation by AMA rather than actual evidence). Agents are considered potential "transaction participants" with access to dispute resolution clauses, including FSC.  However, even in such cases, the agent's actions subject to the claims must closely relate to the contract.  *Britton*, 4 F.3d at 747.  As stated in Section III.A.-C, Appellees' alleged conduct is not closely related to the CPA.  Further, Appellees are simply not agents of GIM.

Agency is a fiduciary relationship that arises when one-person (a "principal") manifests assent to another person (an "agent") that the agent shall act *on the principal's behalf* and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.  *Rest. 3d of Agency*, § 1.01.  To establish an agency relationship, a party must set forth evidence that: (1) the agent holds power to alter legal relations between the principal and third persons and between the principal and himself; (2) the agent is a fiduciary with respect to matters within the scope of the agency; and (3) the principal has right to control the conduct of the agent. *Solid Host, NL v. Namecheap, Inc.*, 652 F. Supp. 2d 1092, 1111 n.53 (C.D. Cal. 2009).

In examining each Appellee, it is clear that there is no agency relationship with GIM.  Appellees present no facts supporting a conclusion that GIM is their principal, that they hold power to alter relationships between third parties and GIM, that they are fiduciaries with respect to matters within the scope of the agency, or that GIM retains the right to control them with respect to their duties.

There is simply no evidence that Sagan is an agent of GIM. Sagan is Cyberweb's agent.  7 ER 1154-58.  With regard to Cyberweb, Cyberweb falsely claimed it hired GIM in a technical services agreement (copy never produced and contradicted by their own representation in Barbados).  Based upon their assertion (which is false), Cyberweb would be the principal, and GIM would be Cyberweb's agent.  They have confused the roles, they are trying to assert that Cyberweb is the agent and GIM is the principal.

Netmedia Services does have a technical services contract with GIM specific to the operation of GIM's many web sites (i.e. HostedTube, not Porn.com).  However, this contract expressly states that Netmedia *is not an* agent *of GIM*.  7 ER 1147-52.  Since the contractual relationship clearly states it is not an agency relationship, Netmedia cannot now come forward and claim to be an agent.

While a Netmedia-GIM services contract exists, it does not explicitly state for work on Porn.com.  In the Barbados litigation, in Paragraph 1.2.1 of the Statement of Claim, these Appellees expressly assert that *Cyberweb employs*

*Netmedia directly under a different Technical Services Agreement relating to Porn.com.* Thus, it appears that there is no Netmedia-GIM agreement pertaining to Porn.com, but rather Netmedia works for Cyberweb via its own contract, independently of GIM.

Koonar has different positions and directorships in each corporate Defendant. He is a director of a holding company which owns 100% of GIM, and 50% of Cyberweb and Sagan (Sagan is Cyberweb's agent). He is the President of Netmedia. He is an agent of Netmedia, and if the Court finds him to be an agent of GIM, then he is also an agent of Cyberweb because his involvement is identical (via the holding corporation). At this stage, the court must determine if Koonar's actions in this case were as GIM's agent, or as Netmedia, Cyberweb, and Sagan's agent. Porn.com is owned by Cyberweb, Sagan is Cyberweb's agent, and Netmedia performs all work for Porn.com via a Cyberweb-Netmedia agreement, having nothing to do with GIM. Koonar's alleged actions in this case are *not* as a GIM agent, but rather as an agent to the corporate Appellees. The Court must parse through his different executive positions and directorships and attribute his actions to the correct corporations.

Non-signatory agents can only enforce a FSC if there is evidence that the contractual parties intended for the agent to benefit from the clause. *Morgan Tire*

*of Sacramento, Inc. v. Goodyear Tire & Rubber Co.*, 60 F. Supp. 3d 1109, 1119
(E.D. Cal. 2014).  No such intent is manifested here.

### VI.  Appellees are *not* implied licensees.

Appellees also assert that they are implied licensees, and thus entitled to
enforce the FSC.  There has not been a single case where an "implied licensee" is
considered an acceptable non-party "transaction participant" under *Manetti-Farrow*.

Appellees assert they are an implied licensee for the following reasons: the
CPA would be worthless without an implied license on Porn.com because GIM has
no websites (false); AMA knew that videos provided to GIM were  being displayed
on Porn.com; and AMA knew Appellees were performing tasks under the CPA as
GIM's agents.  While the District Court did not address this argument, the facts
and arguments were presented and it is requested that the Ninth Circuit do so now.

Even if these assertions were true (they are not), Appellees have no case law
or logical argument supporting that an implied license to display AMA provided
content on Porn.com means the implied license grants access to the FSC under
*Manetti-Farrow*.  The explicit language of the CPA explicitly states after granting
GIM a nontransferable license for material AMA provides to GIM, "No license to
any other intellectual property of Licensor is provided hereby." Thus, no additional
licenses can be created under the CPA.  Yet Appellees are arguing for the creation

of additional licenses for AMA intellectual property that is expressly precluded from the license, to third parties, under the CPA, in violation of this language.

AMA was aware that content that *AMA provided to GIM* was streamed on Porn.com (with belief that GIM was streaming). AMA also knew this was the exact same program materials AMA provided to Cyberweb via its 2007 agreement with Cyberweb. Likely, if AMA were to sue Appellees for display of promotional content AMA submitted to GIM, they may have an implied license defense for the promotional content (not the alleged conduct in this case). However, access to the FSC is not created by such implied license.

There is no valid argument or case law to support an implied license extends further or grant access to another's FSC based upon an independent course of conduct where a contract forecloses the material at issue and additional licenses. Moreover, having an implied license for material AMA provides to GIM is unrelated to the conduct in this dispute which involves material that was illegally acquired irrespective of both AMA and GIM.

In *Foad,* 270 F.3d at 821, an implied license was found in favor of an architectural firm using engineering plans to develop a final site plan. The contract with the engineering firm granted an implied license to the architect in order to complete the project it was designed for. *Id.* at 832. (There was no issue, and thus not finding, that the implied license carried with it an FSC.) Here, the infringed

content has nothing to do with GIM allowing a "subsequent" entity fulfilling the requirements or purpose of the CPA on GIM websites.

In *Effects Assocs v. Cohen*, 908 F.2d 555 (9th Cir. 1009), upon verbal contract, plaintiff granted an implied license based upon plaintiff creating the work at the defendant's request intending that the defendant copy and distribute it. *Id.* 558-59. Here, AMA has its own contract with Appellees (without a FSC) *and* specifically demanded that Appellees NOT use or display any unauthorized AMA content.

In *Keane Dealer Servs. V. Harts*, 968 F. Supp. 944 (S.D.N.Y. 1997), parties disputed over a software program after defendant purchased retail branches and software containing an interface developed in part by plaintiff. Smith Barney's purchase resulted in an implied license for the interface as there was no objection to its known use. *Objection* there meant *revocation* of any implied license. *Id.* at 947. Here, AMA did object to Appellees' use of any content that AMA had not submitted to GIM.

In *Field v. Google, Inc.*, 412 F. Supp. 2d 1106 (D. Nev. 2006), absent explicit agreement between the parties, the Court looked to conduct to determine the existence of an implied license. The Court decided that by requesting Google to index/crawl his website and not taking standard procedures to opt out, Field had acquiesced to Google caching his images. *Id.* at 1115-16. Here, AMA specifically

objected to Appellees' use of illegally provided material, and AMA made it clear that Appellees were not granted license to use any other content for any purpose. A perceived implied license would be revoked. Therefore, the "implied" license argument fails entirely.

In *Gen. Protect Group, Inc. v. Leviton Mfg. Co.,* 651 F.3d 1355 (Fed. Cir. 2011), an FSC was triggered by an implied license arising from a continuation patent stemming from a settlement agreement, *between the parties*. *Id.* at 1358. The instant matter is clearly distinguishable. Here, *non-signatories* are baselessly arguing for an implied license for *any* AMA content based upon a different company's restrictive *nontransferable license*, a manufactured and provably false course of conduct, the existence of a direct contract between the relevant parties (the 2007 AMA-Cyberweb contract), and language in the CPA that explicitly stated the contract does not provide for any other licenses and the material at issue is precluded. Simply put, no implied license exists.

# Conclusion

The District Court's dismissal of AMA's claims should be overturned, and this matter remanded with all pre-answer motions resolved in AMA's favor. The District Court has not articulated any reasoning for why the CPA applies to the claims here. The District Court's overturned ruling, finding the CPA applied to AMA's claims, acknowledged the CPA was a licensing agreement between a Licensor (AMA) and a Licensee (now GIM), and that the court would need to evaluate the actions of the licensee. However, AMA is not alleging infringement against the licensee, GIM. In fact, Appellees' conduct was completely independent of GIM and the CPA.

The District Court's determination that Appellees were transaction participants, and thus had standing to assert the FSC was an abuse of discretion. In order to find Appellees had standing under *Manetti-Farrow* to enforce the FSC, the District Court was required to determine that Appellees' *alleged conduct (infringement)* "so closely relates" to the CPA, but failed to do so. Inexplicably, considering the clear standard set forth by the Ninth Circuit, the District Court failed to consider Appellees' alleged conduct (infringement) at all, let alone find the alleged conduct so closely related to the CPA.

Appellees' alleged conduct does not closely relate to the CPA. Their actions were separate and distinct from the CPA, and for the sole benefit of

themselves. Appellees conceded this with their own evidentiary submissions, a "complete" and detailed account summary of what videos were treated as licensed. The CPA governs *only* AMA content AMA provides to GIM through the PaidPerView program, precisely corroborated by Appellees' submitted account summary. The CPA has nothing to do with the full-length content, content not submitted by AMA, or images stolen from AMA and displayed for free with no compensation or advertising benefits to AMA. The Court can fully rely upon Appellees' own evidentiary submissions – the account summary as well as the *full* Skype logs where the Defendants admitted they were not reviewing Porn.com to assign this other, illegal material at issue in this case to the CPA.

The alleged infringement conduct does not benefit parties GIM, AMA, or the CPA's PaidPerView program, but only non-signatory Appellees. Therefore, the alleged conduct cannot be "so closely related" to the CPA and Appellees are not transaction participants entitled to enforce the FSC.

Further, Appellees are not third-party beneficiaries to the CPA, not agents of GIM, and do not have an implied license to the illegally acquired full-length content or the images.

Accordingly, it is respectfully requested that District Court's dismissal be overturned and this matter remanded to the District Court.

DATED: March 6, 2019.

*/s/ Spencer Freeman*                   */s/ Veronica L. Manolio*

Spencer D. Freeman (25069)      Veronica L. Manolio (020230)
sfreeman@freemanlawfirm.org    vmanolio@mf-firm.com
Freeman Law Firm, Inc.          Manolio & Firestone, PLC
1107 ½ Tacoma Avenue South    8686 E. San Alberto Dr., Suite 200
Tacoma, WA 98402            Scottsdale, AZ 85258
(253) 383-4500               (480) 222-9100

Counsel for Plaintiff/Appellant AMA Multimedia, LLC

**Certificate of Compliance Pursuant to FRAP 32(a)(7)(c), FRAP 32(g) and 9th Circuit Rules 32-1 for Case Number 18-17117**

I certify that this brief complies with the length limits permitted by Ninth Circuit Rule 32-1.  Using Microsoft Word word count, the brief is 12,991 words, excluding portions exempted by Fed.R.App.P. 32(f), if applicable.  The brief's type size and type face comply with Fed.R.App.P. 32(a)(5) and (6).

Dated March 6, 2019.

*/s/  Spencer D. Freeman*
Counsel for Appellant
AMA Multimedia, LLC

**Statement of Related Cases**

Pursuant to Circuit Rule 28-2.6, AMA v. Sagan Limited, et al. Ninth Circuit

Court of Appeals Case No. 17-15178 relates to the instant matter as it arises out of

the same case, had been heard in this Court, and involves the same events.

## Certificate of Service

### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on March 6, 2019.

/s/  *Spencer D. Freeman*
Counsel for Plaintiff/Appellant
AMA Multimedia, LLC

# EXHIBIT B

NO. 18-17117

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
_____

AMA MULTIMEDIA, LLC,
*Plaintiff-Appellant,*

v.

SAGAN LIMITED, individually and d/b/a Porn.com, CYBERWEB LTD., formerly MXN LTD., individually and d/b/a Porn.com, NETMEDIA SERVICES, INC., individually and d/b/a Porn.com, GLP 5, INC., individually and d/b/a Trafficforce.com, and DAVID KOONAR, an individual,
*Defendants-Appellees.*
_____

## ANSWERING BRIEF OF DEFENDANTS-APPELLEES
_____

On Appeal From The United States District Court
For The District Of Arizona, Case No. 2:16-cv-01269-DGC
The Honorable David G. Campbell, Senior United States District Judge
_____

ERICA J. VAN LOON – CA State Bar No. 227712
evanloon@lathropgage.com
JOSHUA J. POLLACK – CA State Bar No. 215922
jpollack@lathropgage.com
AMY E. BURKE – CA State Bar No. 276699
aburke@lathropgage.com
LATHROP GAGE LLP
1888 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone: (310) 789-4600
Facsimile:  (310) 789-4601

Attorneys for Defendants-Appellees

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellees submit the following corporate disclosure statements with respect to those Appellees that are corporations:

Sagan Limited ("Sagan") is a Seychelles Corporation. Sagan has no parent corporations or entities.

1890933 Ontario Inc., formerly known as Netmedia Services, Inc. ("Netmedia"), is a Canadian company. Netmedia is owned by Imagination Capital, a Canadian company. No publicly held company owns 10% or more of its stock.

Cyberweb Limited ("Cyberweb") is a Barbados Corporation. Cyberweb is 50% owned by 1614985 Ontario Inc., a Canadian company, and 50% owned by Pavilion, a Nevis company. No publicly held company owns 10% or more of its stock.

GLP 5, Inc. ("GLP 5"), was a Michigan corporation that has been dissolved. GLP 5 was owned by GLP 5, Ltd., a Seychelles corporation.

Dated: May 6, 2019

/s/ Erica J. Van Loon
Erica J. Van Loon
Joshua J. Pollack
Amy E. Burke
Lathrop Gage LLP

Counsel for Defendants-Appellees

i

# <u>TABLE OF CONTENTS</u>

**Page**

I.   JURISDICTIONAL STATEMENT ..................................................1

II.   STATEMENT OF ISSUES PRESENTED FOR REVIEW ............................2

III.   STATEMENT OF THE CASE...................................................................3

    A.   Parties ....................................................................................3

    B.   Relevant Facts and Procedural History ................................4

IV.   SUMMARY OF ARGUMENT ......................................................10

V.   STATEMENT OF APPLICABLE STANDARD OF REVIEW....................15

VI.   THE CPA'S FORUM SELECTION CLAUSE APPLIES TO AMA'S COPYRIGHT CLAIMS ...............................................................17

    A.   The District Court Correctly Determined That Its Previous Ruling That The Forum Selection Clause Applies To AMA's Copyright Claims Was "Not Disturbed" On Appeal............................................17

    B.   The District Court Did Not Abuse Its Discretion In Finding That The Forum Selection Clause Applies To AMA's Copyright Claims ........20

        1.   AMA's Proposed Frivolous Analysis Is Contrary To Ninth Circuit Law ...............................................................25

        2.   The District Court Did Not Abuse Its Discretion In Finding Defendants' License Defense Non-Frivolous..........................27

            a.   The CPA Is Not Limited To Content AMA "Provided" Via Uploads Or Specific Formats, As AMA Contends..30

            b.   Section 3.9 Of The CPA Would Be Rendered Meaningless If (As AMA Argues) Content Originating On A Website Is Unlicensed .........................................31

            c.   The Parties' Course Of Performance Under The CPA Shows That They Have Treated Any AMA Content That Appears On Porn.Com As Licensed And Subject To The CPA's Revenue Sharing Provisions, Regardless Of Whether AMA Uploaded The Content..........................33

            d.   AMA's Claims Are Based, At Least In Part, On Content It Uploaded Itself. ......................................................34

       3.     Neither AMA's 2007 Agreement With Cyberweb Nor The Upload Dates Of Some Of The Alleged Infringing Works Alter The Fact That The CPA's Forum Selection Clause Applies To AMA's Copyright Claims ........................................................... 35

   C.    AMA Waived Its Argument That The District Court's Previous Ruling That The Forum Selection Clause Applies To AMA's Copyright Claim Was Disturbed On Appeal ...................................... 38

VII. APPELLEES HAVE STANDING TO ENFORCE THE CPA'S FORUM SELECTION CLAUSE ................................................................... 39

   A.    The District Court Did Not Abuse Its Discretion In Finding That Defendants Have Standing To Enforce The Forum Selection Clause As Closely Related Parties Under *Manetti-Farrow* and *Holland America* ........................................................................................... 39

   B.    Defendants Have Standing To The Enforce The Forum Selection Clause As Third-Party Beneficiaries, Agents, Implied Licensees, Or Assignees Of The CPA ........................................................... 47

       1.     Defendants Have Standing To Enforce The Forum Selection Clause As Third-Party Beneficiaries Of The CPA .................. 48

       2.     Defendants Have Standing To Enforce The Forum Selection Clause As Agents Of GIM ....................................................... 49

       3.     Defendants Have Standing To Enforce The Forum Selection Clause As Implied Licensees Under The CPA ........................ 51

       4.     Defendants Have Standing To Enforce The Forum Selection Clause As Assignees Of GIM ................................................... 54

VIII. CONCLUSION ................................................................................. 56

IX.  STATEMENT OF RELATED CASES ........................................... 58

CERTIFICATE OF SERVICE ................................................................ 59

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adema Techs., Inc. v. Wacker Chem. Corp.*,
  657 F. App'x 661 (9th Cir. 2016) ........................................................23

*Altvater Gessler-J.A. Baczewski Int'l (USA) Inc. v. Sobieski
  Destylarnia, S.A.*,
  572 F.3d 86 (2d Cir. 2009) ........................................................25, 27

*AMA Multimedia, LLC v. Sagan Ltd.*,
  720 F. App'x 873 (9th Cir. 2018) ........................................................15

*American Title Ins. Co. v. Lacelaw Corp.*,
  861 F.2d 224 (9th Cir. 1988) ........................................................51, 56

*ASARCO, LLC v. Union Pac. R.R. Co.*,
  765 F.3d 999 (9th Cir. 2014) ........................................................32

*Bagdasarian Prods., LLC v. Twentieth Century Fox Film Corp.*,
  No. 2:10-cv-02991-JHN-JCGx, 2010 WL 5154136 (C.D. Cal.
  Aug. 12, 2010) ........................................................24

*Bourne v. Walt Disney Co.*,
  68 F.3d 621 (2d Cir. 1995) ........................................................28

*Cigna Prop. & Cas. Ins. Co. v. Polaris Pictures Corp.*,
  159 F.3d 412 (9th Cir. 1998) ........................................................47

*Clinton v. Janger*,
  583 F. Supp. 284 (N.D. Ill. 1984) ........................................................45

*Coastal Steel Corp. v. Tilghman Wheelabrator, Ltd.*,
  709 F.2d 190 (3rd Cir. 1983) ........................................................40, 44, 45

*Color Switch LLC v. Fortafy Games DMCC*,
  No. 1:18-cv-00419-DAD-JLT, 2019 WL 1427975 (E.D. Cal. Mar.
  29, 2019) ........................................................24

*E.E.O.C. v. Maricopa Cty.*,
    339 F. App'x 688 (9th Cir. 2009) ...................................................................28

*Effects Assocs., Inc. v. Cohen*,
    908 F.2d 555 (9th Cir. 1990) ...................................................................51, 52

*Foad Consulting Grp., Inc. v. Azzalino*,
    270 F.3d 821 (9th Cir. 2001) ............................................................................51

*FutureSource LLC v. Reuters Ltd.*,
    312 F.3d 281 (7th Cir. 2002) ............................................................................32

*General Protecht Group, Inc. v. Leviton Manufacturing Co.*,
    651 F.3d 1355 (Fed. Cir. 2011) ..............................................19, 20, 25, 26

*Graham Tech. Solutions, Inc., v. Thinking Pictures, Inc.*,
    949 F. Supp. 1427 (N.D. Cal. 1997) ...............................................................24

*Hart v. Massanari*,
    266 F.3d 1155 (9th Cir. 2001) .........................................................................22

*Holland Am. Line Inc. v. Wartsila N. Am., Inc.*,
    485 F.3d 450 (9th Cir. 2007) ................................................................*passim*

*In re Orange S.A.*,
    818 F.3d 956 (9th Cir. 2016) ...........................................................................22

*Keller v. McGraw-Hill Global Educ. Holding, LLC*,
    Civil Action No. 16-1778, 2016 WL 4035613 (E.D. Pa. July 28,
    2016) .................................................................................................................35

*Klamath Water Users Protective Ass'n v. Patterson*,
    204 F.3d 1206 (9th Cir. 2000) .........................................................................48

*Kode v. Carlson*,
    596 F.3d 608 (9th Cir. 2010) ...........................................................................15

*Liberty City Church of Christ, Inc. v. Taylor*,
    No. 5:12-CV-04392 EJD, 2013 WL 621792 (N.D. Cal. Feb. 15,
    2013) .................................................................................................................47

*Manetti-Farrow, Inc. v. Gucci Am., Inc.*,
    858 F.2d 509 (9th Cir. 1988) ................................................................*passim*

*Mediterranean Enters., Inc. v. Ssangyong Corp.*,
   708 F.2d 1458 (9th Cir. 1983) ............................................................22

*Morgan Tire of Sacramento, Inc. v. Goodyear Tire & Rubber Co.*,
   60 F. Supp. 3d 1109 (E.D. Cal. 2014) ........................................48, 50

*Murphy v. Schneider Nat'l, Inc.*,
   362 F.3d 1133 (9th Cir. 2004) ............................................................15

*O'Guinn v. Lovelock Corr. Ctr.*,
   502 F.3d 1056 (9th Cir. 2007) ............................................................38

*Phillips v. Audio Active Ltd.*,
   494 F.3d 378 (2d Cir. 2007) ..........................................................25, 27

*Questrel, Inc. v. Merriam-Webster, Inc.*,
   No. SACV 10-1907 AG (MLGx), 2011 WL 7637786 (C.D. Cal.
   Mar. 23, 2011)..............................................................................24, 35

*S.O.S., Inc. v. Payday, Inc.*,
   886 F.2d 1081 (9th Cir. 1989) ............................................................28

*Scherk v. Alberto-Culver Co.*,
   417 U.S. 506 (1974).............................................................................22

*Schoenduve Corp. v. Lucent Technologies, Inc.*,
   442 F.3d 727 (9th Cir. 2006) .....................................................*passim*

*Scott USA Inc. v. Patregnani*,
   No. 1:14-cv-00482-BLW, 2015 WL 1736496 (D. Idaho Apr. 16,
   2015) ...................................................................................................44

*Stevens v. CoreLogic, Inc.*,
   194 F. Supp. 3d 1046 (S.D. Cal. 2016).............................................54

*Sun v. Advanced China Healthcare, Inc.*,
   901 F.3d 1081 (9th Cir. 2018) .....................................................21, 26

*Ultratech, Inc. v. Ensure NanoTech (Beijing), Inc.*,
   108 F. Supp. 3d 816 (N.D. Cal. 2015).............................................47

**Statutes**

17 U.S.C. § 101 ...........................................................................................1

17 U.S.C. § 507(b) ....................................................................................37

28 U.S.C. § 1291 ........................................................................................1

28 U.S.C. § 1331 ........................................................................................1

28 U.S.C. § 1338 ........................................................................................1

**Other Authorities**

Federal Rule of Appellate Procedure 4(a)(1)(A) .......................................1

11 *Williston on Contracts* § 32:5 (4th ed. 2014) ....................................32

# I.   JURISDICTIONAL STATEMENT

The United States District Court for the District of Arizona had subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because it was a civil action arising under the laws of the United States, specifically, 17 U.S.C. § 101 *et seq.*, and pursuant to 28 U.S.C. § 1338 because it was a civil action arising under an Act of Congress relating to copyrights.

The United States Court of Appeals for the Ninth Circuit has jurisdiction over this matter pursuant to 28 U.S.C. § 1291 because this appeal arises from a final decision of the United States District Court for the District of Arizona.

The date of the decision of the United States District Court for the District of Arizona was October 24, 2018. Pursuant to Federal Rule of Appellate Procedure 4(a)(1)(A), the Notice of Appeal was timely filed on October 26, 2018.

## II.    <u>STATEMENT OF ISSUES PRESENTED FOR REVIEW</u>

1.    Did the District Court abuse its discretion in determining that Defendants have standing to enforce the forum selection clause in the Content Partner Revenue Sharing Agreement ("CPA") between Appellant AMA Multimedia, LLC ("AMA"), and G.I.M. Corporation ("GIM") because Defendants' alleged conduct is closely related to the contractual relationship between AMA and GIM?

2.    Do Defendants have standing to the enforce the forum selection clause in the CPA as third-party beneficiaries, agents, implied licensees, or assignees?

## III.   STATEMENT OF THE CASE

### A.   Parties

Plaintiff-Appellant AMA Multimedia, LLC ("AMA"), is a Nevada limited liability company. AMA produces adult audiovisual material (i.e., pornography), which it distributes through DVD sales and the World Wide Web via its web sites under its known brands "Passion-HD," "Porn Pros," "Castingcouch-x.com," "FantasyHD," and "Tiny4k.com," among others. 6 Excerpts of Record ("ER") 1064-66 (First Amended Complaint ("FAC")) at ¶¶ 28, 35, 39, 41, 43, 45.

Defendant-Appellee 1890933 Ontario Inc., formerly known as Netmedia Services, Inc. ("Netmedia"), is a computer services company located in Ontario, Canada. 6 ER 1028 at ¶¶ 10, 12. Netmedia provides general maintenance of certain websites, including Porn.com. *Id.* at ¶ 12.

Defendant-Appellee Cyberweb, Ltd. ("Cyberweb"), formerly MXN Ltd., is a Barbados corporation. Cyberweb is an owner and operator of Porn.com. 4 ER 578 at ¶¶ 2, 5; 6 ER 1061 (FAC) at ¶ 4.

Defendant-Appellee Sagan Limited ("Sagan") is a Seychelles corporation. Sagan is an owner of Porn.com. 4 ER 718 at ¶ 3; 6 ER 1061 (FAC) at ¶ 2.

Defendant-Appellee David Koonar ("Koonar") is a resident of Canada. He is the President of non-party G.I.M. Corporation ("GIM"). Koonar is also the President of Netmedia. 7 ER 1174 at ¶ 1; 6 ER 1061 (FAC) at ¶ 8.

3

Defendant-Appellee GLP 5, Inc. ("GLP 5"), was a Michigan corporation
that did business as TrafficForce.com, an advertising and publishing network. 6 ER
1061, 1066-1067 (FAC) at ¶¶ 7, 47.

### B.    Relevant Facts and Procedural History

In this action, AMA alleges that Sagan, Cyberweb, Netmedia, and Koonar
(collectively, "Defendants") are each owners and/or operators of Porn.com. 6 ER
1061-62, 1066 (FAC) at ¶¶ 2-8, 46; Appellant's Opening Brief ("Opening Br.") at
4. AMA further alleges that Defendants engaged in copyright infringement by
displaying without authorization sixty-four (64) of AMA's full-length videos on
Porn.com. 6 ER 1072-73 (FAC) at ¶ 78. Defendants categorically deny any
wrongdoing, and contend that they had the right to display the allegedly infringing
material based on a Content Partner Revenue Sharing Agreement ("CPA" or
"CPRA") that AMA entered into in September 2012 with one of Defendants'
affiliates, GIM, "for revenue sharing on content posted on Porn.com." 6 ER 929 at
¶ 17; *see also* 5 ER 732 at ¶ 22.

Under the CPA, AMA authorized the display of AMA-copyrighted content
on any websites whose advertisements are controlled by the Traffic Force
Advertising Management System, including Porn.com. 6 ER 1050 (CPA) at
Background, § B ("Licensee desires to provide the Content to end users of a
single/(group of) website(s) (the "Website(s)") on the Worldwide Web, who's [sic]

advertisements are controlled by the Traffic Force Advertising Management
System, ("Traffic Force") . . . ."); *id.* at § 1.1 (". . . Licensor grants Licensee a non-
exclusive, nontransferable worldwide license during the Term to use, publish,
display, and distribute the Content on the Website(s), solely for the Purpose."). In
exchange, AMA received a portion of the advertising revenue generated by its
videos under the paidperview.com revenue sharing program. 6 ER 929 at ¶ 17.

AMA filed this action in the District Court of Arizona notwithstanding that
the CPA contains a forum selection clause requiring that all claims arising out of or
relating to the CPA be brought in Barbados courts:

> 10.5 Choice of Law. This Agreement shall be governed by and
> construed in accordance with the laws of Barbados, without regard to
> conflicts of law principles. Any legal action arising out of or relating
> to this Agreement must be instituted in a court located in Barbados
> and the Parties submit to the jurisdiction of any such court.

6 ER 1055 (CPA) at § 10.5.

Defendants filed multiple motions (ultimately consolidated) to the District
Court seeking dismissal of AMA's copyright infringement claims on *forum non
conveniens* grounds based on the CPA's forum selection clause. 1 ER 2-3 (citing
Docs. 27-1, 42-1, 49-1, and 70-1). Following jurisdictional discovery, the District
Court granted Defendants' motions to dismiss based on *forum non conveniens*. 1
ER 16-33 (January 26, 2017, Order). The District Court found that the forum
selection clause in the CPA (1) applies to AMA's copyright infringement claims

because the dispute arises out of or relates to the CPA, (2) is valid and enforceable, and (3) can be invoked by Koonar as an officer of GIM and by Cyberweb, Netmedia, and Sagan because they are affiliates of GIM and were assigned rights under the CPA. 1 ER 20-32; 1 ER 3.

AMA appealed and the Ninth Circuit vacated the District Court's judgment, finding that the record did not adequately support an assignment of GIM's rights under the CPA. 1 ER 11-15 (April 27, 2018, Memorandum). The Ninth Circuit remanded the case for further proceedings, stating that "[w]e do not reach Defendants' alternative arguments for enforcing the forum-selection clause, including those based on an implied license, agency relationships, or third party beneficiary status. '[A] range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses.' *Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 n.5 (9th Cir. 1988) . . . . Defendants may pursue those theories on remand." 1 ER 15.

At the District Court's direction, the parties filed supplemental briefs. 2 ER 271-292; 1 Supplemental Excerpts of Record ("SER") 16-37 and 1-15. Defendants argued that they have standing to enforce the CPA's forum selection clause as closely related parties under *Manetti-Farrow* and because of their status as agents of GIM, third-party beneficiaries of the CPA, implied licensees, and/or assignees of rights under the CPA. 2 ER 271-292; 1 SER 1-15. AMA argued that

Defendants' operation of Porn.com and allegedly infringing conduct have nothing
to do with the CPA or GIM. 1 SER 24-36.

In its October 24, 2018, Order granting Defendants' renewed motion to
dismiss based on *forum non conveniens*, the District Court stated that it "previously
found that the CPRA's forum selection clause applies to AMA's copyright claims
and otherwise is valid and enforceable" and that "[t]hese findings were not
disturbed on appeal." 1 ER 3 (citing Doc. 126 at 5-11, 14-17 [1 ER 20-26, 29-32]
and Doc. 147-1 [1 ER 11-15]). The District Court then held that "[t]he evidence in
this case, even when construed in AMA's favor, shows that Defendants are so
closely related to the contractual relationship between AMA and GIM that they
have standing to invoke the CPRA's forum selection clause." 1 ER 5.

The District Court found that AMA entered into the CPA with GIM for the
specific purpose of having its content displayed on Porn.com, and that AMA knew
Porn.com was owned and operated by Cyberweb and Netmedia:

> AMA's assertion that Defendants are strangers to the CPRA is
> disproved by the record. Doc. 157 at 2 [1 SER 17]. AMA notes that
> while the CPRA required GIM to develop and operate the websites
> featuring the AMA videos, Defendants – not GIM – own and operate
> Porn.com. *Id.* at 4-6, 13 [1 SER 19-21, 28]. AMA suggests that it had
> no knowledge or expectation that its videos would be posted on
> Porn.com pursuant to the CPRA, but this plainly is incorrect. The
> evidence shows that AMA entered into the CPRA for the specific
> purpose of having its videos displayed on Porn.com, not GIM-owned
> websites, and that AMA knew Porn.com was owned and operated by
> Cyberweb and Netmedia. Shortly before entering into the CPRA,
> AMA's president, Adam Silverman, asked a colleague to check out "a

7

submission prog[ram] *for porn.com* that also includes a payout for views," and the colleague responded that he "was keen to get our videos *on porn.com*." Doc. 38-3 at 6 [5 ER 794] (emphasis added). Mr. Silverman stated in a declaration that "[i]n September 2012, AMA entered into a content partnership agreement with GIM *for revenue sharing on content posted on Porn.com*." Doc. 33-2 ¶ 17 [6 ER 929] (emphasis added); *see also* Doc. 34-1 ¶ 22 [1 SER 108] ("AMA previously entered into a [CPRA] for promotional materials to be posted on Porn.com. The [CPRA] is with GIM[.]"); Doc. 38-1 ¶ 22 [5 ER 732] (same). Mr. Silverman testified that "[w]hen AMA signed up for the [CPRA] *for Porn.com*, AMA representatives had direct contact with . . . *Netmedia* regarding initiating the program." Doc. 38-1 ¶ 29 [5 ER 733] (emphasis added). Further, when AMA had questions about user-uploaded videos under the Paidperview.com program, AMA communicated with representatives of Netmedia and Cyberweb. Doc. 83-1 [3 ER 411-433]. Contrary to AMA's assertion, the parties intended that AMA's videos would be posted on Porn.com pursuant to the CPA, and AMA knew that the site was not actually operated by GIM.

1 ER 5-6. AMA does not mention any of this evidence in its Opening Brief.

The District Court also found that that "AMA could not have posted its videos on Porn.com and benefited from the Paidperview.com program – the express purpose of the CPRA – without Defendants' involvement." 1 ER 5. The District Court based this finding on the following evidence:

AMA itself alleges that "Defendants Sagan Limited, Cyberweb Ltd., Netmedia Services, Inc., and David Koonar are each owners and/or operators of Porn.com and/or are doing business as Porn.com." Doc. 16 ¶ 46 [6 ER 1066]. When AMA became a member of GIM's Paidperview.com program in order to post videos on Porn.com, GIM necessarily involved Defendants in the CPRA. Porn.com is owned by Cyberweb and Sagan, not GIM. Docs. 67 at 2 [1 SER 46], 157 at 3-4 [1 SER 18-19]. Cyberweb entered into an agreement with GIM to facilitate the operation of Porn.com, and GIM in turn subcontracted with Netmedia because GIM does not have the technical capacity to

operate Porn.com or administer the Paidperview.com program. Docs.
117 at 8 [2 SER 228], 132 at 10 [2 SER 213]. All technical aspects
and day-to-day operation of both Porn.com and Paidperview.com is
performed by Netmedia. Docs. 67 at 3 [1 SER 47], 117 at 3-4, 7 [2
SER 223-224, 227].

1 ER 5.

The District Court further found that "Defendants Cyberweb, Netmedia, and

Sagan are not only involved in the operation of Porn.com, they are, as AMA

acknowledges, closely related entities. Indeed, AMA asserts that Koonar is the

'common thread' among these entities and the 'driving and guiding force behind

Porn.com.' Doc. 117 at 8 [2 SER 228]. Koonar is the president of the holding

company that owns all of GIM and 50% of Cyberweb. *Id.* He is also the president

of GIM and Netmedia. *Id.* Sagan is a Seychelles corporation and is listed as the

owner-operator of Porn.com in Porn.com's terms of service and a form filed with

the U.S. Copyright Office. Docs. 16 ¶ 3 [6 ER 1061], 38 at 3 n.1 [1 SER 74]." 1

ER 6.

Based on the above, the District Court concluded that, "[i]n short, there can

be no doubt that Defendants are all closely related to the contractual relationship

created by the CPRA – the relationship under which AMA sought to have its

materials displayed on Porn.com." 1 ER 6. The District Court granted Defendants'

renewed motion to dismiss based on *forum non conveniens* and dismissed AMA's

claims against GLP 5 for lack of personal jurisdiction. 1 ER 9.

## IV.   **SUMMARY OF ARGUMENT**

The CPA's forum selection clause requires that any legal action "arising out of *or relating to*" the CPA be brought in Barbados courts. The District Court found in its January 26, 2017, Order that the CPA's forum selection clause applies to AMA's copyright infringement claims, and determined in its October 24, 2018, Order that this finding was "not disturbed on appeal." AMA's argument that "[t]he District Court was wrong that its determination that the CPA's forum selection clause applied to AMA's copyright claims was not disturbed on appeal" (Opening Br. at 24) fails for at least three reasons.

First, the Ninth Circuit did not address whether the CPA's forum selection clause applies to AMA's copyright claims. In its April 27, 2018, Memorandum, the Ninth Circuit ruled only that there was insufficient evidence of an assignment of rights under the CPA. The Ninth Circuit expressly did not reach Defendants' alternative arguments for enforcing the forum selection clause, and it did not disturb the District Court's rulings that the forum selection clause applies to AMA's copyright claims, and is valid and enforceable. Contrary to AMA's contention, the District Court's determination that the CPA's forum selection clause applies to AMA's copyright claims was *not* premised on its determination that the CPA was "assigned" to Defendants, but rather on the District Court's conclusion that "the Court cannot resolve this case without interpreting the

10

CPRA." 1 ER 26.

Second, even if the District Court should have revisited its finding that the CPA's forum selection clause applies to AMA's copyright claims, the District Court did not abuse its discretion in concluding that "[u]nder governing Ninth Circuit law, this case . . . arises out of or relates to the CPRA, and the forum selection clause applies to this dispute." 1 ER 26. The Ninth Circuit repeatedly has held that forum selection clauses using "related to" language (as the CPA's clause does) provide a significantly broader scope than clauses with only "arising under" language. The District Court correctly found that, "[a]s in *Manetti-Farrow*, each of the copyright claims in this case 'relates in some way to rights and duties enumerated in the [CPRA],' and '[t]he claims cannot be adjudicated without analyzing whether the parties were in compliance with the contract.'" 1 ER 22. AMA's argument to the District Court that Defendants must present non-frivolous license defenses is squarely at odds with Ninth Circuit precedent, and, in any event, the District Court found Defendants' license defenses to be non-frivolous. AMA's other arguments, regarding its 2007 agreement with Cyberweb and the upload dates of some of the videos at issue, similarly do not change the fact that the CPA's forum selection clause applies to AMA's copyright claims.

Third, AMA never argued to the District Court that it should revisit whether the CPA's forum selection clause applies to AMA's copyright claims. By failing to

11

raise the argument before the District Court, AMA waived it on appeal.

Under Ninth Circuit law, as established in *Manetti-Farrow*, "a range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses," including defendants whose alleged conduct is "closely related to the contractual relationship." 858 F.2d at 514 n.5; *see also Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 456 (9th Cir. 2007) ("The forum selection clauses apply equally to [non-signatories] BVNA and BV Canada because any transactions between those entities and Holland America took place as part of the larger contractual relationship between Holland America and Bureau Veritas."). The District Court did not abuse its discretion in finding that "[t]he evidence in this case, even when construed in AMA's favor, shows that Defendants are so closely related to the contractual relationship between AMA and GIM that they have standing to invoke the CPRA's forum selection clause." 1 ER 5. Contrary to AMA's contention, the October 24, 2018, Order shows that the District Court considered both the merits of the case and Defendants' alleged conduct and concluded that such conduct closely relates to the CPA.

AMA spends most of its Opening Brief arguing that the CPA is unrelated to Porn.com, such that Defendants are "strangers" to the CPA. The District Court correctly found, based on declarations and documents submitted *by AMA*, that this assertion is "disproved by the record" – which demonstrates that "AMA entered

12

into the CPRA for the specific purpose of having its videos displayed on Porn.com,

not GIM-owned websites." 1 ER 5. Remarkably, *AMA fails to mention any of this*

*evidence in its Opening Brief*.

The District Court also correctly found that (1) "Porn.com is owned by

Cyberweb and Sagan, not GIM," (2) "GIM does not have the technical capacity to

operate Porn.com or administer the Paidperview.com program," (3) "[a]ll technical

aspects and day-to-day operation of both Porn.com and Paidperview.com is

performed by Netmedia," and (4) "AMA could not have posted its videos on

Porn.com and benefited from the Paidperview.com program – the express purpose

of the CPRA – without Defendants' involvement." 1 ER 5. Again, *AMA does not*

*mention any of this in its Opening Brief*.

AMA's copyright infringement claims are based on its allegation that

Defendants displayed AMA's copyrighted material on Porn.com. Defendants

contend that they had the right to display the allegedly infringing material based on

the CPA. The District Court did not abuse its discretion in finding that Defendants,

the owners and/or operators of Porn.com, have standing to enforce the CPA's

forum selection clause because they "are all closely related to the contractual

relationship created by the CPRA – the relationship under which AMA sought to

have its materials displayed on Porn.com." 1 ER 6. Defendants also have standing

to enforce the CPA as third party beneficiaries, agents, implied licensees, and/or

assignees.

For all these reasons, the District Court's October 24, 2018, Order

dismissing this action should be affirmed in its entirety.

## V.    STATEMENT OF APPLICABLE STANDARD OF REVIEW

The Ninth Circuit applies an abuse of discretion standard in reviewing an order dismissing a lawsuit under the doctrine of *forum non conveniens* based on a forum selection clause. *Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1137 (9th Cir. 2004) ("The district court's decision to enforce a forum selection clause is reviewed for abuse of discretion"). As the Ninth Circuit held in relation to the earlier appeal in this case, "The CPRA's forum-selection clause must be enforced unless the district court 'reach[ed] a result that is illogical, implausible, or without support in the inferences that may be drawn from the record.' *Kode v. Carlson*, 596 F.3d 608, 612 (9th Cir. 2010)." *AMA Multimedia, LLC v. Sagan Ltd.*, 720 F. App'x 873, 874 (9th Cir. 2018).

AMA argues that in ruling on a *forum non conveniens* motion "any facts in genuine dispute must be viewed in a light favorable to the non-moving party." Opening Br. at 22. The District Court did exactly that. It acknowledged that "[t]he court must resolve all factual conflicts and draw all reasonable inferences in favor of the non-moving party," and held that "[t]he evidence in this case, *even when construed in AMA's favor*, shows that Defendants are so closely related to the contractual relationship between AMA and GIM that they have standing to invoke the CPRA's forum selection clause." 1 ER 4-5 (emphasis added).

AMA also argues that "[t]he first step of an abuse of discretion test is to

determine *de novo* whether the District Court identified the correct legal rule to apply to the relief requested." Opening Br. at 21. AMA's argument is a *non-sequitur* because AMA expressly acknowledges that "*[t]he District Court enunciated the correct rule*" under *Manetti-Farrow* and *Holland America* regarding when a transaction participant has standing to enforce a forum selection clause. Opening Br. at 27. The question presented is not whether the District Court identified the correct legal rule (it did), but whether the District Court abused its discretion in finding that Defendants have standing to enforce the CPA's forum selection clause as closely related transaction participants (it did not).

# VI. THE CPA'S FORUM SELECTION CLAUSE APPLIES TO AMA'S COPYRIGHT CLAIMS

The District Court found in its January 26, 2017, Order that the CPA's forum selection clause applies to AMA's copyright infringement claims (1 ER 20-26), and determined in its October 24, 2018, Order that this finding was "not disturbed on appeal." 1 ER 3. AMA argues that the District Court erred in making this determination. Opening Br. at 23-26. AMA's argument fails for at least three reasons: (1) the Ninth Circuit did not address whether the CPA's forum selection clause applies to AMA's copyright claims, much less disturb the District Court's finding that it does; (2) the District Court did not abuse its discretion in finding that the CPA's forum selection clause applies to AMA's claims; and (3) AMA waived the argument by failing to raise it before the District Court.

## A. The District Court Correctly Determined That Its Previous Ruling That The Forum Selection Clause Applies To AMA's Copyright Claims Was "Not Disturbed" On Appeal

In its January 26, 2017, Order, the District Court ruled in Defendants' favor on three issues: (i) whether the CPA's forum selection clause applies to AMA's copyright claims (1 ER 20-26); (ii) whether Defendants have standing to invoke the forum selection clause (1 ER 26-29); and (iii) whether the forum selection clause is valid and enforceable (1 ER at 29-32).

The Ninth Circuit's April 27, 2018, Memorandum addressed *only* the second

issue, i.e., "On this record, we are unable to conclude that Defendants were valid assignees of GIM's rights under the CPRA." 1 ER 14. The Ninth Circuit did not disturb the District Court's rulings that the forum selection clause applies to AMA's copyright claims and is valid and enforceable. Rather, the Ninth Circuit said that it "[did] not reach Defendants' alternative arguments for enforcing the forum-selection clause, including those based on an implied license, agency relationships, or third-party beneficiary status. '[A] range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses.' *Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 n.5 (9th Cir. 1988) . . . . Defendants may pursue those theories on remand." 1 ER 15.

AMA focuses on one paragraph of the January 26, 2017, Order where the District Court said, "When the licensor alleges infringement against the licensee, as AMA does here, the Court must interpret the license agreement to determine whether the licensee's actions are authorized by the agreement and therefore non-infringing." Opening Br. at 24 (citing 1 ER 22). AMA asserts that "[t]he District Court determination that the FSC applied to AMA's copyright claims was expressly premised on the determination that the CPA had been 'assigned' to Appellees, making them the 'licensees'." *Id.* AMA then argues that, because the Ninth Circuit found insufficient evidence of an assignment, Defendants cannot be licensees under the CPA and the District Court's finding was reversed. *Id.* at 25.

AMA is incorrect.

The Ninth Circuit did not implicitly rule, as AMA contends, that Defendants "are not licensees." Opening Br. at 25. To the contrary, the Ninth Circuit left open the possibility that Defendants are implied licensees (or agents, third-party beneficiaries, assignees, or transaction participants) under the CPA. 1 ER 15. As the District Court stated when it ordered supplemental briefing after remand:

> The Ninth Circuit's ruling did not foreclose Defendants' arguments that (1) they may assert the forum selection clause in the CPRA because they are closely-related parties under the *Manetti-Farrow* case, (2) they are agents of a signatory, (3) they are third-party beneficiaries of the CPRA, and (4) they are implied licensees under the CPRA. The court of appeals found Defendants' evidence of (5) assignment of the CPRA insufficient, but did not rule that the assignment argument was entirely foreclosed.

6 ER 1130 at Doc. 153.

More importantly, the District Court's holding that the CPA's forum selection clause applies to AMA's copyright claims was *not* premised on its determination that Defendants were assignees, but rather on the District Court's conclusion that "the Court cannot resolve this case without interpreting the CPRA." *See* January 26, 2017, Order at 10 ("Defendants argue that their use of AMA's material is authorized by the CPRA and therefore is not copyright infringement. As in *Gen. Protecht* [*Group, Inc. v. Leviton Manufacturing Co.*, 651 F.3d 1355 (Fed. Cir. 2011)], the Court will be required to interpret the CPRA in order to rule on this defense and determine whether AMA can proceed with its

infringement suit. 'Thus, there is no question in this case that the dispute "relates to or arises out of" the [CPRA].'"); *id.* at 11 ("The parties vigorously present competing evidence regarding the meaning of the CPRA and their course of dealing under the agreement. Docs. 74, 77, 78, 83, 84. At the very least, this factual dispute will require a court to evaluate the meaning and scope of the CPRA and the parties' business dealings under it. As in *Gen. Protecht*, '[t]he outcome of that dispute will determine whether [AMA] can sustain its suit for infringement.' 651 F.3d at 1359."); *id.* ("In short, the Court cannot resolve this case without interpreting the CPRA. Under governing Ninth Circuit law, this case therefore arises out of or relates to the CPRA, and the forum selection clause applies to this dispute."). 1 ER 25-26. As the District Court put it in the October 24, 2018, Order, "The Court found that the [forum selection] clause . . . applies to AMA's copyright infringement claims *because the dispute arises out of or relates to the CPRA*." 1 ER 3 (emphasis added).

The District Court correctly determined that its prior finding that the CPA's forum selection clause applies to AMA's copyright claims "was not disturbed on appeal." 1 ER 3.

### B. The District Court Did Not Abuse Its Discretion In Finding That The Forum Selection Clause Applies To AMA's Copyright Claims

Even if the District Court should have revisited its finding that the CPA's forum selection clause applies to AMA's copyright claims, the District Court did

not abuse its discretion in concluding that "[u]nder governing Ninth Circuit law, this case . . . arises out of or relates to the CPRA, and the forum selection clause applies to this dispute." 1 ER 26 (incorporated by reference at 1 ER 3).

The CPA's forum selection clause states that, "Any legal action *arising out of or relating to* this Agreement must be instituted in a court located in Barbados." 6 ER 1055 (CPA) at § 10.5 (emphasis added). The Ninth Circuit addressed similar language in *Schoenduve Corp. v. Lucent Technologies, Inc.*, 442 F.3d 727 (9th Cir. 2006). There, the contract's arbitration clause required arbitration of any dispute that "arises out of or relates to this Agreement." *Id.* at 732. The Ninth Circuit held that this language was broad enough to cover quasi-contract and estoppel issues because they related to the agreement, even though they did not arise out of the actual contract and were not contemplated by the parties prior to arbitration. *Id.* ("Intending to reach all aspects of their relationship, Lucent required the parties to arbitrate any dispute arising out of or relating to the [contract].").

*Schoenduve* recognized, as have other Ninth Circuit cases, that clauses using "related to" language provide a significantly broader scope than clauses with only "arising under" language. *See e.g., Sun v. Advanced China Healthcare, Inc.*, 901 F.3d 1081, 1086 (9th Cir. 2018) ("We have held that forum-selection clauses covering disputes 'arising out of' a particular agreement apply only to disputes 'relating to the interpretation and performance of the contract itself.' . . . By

contrast, forum-selection clauses covering disputes 'relating to' a particular agreement apply to any disputes that reference the agreement or have some 'logical or causal connection' to the agreement. . . . The dispute need not grow out of the contract or require interpretation of the contract in order to relate to the contract.") (citations omitted); *Mediterranean Enters., Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1464 (9th Cir. 1983) (holding that arbitration clauses omitting the broad "related to" language are "intended to cover a much narrower scope of disputes, i.e., only those relating to the interpretation and performance of the contract itself").[1] Indeed, AMA acknowledges that "relate to" is granted an "expansive interpretation" in the context of a forum selection clause. Opening Br. at 26-27 n.7.

Other Ninth Circuit cases have been similarly liberal in interpreting forum selection clauses. In *Manetti-Farrow*, the Ninth Circuit considered the scope of a clause selecting Florence, Italy as the forum for resolution of any controversy

---

[1] *Schoenduve* and *Mediterranean Enterprises* involved arbitration clauses, but such authority applies with equal force to forum selection clauses. *See, e.g., Manetti-Farrow*, 858 F.2d at 514 n.4 ("Although *Mediterranean* involved interpretation of the scope of an arbitration clause, we apply its analysis here because an agreement to arbitrate is actually a specialized forum selection clause. *See Scherk* [*v. Alberto-Culver Co.*, 417 U.S. [506,] 519, 94 S.Ct. [2449,] 2457 [(1974)].")". While the three-judge panel in *In re Orange S.A.*, 818 F.3d 956 (9th Cir. 2016), questioned this rule, *Manetti-Farrow* remains binding authority. *Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001) ("Once a panel resolves an issue in a precedential opinion, the matter is deemed resolved, unless overruled by the court itself sitting en banc, or by the Supreme Court.").

"regarding interpretation or fulfillment" of the contract. 854 F.2d at 510. The

plaintiff asserted various tort claims against the defendants, including conspiracy

and tortious interference with prospective economic advantage. *Id.* at 511. The

plaintiff argued that the forum selection clause did not apply because its tort claims

did not relate to "interpretation" or "fulfillment" of the contract. *Id.* at 514. The

Ninth Circuit disagreed, holding that the clause applied because "[e]ach of these

claims relates in some way to rights and duties enumerated in the [contract]," and

"[t]he claims cannot be adjudicated without analyzing whether the parties were in

compliance with the contract." *Id.* Thus, even in a case that did not include the

broader "related to" language, the Ninth Circuit held that a forum selection clause

applies if the claim cannot be decided without interpreting the contract.

The forum selection clause in the CPA is of the broader variety. It

encompasses any legal action "arising out of *or relating to*" the CPA. 6 ER 1055

(CPA) at § 10.5. The District Court correctly concluded that "[u]nder the liberal

approach taken in *Schoenduve Corp.* and *Manetti-Farrow*, the clause plainly

applies to this case" because "[a]s in *Manetti-Farrow*, each of the copyright claims

in this case 'relates in some way to rights and duties enumerated in the [CPRA],'

and '[t]he claims cannot be adjudicated without analyzing whether the parties were

in compliance with the contract.' 858 F.2d at 514." 1 ER 22. *See Adema Techs.,*

*Inc. v. Wacker Chem. Corp.*, 657 F. App'x 661, 662 (9th Cir. 2016) ("Where a

broad forum-selection clause is included in a contract and the parties raise non-contractual claims, the forum-selection clause can apply to the non-contractual claims, at least where 'resolution of the claims relates to interpretation of the contract.'") (quoting *Manetti-Farrow*); *Graham Tech. Solutions, Inc., v. Thinking Pictures, Inc.*, 949 F. Supp. 1427, 1433-34 (N.D. Cal. 1997) (applying *Manetti-Farrow* and holding that, "Although the causes of action pleaded in this case by [plaintiff] are copyright infringement claims, resolution of this action ultimately requires interpretation of the contract. . . . For either party to prevail in this action, it must prove that its interpretation of the [contract] . . . is correct. The causes of action alleged by [plaintiff] relate to the central conflict over the interpretation of the [contract], and therefore fall within the scope of the forum selection clause."); *Questrel, Inc. v. Merriam-Webster, Inc.*, No. SACV 10-1907 AG (MLGx), 2011 WL 7637786, at *3 (C.D. Cal. Mar. 23, 2011) (applying *Manetti-Farrow* and holding that a forum selection clause in a license agreement applied to plaintiff's copyright infringement claim because the court needed to look at the license agreement to adjudicate the claim); *Bagdasarian Prods., LLC v. Twentieth Century Fox Film Corp.*, No. 2:10-cv-02991-JHN-JCGx, 2010 WL 5154136, at *2-3 (C.D. Cal. Aug. 12, 2010) (same); *Color Switch LLC v. Fortafy Games DMCC,* No. 1:18-cv-00419-DAD-JLT, 2019 WL 1427975 at *4 (E.D. Cal. Mar. 29, 2019) ("As a result [of *Manetti-Farrow*], district courts in the Ninth Circuit have found that

24

copyright infringement claims that require interpretation of an underlying contract, which includes a forum selection clause, may therefore fall within the scope of the contract's forum selection clause.").

1. **AMA's Proposed Frivolous Analysis Is Contrary To Ninth Circuit Law**

No Ninth Circuit court has ever evaluated the persuasiveness of a purported license defense to determine whether that license defense invoked a forum selection clause. Nonetheless, AMA argued to the District Court that a copyright action does not arise out of a license agreement when the license defense is "clearly frivolous." 1 ER 22; 2 ER 318. As support, AMA cited three out-of-Circuit cases: *Phillips v. Audio Active Ltd.*, 494 F.3d 378 (2d Cir. 2007), *Altvater Gessler-J.A. Baczewski Int'l (USA) Inc. v. Sobieski Destylarnia, S.A.*, 572 F.3d 86 (2d Cir. 2009), and *Gen. Protecht*. 1 ER 22; 2 ER 317-18.

In *Gen. Protecht*, the Federal Circuit suggested that a party seeking to enforce a forum selection clause may be required to raise "a non-frivolous dispute regarding the scope of a patent license." 651 F.3d at 1359. *Gen. Protecht* is not controlling and is squarely at odds with Ninth Circuit authority.

First, *Gen. Protecht* determined the license defense was non-frivolous. 651 F.3d at 1359. This means that the Federal Circuit's comments in *Gen. Protecht* regarding the impact of a frivolous license defense were *dicta*. Defendants have found no judicial decision, including *Gen. Protecht*, that has ever declined to

enforce a forum selection clause because it deemed a defendant's license defense to be frivolous.

Second, even if not *dicta*, the *Gen. Protecht* decision is not at odds with Defendants' position because the District Court herein also determined that Defendants' license defense was non-frivolous.

Third, as discussed above, the Ninth Circuit has held that forum selection clauses of the type at issue here (covering claims "arising out of or relating to" the CPA) apply to *all aspects of the parties' relationship*. *Schoenduve*, 442 F.3d at 732 ("Intending to reach all aspects of their relationship, Lucent required the parties to arbitrate any dispute arising out of or relating to the [contract]."); *see also Sun*, 901 F.3d at 1086 ("forum-selection clauses covering disputes 'relating to' a particular agreement apply to any disputes that reference the agreement or have some 'logical or causal connection' to the agreement. . . . The dispute need not grow out of the contract or require interpretation of the contract in order to relate to the contract."). Thus, while the Federal Circuit in *Gen. Protecht* sought to avoid a situation in which "virtually every subsequent dispute between contracting parties would trigger such a forum selection clause," 651 F.3d at 1359, under Ninth Circuit law the broad forum selection clause at issue here should be interpreted in precisely that manner. In fact, under *Schoenduve*, claims that do not involve the contract in any way are nonetheless subject to a "related to" forum selection clause if they

relate to the parties' broader economic relationship. *Schoenduve*, 442 F.3d at 732

("relating to" clause was "broad enough to include a claim for commissions based

on quasi-contract or estoppel."). It would be wrong to require a party seeking to

enforce a forum selection clause to prove it has a non-frivolous license defense

when, under Ninth Circuit precedent, a contract-based claim or defense is not even

required to invoke the forum selection clause.

    As for *Phillips* and *Altvater*, the District Court correctly concluded that they

are distinguishable from this case and conflict with *Manetti-Farrow*.

> *Phillips* and *Altvater* are distinguishable from this case. The clauses in
> *Phillips* and *Altvater* contained the narrower "arising under" or
> "resulting from" language, rather than the broader "arising out of or
> relating to" language in the CPRA. Furthermore, *Phillips* and *Altvater*
> are inconsistent with Ninth Circuit law. Both suggest that a claim does
> not "arise out of" a contract if the plaintiff may bring the claim
> without any reference to the contract. This approach conflicts with
> *Manetti-Farrow*, which holds that a forum selection clause applies to
> non-contract claims when the claims relate "in some way to rights and
> duties enumerated in the [contract]" and "[t]he claims cannot be
> adjudicated without analyzing whether the parties were in compliance
> with the contract." 858 F.2d at 514. A claim that may be brought
> without reference to a contract may nonetheless require interpretation
> of the contract, particularly if the contract presents a possible defense
> to the claim. To the extent *Phillips* and *Altvater* conflict with *Manetti-
> Farrow*, the Court must follow Ninth Circuit law.

1 ER 24.

### 2.    The District Court Did Not Abuse Its Discretion In Finding Defendants' License Defense Non-Frivolous

Even if one (erroneously) assumes that Defendants must present a non-

frivolous license defense under the CPA in order to invoke the forum selection clause, Defendants have done so.

The Ninth Circuit reviews frivolousness determinations under the abuse of discretion standard. *See, e.g., E.E.O.C. v. Maricopa Cty.*, 339 F. App'x 688, 689 (9th Cir. 2009). As a preliminary matter, it is undisputed that the CPA provides a license with respect to certain of AMA's copyrighted content. Opening Br. at 11; 6 ER 1050 (CPA) at § 1.1; 6 ER 935 at ¶ 48. Thus, under Ninth Circuit law it is *AMA's burden* to prove that Defendants' alleged conduct is *not* licensed. "To prevail on its claim of copyright infringement, [the copyright owner] must prove . . . 'copying' of protectible expression by [the accused infringer] beyond the scope of [the] license." *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1085 (9th Cir. 1989); *see also Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995) ("We conclude that, in cases where only the scope of the license is at issue, the copyright owner bears the burden of proving that the defendant's copying was unauthorized.") (citing *S.O.S.*). In other words, Defendants' conduct is presumptively licensed. Defendants are aware of no authority in which a presumptively valid license defense was deemed frivolous.

Additionally, the District Court's non-frivolousness determination, which is not dependent upon the ultimate success of Defendants' arguments, is entitled to deference under the abuse of discretion standard. *See, e.g., E.E.O.C.,* 339 F. App'x

at 689 ("Based on our review of the record . . . we conclude that the district court

abused its discretion when it determined that the EEOC pursued its claims in bad

faith and that its position was frivolous. The EEOC's arguments were ultimately

unsuccessful. Nonetheless, a weak case is not tantamount to a frivolous case.")

Here, the District Court analyzed the entire record and concluded that Defendants

presented multiple non-frivolous defenses.

> But even if [a non-frivolous license defense] is a requirement for
> application of a forum selection clause (the Court has found no other
> case that discusses such a requirement), the Court concludes that
> Defendants have raised a non-frivolous license defense. Defendants
> argue that (1) the CPRA is not limited to content AMA "provided" via
> uploads or specific formats, as AMA contends; (2) § 3.9 of the CPRA
> is rendered meaningless if content originating on a website is
> unlicensed; (3) the parties' course of performance under the CPRA
> shows that they have treated any AMA content that appears on
> Porn.com as licensed and subject to the CPRA's revenue sharing
> provisions, regardless of whether AMA uploaded the content; and (4)
> some content AMA has alleged to be infringing was actually uploaded
> by AMA itself, thus falling squarely within AMA's understanding of
> content licensed by the CPRA. Doc. 74 at 9-12 [3 ER 525-528]. *While
> some of these arguments appear doubtful, the Court cannot conclude
> that they are frivolous*. The parties vigorously present competing
> evidence regarding the meaning of the CPRA and their course of
> dealing under the agreement. Docs. 74, 77, 78, 83, 84. At the very
> least, this factual dispute will require a court to evaluate the meaning
> and scope of the CPRA and the parties' business dealings under it.

1 ER 25-26 (emphasis added). The District Court was correct, and unquestionably

did not abuse its discretion. As discussed below, each of Defendants' license

defense arguments is non-frivolous.

### a.   The CPA Is Not Limited To Content AMA "Provided" Via Uploads Or Specific Formats, As AMA Contends

The CPA grants a copyright license with respect to any Content "provided" by AMA. 6 ER 1050 (CPA) at § 1.1 ("Subject to the terms and conditions set forth in this Agreement, with respect to any and all Content that Licensor submits *or provides* to Licensee, Licensor grants Licensee a non-exclusive, nontransferable worldwide license during the Term to use, publish, display, and distribute the Content on the Website(s), solely for the Purpose."). While AMA argues that the CPA applies only to Content "provided" directly from AMA to Defendants (Opening Brief at 35-36), the plain language of the CPA rebuts AMA's argument. The CPA repeatedly refers to content that is "provided" from a website:

- Background, Section B ("Licensee desires to *provide* the Content to end users of a single/(group of) *website(s)* (the "Website(s)") on the Worldwide Web");

- Section 1.4 ("Licensee agrees that it will only *provide* streaming services of the Content in both the public and private areas of the *Website*(s)");

- Section 5.1 ("Licensee shall establish, build, develop and maintain the *Website*(s) featuring the Content and including without limitation a secure system through which Content may be *provided* to users").

6 ER 1050, 1052 (emphasis added). Thus, contrary to AMA's contention, the CPA

30

uses the term "provide" to include the provision of Content from a website.

And contrary to AMA's contention (Opening Br. at 12), Sections 4.1 and 4.6 of the CPA do not limit the means by which Content can be "provided." Section 4.1 specifies that AMA will provide Content, but says nothing about the means by which such Content can be provided. 6 ER 1052. Section 4.6 is designed to protect Defendants, by preventing AMA from unilaterally providing content by unacceptable methods. Nothing in Section 4.6 restricts Defendants' right to accept AMA content via other means, formats, or sources. This is evidenced by the fact that Section 4.6 refers to "acceptable methods" of delivery, not "exclusive methods." *Id.* And even if Section 4.6 suggested a narrow definition of "provide," this would merely create an ambiguity in the CPA that would need to be resolved by the Barbados courts.[2]

### b. Section 3.9 Of The CPA Would Be Rendered Meaningless If (As AMA Argues) Content Originating On A Website Is Unlicensed

Section 3.9 of the CPA makes no sense if (as AMA contends) AMA Content provided from a website is unlicensed. Section 3.9 sets forth a revenue sharing scheme relating to Content "originating" from a website.

> 3.9   In the event that the Content *originates* and/or is associated with an existing *website associated with Licensor*, Licensee may

---

[2] Section 10.8 of the CPA provides that, "Any rule of construction that states that ambiguities shall be construed against the drafting party shall not apply in interpreting this Agreement." 6 ER 1055.

> amongst its various methodologies, direct traffic to any such
> website and Licensee shall be compensated for any revenues
> generated as a result of Licensee directing such traffic.

6 ER 1052 (emphasis added). As is evident from Exhibit "A" to the CPA, the

"origin" of Content refers to the means by which licensed Content is "provided"

under the CPA.

> The following outlines minimum content requirements and ideal
> submission materials that pertain to content coming from DVD's,
> delivery necessities for content with *other origins* may vary and can
> be discussed with the administrators of the program . . . .

6 ER 1055 at Exhibit "A" (emphasis added).

If Content provided from a website is (as AMA contends) unlicensed, then

there would be no reason to discuss revenue sharing with respect to such Content

and no reason for Section 3.9 to exist. AMA's interpretation of the CPA must be

rejected because it would render Section 3.9 either nonsensical or superfluous.

*ASARCO, LLC v. Union Pac. R.R. Co.*, 765 F.3d 999, 1010 (9th Cir. 2014)

("'[E]very word, phrase or term of a contract must be given effect,' and courts

should avoid accepting interpretations that 'render[ ] part of the writing

superfluous.'") (quoting 11 *Williston on Contracts* § 32:5 (4th ed. 2014));

*FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 284 (7th Cir. 2002)

("Nonsensical interpretations of contracts, as of statutes, are disfavored.").

      c.    **The Parties' Course Of Performance Under The CPA Shows That They Have Treated Any AMA Content That Appears On Porn.Com As Licensed And Subject To The CPA's Revenue Sharing Provisions, Regardless Of Whether AMA Uploaded The Content**

Defendants submitted evidence showing that, beginning in 2012, Porn.com began reviewing user-posted Content on Porn.com for watermarks (i.e., identification markers) indicating that such content is owned by Porn.com partners, including AMA. 3 ER 534 at ¶ 2. Content bearing a partner's watermark is "assigned" to that partner's account (i.e., treated as licensed content, and subject to the CPA's revenue sharing provisions). *Id.* Beginning in 2013, Porn.com has identified more than one thousand user-posted videos bearing AMA watermarks, and under CPA Section 3.1 has paid AMA its revenue share for each of these videos. *Id.* at ¶ 3. Beginning in November 2015, AMA's account statements on the paidperview.com website mark each user-uploaded video assigned to AMA's account with a red box and asterisk, which when clicked presents a dialog box stating that the video in question has been assigned to AMA's account and stating the amount of shared revenue that video has generated under the CPA. 3 ER 534-535 at ¶¶ 4-5; 3 ER 537. While AMA contends that it was ignorant of the watermark assignment program, Skype chat logs from June 24, 2015, demonstrate that AMA was fully aware of this program. 3 ER 412-413 at ¶¶ 4-7; 3 ER 414-427; 3 ER 438-439 at ¶¶ 4-8; 3 ER 441-448.

In its Opening Brief (at 16-18, 42-48), AMA asserts that the assignment program was "false" and "fabricated," and that the chat log evidence was misrepresented (notwithstanding that Defendants submitted the complete chat logs to the District Court). But AMA cannot dispute that Netmedia has assigned user-uploaded content to the CPA paidperview.com accounts of seventy-seven (77) active CPA paidperview.com partners, and that forty-one (41) of these partners have subsequently made specific requests regarding the treatment of their assigned videos. 3 ER 435 at ¶¶ 3-4. The District Court correctly found that "[t]he parties vigorously present competing evidence regarding the meaning of the CPRA and their course of dealing under the agreement. . . . At the very least, this factual dispute will require a court to evaluate the meaning and scope of the CPRA and the parties' business dealings under it." 1 ER 26.

### d. AMA's Claims Are Based, At Least In Part, On Content It Uploaded Itself.

Even if one were to accept AMA's (erroneous) arguments regarding content obtained from websites, they do not apply to content AMA itself uploaded. AMA alleges that Defendants violated AMA's copyrights by using images from AMA videos in certain banner ads. Opening Br. at 10, 39-40; 6 ER 1077 (FAC) at ¶ 98; 6 ER 1120-1123 (Ex. J to FAC). However, the images in the example banner ads provided by AMA (6 ER 1120-1123), are from videos that AMA itself uploaded to the paidperview.com platform. 3 ER 535 at ¶ 8. These videos are licensed even

under AMA's definition of the term "provided" (*see* 6 ER 935 at ¶ 48), and the only question is whether Defendants' alleged use of these videos exceeded the scope of the license. Accordingly, such claims arise from or relate to the CPA, and thus fall within the scope of the forum selection clause. *Questrel*, 2011 WL 7637786, at *3 (clause covers claim that defendant exceeded scope of license); *Keller v. McGraw-Hill Global Educ. Holding, LLC*, Civil Action No. 16-1778, 2016 WL 4035613 at *5 (E.D. Pa. July 28, 2016) (same).

In sum, each of Defendants' license defense arguments is supported by abundant record evidence and relevant case authority. The District Court did not abuse its discretion in concluding that Defendants' license defense is non-frivolous.

3.  **Neither AMA's 2007 Agreement With Cyberweb Nor The Upload Dates Of Some Of The Alleged Infringing Works Alter The Fact That The CPA's Forum Selection Clause Applies To AMA's Copyright Claims**

In its August 31, 2018, Supplemental Memorandum, AMA argued to the District Court for the first time (after *28 months* of litigation and *dozens* of briefs being filed) that the CPA's forum selection clause does not apply to AMA's copyright claims because of a contract that AMA entered into with Cyberweb in 2007. 1 SER 16-37. Not only was it improper for AMA to introduce new evidence at this stage – particularly when AMA argued to the District Court on June 29, 2018, that "[t]he briefing at this point is sufficient for the Court to enter rulings on

the outstanding issues" (1 SER 40) – the 2007 contract does not change the fact
that Defendants assert a license defense under the *CPA*. Because the court cannot
resolve this case without interpreting the CPA, the forum selection clause in the
CPA applies. *See* Section VI.B., *supra.*

AMA argues that "[t]he District Court ignored [the 2007] contract entirely"
in its October 24, 2018, order. Opening Br. at 33. That is not true. The District
Court expressly referenced the 2007 contract when it noted that AMA began
providing certain promotional videos to Defendants in 2007. 1 ER 2 (citing Doc
157-1 at 19 [1 ER 78-79].) The District Court concluded, however, that "AMA
entered into the CPRA for the specific purpose of having its videos displayed on
Porn.com," and that "the CPRA's forum selection clause applies to AMA's
copyright claims." 1 ER 3 and 5.

AMA additionally argues that because the upload dates of some of the
allegedly infringing videos predate September 2012 the CPA does not relate to
AMA's copyright claims. Opening Br. at 9, 25, 39. AMA is incorrect for at least
three reasons.

First, AMA cannot assert copyright infringement claims for conduct that
occurred before AMA entered into the CPA in September 2012. AMA filed its
initial complaint in this case on April 28, 2016. 2 ER 63 at ¶ 4. Any claims for
alleged copyright infringement that occurred before September 2012 are barred by

the three-year statute of limitations in the Copyright Act. 17 U.S.C. § 507(b).

Second, AMA cannot rely on the upload dates as evidence of when the alleged infringement occurred while simultaneously contending that the upload dates are "clearly manufactured" and "fake." *See* 6 ER 1074 (FAC) at ¶ 87 ("At least ten (10) of Plaintiff's videos published on Porn.com were published by 'third parties' on a date that *predates the actual production and/or release of the video*. Obviously, it is impossible for a video to have been published on Porn.com before it was ever made."); 6 ER 1108-1109 (Ex. E to FAC) (summary list of Plaintiff's videos on Porn.com purported to be published before the video was actually produced); 2 ER 66-67 at ¶ 19 (providing an example of a video that was allegedly uploaded eight years ago to Porn.com when the video was not filmed until four years ago); Opening Br. at 9 ("some videos show a video 'uploaded date' years *before* AMA even produced the video, showing the upload video information is a discernible falsehood").

Third, AMA alleged in its First Amended Complaint that the infringing conduct took place "[i]n or about November 2015, and for an *unknown* time before and up to and including the present." 6 ER 1072 at ¶ 78 (emphasis added). AMA presented no evidence to the District Court that the alleged infringement began before AMA entered into the CPA in September 2012.

**C. AMA Waived Its Argument That The District Court's Previous Ruling That The Forum Selection Clause Applies To AMA's Copyright Claim Was Disturbed On Appeal**

In addition to lacking factual or legal merit, AMA's argument that "[t]he District Court erred in determining its previous ruling that the forum selection applies to AMA's copyright claims was not disturbed on appeal" (Opening Br. at 23) fails for a third and independent reason. Under Ninth Circuit precedent, arguments that are not raised before the District Court are waived on appeal. *O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1063 n.3 (9th Cir. 2007). After the Ninth Circuit issued its April 27, 2018, Memorandum, AMA never argued to the District Court that it should revisit whether the CPA's forum selection clause applies to AMA's copyright claims. *See* 1 SER 16-37, 38-40. AMA cannot raise the issue for the first time on appeal.

## VII.    APPELLEES HAVE STANDING TO ENFORCE THE CPA'S

## FORUM SELECTION CLAUSE

### A.    The District Court Did Not Abuse Its Discretion In Finding That Defendants Have Standing To Enforce The Forum Selection Clause As Closely Related Parties Under *Manetti-Farrow* and *Holland America*

Under Ninth Circuit law, "a range of transaction participants, parties and

non-parties, should benefit from and be subject to forum selection clauses."

*Manetti-Farrow*, 858 F.2d at 514 n.5. This includes defendants whose alleged

conduct is "closely related to the contractual relationship." *Id.* Thus, under

*Manetti-Farrow* courts routinely hold that when a non-signatory is involved in the

performance of a contract it may rely upon the contract's forum selection clause.

For example, the Ninth Circuit in *Manetti-Farrow* held that the forum

selection clause applied to a non-signatory affiliate and three individual directors

of the signatory defendant. *Id.* ("We agree with the district court that the alleged

conduct of the non-parties is so closely related to the contractual relationship that

the forum selection clause applies to all defendants."). Similarly, the Ninth Circuit

applied a forum selection clause to non-signatory affiliates in *Holland America*,

485 F.3d at 456 ("The forum selection clauses apply equally to [non-signatories]

BVNA and BV Canada because any transactions between those entities and

Holland America took place as part of the larger contractual relationship between

Holland America and Bureau Veritas.").

AMA argues that the District Court did not analyze or consider whether
Defendants' allegedly infringing conduct closely relates to the CPA. Opening Br.
at 27-28. Not so. The District Court noted that "AMA contends that . . .
Defendants' *infringing conduct* and operation of Porn.com have nothing to do with
the CPRA or GIM" and then expressly rejected that argument in the next
paragraph:

> The Court previously found that the CPRA's forum selection clause
> applies to AMA's copyright claims and otherwise is valid and
> enforceable. Doc. 126 at 5-11, 14-17 [1 ER 20-26, 29-32]. These
> findings were not disturbed on appeal. *See* Doc. 147-1 [1 ER 11-15].
> Having considered the supplement briefs and relevant case law, the
> Court now finds that Defendants have standing to enforce the CPRA's
> forum selection clause because they are closely related to the
> contractual relationship between AMA and GIM.

1 ER 3. The context makes clear that the District Court considered Defendants'
alleged conduct and concluded that such conduct is closely related to the CPA.

AMA further argues that a *forum non conveniens* analysis requires review
and assessment of the merits of the underlying case. Opening Br. at 33. The case
AMA cites, *Coastal Steel Corp. v. Tilghman Wheelabrator, Ltd.*, 709 F.2d 190 (3rd
Cir. 1983), stands only for the proposition that a "*forum non conveniens*
determination cannot be easily made . . . without *reference to* the merits of the
case." *Id.* at 195 (emphasis added). In any event, the District Court *did* review and
assess the merits. As discussed in Section VI.B.2. above, in its January 26, 2017,
Order finding that the CPA's forum selection clause applies to AMA's copyright

claims, the District expressly determined that "Defendants have a raised a non-frivolous license defense" such that "the Court cannot resolve this case without interpreting the CPRA." 1 ER 26. The District Court incorporated these findings in its October 24, 2018, Order. 1 ER 3.

AMA spends much of its brief arguing that the CPA is unrelated to Porn.com, such that Defendants are "strangers" to the CPA. The District Court correctly determined that this assertion is "disproved by the record." 1 ER 5.

Earlier in this case, AMA's President, Adam Silverman, expressly acknowledged that AMA entered into the CPA because it wanted to post content on Porn.com. *See* 6 ER 929 (Silverman Declaration) at ¶ 17 ("In September 2012, AMA entered into a content partnership agreement with GIM *for revenue sharing on content posted on Porn.com*."); 1 SER 187 (same); 5 ER 732 (Silverman Declaration) at ¶ 22 ("AMA previously entered into a Content Partnership Agreement *for promotional materials to be posted on Porn.com*. The Content Partnership Agreement is with GIM Corp."); 1 SER 108 (Silverman Declaration) at ¶ 22 (same). In fact, shortly before entering into the CPA, Mr. Silverman asked one of his AMA colleagues, Lewis Thornton, to check out "a tube submission [program] *for porn.com* that also includes a payout for views." 5 ER 794. Mr. Thornton responded that he was "*keen to see get our videos on porn.com*." *Id.* The District Court expressly relied on this evidence to find that "AMA entered into the

CPRA for the specific purpose of having its videos displayed on Porn.com, not GIM-owned websites" (1 ER 5-6). Remarkably, *AMA fails to mention any of these facts or findings in its Opening Brief*.

While the parties to the CPA are AMA and GIM, Porn.com is owned by Cyberweb and Sagan, not GIM. 4 ER 578 at ¶ 5; Opening Br. at 4-6. AMA acknowledges that "Porn.com is *NOT* a GIM website" and "*GIM does not own nor operate Porn.com*." Opening Br. at 4 and 6 (emphasis in original); 2 ER 75 at ¶ 49. GIM necessarily involved Defendants in the CPA, as the District Court found (1 ER 5), and AMA repeatedly has asserted that Defendants "[e]ach perform a critical role in the operation of Porn.com and Traffic Force such that they are agents in the ventures and/or alter egos of each other." *See, e.g.,* 1 SER 81. By AMA's own admission, Defendants are intimately involved in all aspects of Porn.com – and thus their alleged conduct is "closely related to the contractual relationship" between AMA and GIM. *See, e.g.*, 1 SER 81 ("Netmedia . . . operates Porn.com. Not only has GIM granted Netmedia rights to AMA's content under the CPA, but Netmedia employees are [involved] in all aspects of Porn.com."); 1 SER 96 ("*NetMedia, Inc. provides support/uploads content to www.Porn.com, for the benefit of* 'Traffic Force, *GIM Corp.*, SAGAN Ltd., and Cyberweb Ltd.'"); 1 SER 66 (referencing GIM and Defendants: "These companies are alter-egos of each other, not separate/unrelated"); 1 SER 47 ("In addition, NetMedia employees also

manage the advertising for Porn.com, assist in billing and payments, and both send and receive money for both GIM and Cyberweb"); Opening Br. at 5-6 ("All technical aspects and day-to-day business operations of Porn.com . . . are done by Netmedia employees"); *id.* at 6 (describing Koonar's relationship to GIM and Defendants).

AMA's copyright infringement claims are based on its allegation that Defendants displayed AMA's copyrighted material on Porn.com. 6 ER 1072 (FAC) at ¶ 78. Defendants contend that they had the right to display the allegedly infringing material based on the CPA. Given that AMA entered into the CPA for the specific purpose of having its videos displayed on Porn.com, Defendants' alleged conduct necessarily is closely related to that contractual relationship – as the District Court correctly concluded. 1 ER 6 ("In short, there can be no doubt that Defendants are all closely related to the contractual relationship created by the CPRA – the relationship under which AMA sought to have its materials displayed on Porn.com.").

The crux of AMA's argument is that Defendants lack standing to invoke the CPA's forum selection clause because the CPA's license does not extend to Defendants' allegedly infringing conduct. If that were true, no alleged infringer could *ever* invoke a forum selection clause in a licensing agreement – because infringing conduct, by definition, is not licensed. That is not the law. *See* Section

VI.B., *supra*. Defendants are entitled to have a Barbados court determine the merits of their license defense. Indeed, AMA's heavy reliance on the CPA to explain why Defendants' conduct allegedly is not licensed demonstrates precisely why the District Court was correct in holding that "the Court cannot resolve this case without interpreting the CPRA." 1 ER 26.

AMA suggests that only third-party beneficiaries may enforce a forum selection clause under *Manetti-Farrow*. Opening Br. at 48. AMA cites no legal authority to support this assertion, and the Ninth Circuit in *Holland America* applied the *Manetti-Farrow* doctrine without any mention of a third-party beneficiary requirement. *Holland Am.,* 485 F.3d at 456; *see also Scott USA Inc. v. Patregnani*, No. 1:14-cv-00482-BLW, 2015 WL 1736496, at *3 (D. Idaho Apr. 16, 2015) (citing *Manetti-Farrow* and holding that "a formal third-party beneficiary relationship is not required for Patregnani to enforce the forum selection clause against BikeStreet").

AMA argued to the District Court that in finding that "a range of transaction participants . . . should benefit from and be subject to forum selection clauses," *Manetti-Farrow* cited a case involving third-party beneficiaries, *Coastal Steel Corp. v. Tilghman Wheelabrator, Ltd.*, 709 F.2d 190 (3d Cir. 1983), evidencing, according to AMA, that the "'*Manetti-Farrow* issue' is one of third party beneficiary status." 1 SER 29. The District Court properly rejected AMA's

argument:

> *Manetti-Farrow* actually quoted an Illinois district court case, *Clinton v. Janger*, 583 F. Supp. 284, 290 (N.D. Ill. 1984), which in turn cited *Coastal Steel*. 858 F.2d at 514 n.5. Nothing in either of those cases, however, suggests that third-party beneficiaries are the only non-parties to the contract that may benefit from a forum selection clause. *Coastal Steel* held only that third-party beneficiary status is no basis for disregarding such a clause. 709 F.2d at 203. *Clinton* noted that the range of transaction participants encompasses third-party beneficiaries, but made clear that other non-parties to the contract may also enforce forum selection clauses. 583 F. Supp. at 290 ("[T]he cases hold that a range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses. This is especially true where the non-party is a third party beneficiary of the disputed contract[.]" (citing *Coastal Steel*)).

1 ER 8.

AMA attempts to distinguish *Manetti-Farrow*, *Clinton*, *Coastal Steel*, and *Holland America* by arguing that, "[e]ach case granting a non-signatory 'transaction participant' access to an FSC involves determination of specific alleged conduct by the non-signatory, that is at issue in the dispute, which *closely related* to the transaction or contractual relationship containing the FSC." Opening Br. at 28 (emphasis in original). But that is precisely the situation here. As the District Court found, "AMA could not have posted its videos on Porn.com and benefited from the Paidperview.com program – the express purpose of the CPRA – without Defendants' involvement." 1 ER 5; *see* Section III.B., *supra*. When AMA was considering whether to enter into the CPA, it communicated with *Defendants*, not GIM. *See* 5 ER 733 (Silverman Declaration) at ¶ 29 ("When AMA signed up

45

for the Content Partnership Agreement for Porn.com, AMA representatives had direct contact with Ross Allen at *Netmedia* regarding initiating the program."); 5 ER 791-796 (email thread between AMA representatives and Ross Allen at Netmedia). *Cyberweb and Sagan* own Porn.com, not GIM, and it is Defendants who "perform a critical role in the operation of Porn.com and Traffic Force." 1 SER 81. In addition, when AMA had questions regarding the treatment of user-uploaded content under the paidperview.com program, AMA communicated with representatives of *Netmedia and Cyberweb*, not GIM. 3 ER 412 at ¶¶ 1-2; 3 ER 414-427; 3 ER 438 at ¶¶ 1-2; 3 ER 441-448.

Cyberweb, Netmedia, and Sagan not only are affiliates of GIM, as the District Court found in its January 26, 2017, Order (1 ER 27) and AMA implicitly concedes (Opening Br. at 41), their conduct is "so closely related" to the CPA that they are entitled to benefit from its forum selection clause. As in *Holland America*, any transactions between the corporate Defendants and AMA relating to Porn.com took place as part of the "larger contractual relationship" between AMA and GIM.

Koonar may also avail himself of the CPA's forum selection clause, as the District Court found. 1 ER 7-8. AMA asserts that "Mr. Koonar is the common force behind Sagan, Cyberweb, Netmedia, and GIM. Mr. Koonar is the President and Sole Director of a holding corporation, which is a 100% shareholder of GIM and 50% shareholder of both Cyberweb and Sagan. Koonar is President of GIM

and President and Director of Netmedia." Opening Br. at 6; *see also id.* at 53; 2
SER 228. District courts in the Ninth Circuit that have considered whether to apply
a forum-selection clause to a non-signatory corporate officer have enforced that
forum-selection clause, provided the claims in the suit related to the contractual
relationship. *Ultratech, Inc. v. Ensure NanoTech (Beijing), Inc.*, 108 F. Supp. 3d
816, 822 (N.D. Cal. 2015); *see also Liberty City Church of Christ, Inc. v. Taylor*,
No. 5:12-CV-04392 EJD, 2013 WL 621792, at *2 (N.D. Cal. Feb. 15, 2013)
(finding that any claims against a party employee relating to activities that
occurred within the scope of his employment are subject to the employer's forum
selection clause).

### B. Defendants Have Standing To The Enforce The Forum Selection Clause As Third-Party Beneficiaries, Agents, Implied Licensees, Or Assignees Of The CPA

"In reviewing decisions of the district court, [the Ninth Circuit] may affirm
on any ground finding support in the record. If the decision below is correct, it
must be affirmed, even if the district court relied on the wrong grounds or wrong
reasoning." *Cigna Prop. & Cas. Ins. Co. v. Polaris Pictures Corp.*, 159 F.3d 412,
418 (9th Cir. 1998). Here, Defendants have standing to enforce the forum selection
clause not only as closely related parties to the CPA, but also as third-party
beneficiaries, agents, implied licensees, and/or assignees.

1.    **Defendants Have Standing To Enforce The Forum Selection Clause As Third-Party Beneficiaries Of The CPA**

"[A] person may enforce a forum selection clause he did not sign if he was a third party beneficiary of the contract, a successor in interest to the contract, or an agent intended to benefit from the contract[.]" *Morgan Tire of Sacramento, Inc. v. Goodyear Tire & Rubber Co.*, 60 F. Supp. 3d 1109, 1119 (E.D. Cal. 2014).

Under Ninth Circuit law, an "intended beneficiary need not be specifically or individually identified in the contract, but must fall within a class clearly intended by the parties to benefit from the contract." *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1211 (9th Cir. 2000).

AMA contends that "[r]eview of the CPA illustrates that there were no third parties intended to benefit as it expressly contemplates GIM to perform all necessary acts under the contract." Opening Br. at 49. That is not true. Section 6.2 of the CPA expressly contemplates that agents will assist GIM in performing under the CPA: "Licensee represents and warrants . . . (iii) that all actions taken by Licensee, its employees and *agents*, with respect to the Content or the relationship contemplated by this Agreement shall comply with applicable law." 6 ER 1053 (CPA) at § 6.2 (emphasis added). This provision was necessary because, as the District Court correctly found, (1) "GIM does not have the technical capacity to operate Porn.com or administer the Paidperview.com program" (1 ER 5); (2) as the District Court also correctly found, "[a]ll technical aspects and day-to-day

48

operation of both Porn.com and Paidperview.com is performed by Netmedia" (*id.*); and (3) as AMA acknowledges, "GIM does not own nor operate Porn.com" (Opening Br. at 6). If Defendants were not intended third-party beneficiaries of the CPA, GIM would not be able to display any of AMA's content on Porn.com. That makes no sense because, as demonstrated in Section VII.A. above, AMA entered into the CPA for the specific purpose of having its videos displayed on Porn.com.

Defendants fall within a class clearly intended by AMA and GIM to benefit from the CPA, and on that basis as well Defendants have standing to enforce the CPA's forum selection clause.

2. <u>**Defendants Have Standing To Enforce The Forum Selection Clause As Agents Of GIM**</u>

As discussed above, Section 6.2 of the CPA expressly contemplates that GIM's agents will perform tasks under the agreement. 6 ER 1053. Similarly, Section 10.3 of the CPA expressly allows GIM to "assign this Agreement without consent to an affiliate, parent, or subsidiary . . . ." 6 ER 1055. The District Court found in its January 28, 2017, Order that "all corporate Defendants are affiliates of GIM" (1 ER 27), and AMA does not contest that finding in its Opening Brief. The parties may disagree regarding whether there is sufficient evidence of an assignment, but, contrary to AMA's contention (Opening Br. at 49-50), the CPA unquestionably allows GIM to have Defendants act as its agents and perform tasks under the CPA.

In its Opening Brief (at 51), AMA agrees that agents of a signatory "are considered potential 'transaction participants' with access to" forum selection clauses. *See, e.g., Morgan Tire*, 60 F. Supp. 3d at 1119 ("[A] person may enforce a forum selection clause he did not sign if he was . . . an agent intended to benefit from the contract[.]"). Although AMA now tries to backpedal from its earlier positions in this case (Opening Br. at 51-54), AMA does not, and cannot, deny that it repeatedly asserted that Defendants are agents and alter egos of GIM. *See e.g.*, 1 SER 81 ("NetMedia, Cyberweb, GIM, and GLP 5 are clearly intertwined. Each perform a critical role in the operation of Porn.com and Traffic Force such that they are *agents* in the ventures and/or alter egos of each other.") (emphasis added); 1 SER 96 ("NetMedia, Inc. provides support/uploads content to www.Porn.com, for the benefit of 'Traffic Force, GIM Corp., SAGAN Ltd., and Cyberweb Ltd.'"); 1 SER 66 ("[GIM and Defendants] are alter-egos of each other, not separate/unrelated"); 4 ER 663-664 at ¶ 25 ("Ross Allan who is facilitating monetary transactions and all client relationships on behalf of GIM corporation is an employee of Netmedia . . ."); 1 SER 47 ("In addition, NetMedia employees also manage the advertising for Porn.com, assist in billing and payments, and both send and receive money for both GIM and Cyberweb (an admitted owner of Porn.com)"; 1 SER 49 ("GIM merely provides content to the other named Defendants for distribution"); 2 SER 228 ("Mr. Koonar [GIM's president] is the

common force behind Cyberweb, Sagan, GIM and Netmedia").

Moreover, AMA treated Defendants as GIM's agents when it interfaced with Defendants, not GIM, concerning the paidperview.com program (i.e., the subject of the CPA). *See* 5 ER 792-796 (email thread between AMA representatives and Ross Allen at Netmedia regarding the paidperview.com program); 3 ER 442-448 (log of Skype chat between AMA's President Adam Silverman (aka biggyfuckyoucash), Kris Richardsen (of Cyberweb), and Glen Camara (of Netmedia) regarding the paidperview.com program.); 3 ER 415-427 (log of Skype chat between Ross Allan of Netmedia and Mr. Silverman of AMA regarding same).

While AMA now argues that Defendants are not agents of GIM, Opening Br. at 51-54, AMA took the opposite position in its earlier briefs, which the Court may deem to be judicial admissions. "[S]tatements of fact contained in a brief may be considered admissions of the party in the discretion of the district court." *American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 227 (9th Cir. 1988).

3.  **Defendants Have Standing To Enforce The Forum Selection Clause As Implied Licensees Under The CPA**

Under Ninth Circuit copyright law, a nonexclusive license "may be granted orally, or even be implied from conduct." *Foad Consulting Grp., Inc. v. Azzalino*, 270 F.3d 821, 835 (9th Cir. 2001) (Kozinski, J., concurring); *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990) (same). An implied license will be

found if, absent such an implied license, the contract would be worthless. *See, e.g., Effects Assocs.,* 908 F.2d at 558-559.

AMA argued to the District Court that the CPA "would . . . not be worthless without an implied license on Porn.com" because "[c]ontent that AMA submits to GIM is displayed on literally hundreds of web sites established, developed, and maintained by GIM – completely separate from Porn.com." 1 SER 33. By its own admission, however, AMA "entered into a content partnership agreement with GIM *for revenue sharing on content posted on Porn.com.*" 6 ER 929 (Silverman Declaration) at ¶ 17; *see also* 5 ER 732 (Silverman Declaration) at ¶ 22 ("AMA previously entered into a Content Partnership Agreement *for promotional materials to be posted on Porn.com.* The Content Partnership Agreement is with GIM."). While AMA's content is displayed on other websites, AMA entered into the CPA specifically because it was "keen to see get [its] videos on Porn.com." 5 ER 794. Porn.com is owned by Cyberweb and Sagan, not GIM, and all technical aspects and day-to-day operation of Porn.com is performed by Netmedia. If the owners, operators, and technical service providers of Porn.com did not have licenses, GIM would be unable to display AMA's content on Porn.com. That cannot be the case, and AMA and GIM must have intended that Defendants have an implied license.

AMA argues in its Opening Brief (at 54) that "no additional licenses can be

created under the CPA" because Section 1.1 of the CPA provides that "[n]o license to any other intellectual property of Licensor . . . is provided hereby." 6 ER 1050 (CPA) at § 1.1. That GIM's license under the CPA may limited in scope does not mean that GIM's agents and affiliates cannot have an implied license. AMA ignores Section 6.2 of the CPA, which expressly contemplates that GIM will delegate certain tasks to agents. 6 ER 1053. AMA also ignores Section 10.3 of the CPA, which allows GIM to assign the Agreement to its affiliates. 6 ER 1055. AMA has long been aware that Defendants were performing certain tasks in connection with the CPA. *See* Section VII.A., *supra*. While AMA repeatedly attempts to divorce Defendants' Porn.com-related conduct from the CPA, the CPA *centers* on Porn.com. AMA acknowledges that it "was aware that content that AMA provided to GIM was streamed on Porn.com" and that "if AMA were to sue Appellees for display of promotional content AMA submitted to GIM, they may have an implied license defense." Opening Br. at 55. Although AMA argues that such defense would not arise under or relate to the CPA (*id.*; 1 SER 33), GIM could not have posted AMA's content on Porn.com if Defendants were not express or implied licensees under the CPA.

AMA further argues in its Opening Brief (at 55-57) that, because the content at issue allegedly was "illegally acquired," and AMA allegedly objected to Defendants' use of the content, the parties could not have intended that Defendants

have an implied license. AMA is off target. The question now before the Court is not whether Defendants infringed AMA's copyright (which Defendants vehemently deny), but rather whether Defendants may obtain the benefit of the forum selection clause in the CPA. AMA has sued Defendants with respect to only 3% of the approximately 2,100 AMA videos that have been displayed on Porn.com. 2 ER 68 at ¶ 24 (Silverman Declaration stating that at least 2,132 AMA videos were submitted to the paidperview.com program); 6 ER 1072 (FAC) at ¶ 78 (accusing Defendants of copyright infringement with respect to 64 videos). AMA must believe that Defendants are licensed under the CPA with respect to more than 2,000 AMA videos. *See* 6 ER 935 at ¶ 48 (Silverman Declaration acknowledging that the *CPA* grants *Defendants* a license to certain materials that AMA has submitted or provided). That is sufficient to allow Defendants to enforce the forum selection clause. *See, e.g., Stevens v. CoreLogic, Inc.*, 194 F. Supp. 3d 1046, 1053-54 (S.D. Cal. 2016) (consent to use copyrighted work may be inferred based on silence where the copyright holder knows of the use and does not object.)

4.    **Defendants Have Standing To Enforce The Forum Selection Clause As Assignees Of GIM**

In its April 27, 2018, Memorandum, the Ninth Circuit held that, "*[o]n this record*, we are unable to conclude that Defendants were valid assignees of GIM's rights under the CPRA." 1 ER 14 (emphasis added). When the District Court thereafter ordered additional briefing, it said that "[t]he court of appeals found

54

Defendants' evidence of . . . assignment of the CPRA insufficient, but did not rule

that the assignment argument was entirely foreclosed." 6 ER 1130 at Doc. 153. In

their supplemental briefs, Defendants submitted that two additional facts establish

that Defendants are permitted assignees under, and thus parties to, the CPA. 2 ER

289-290; 1 SER 12-13. AMA's Opening Brief is silent regarding these facts.

First, AMA conceded long ago that Defendants are parties to the CPA. In

paragraph 63 of its First Amended Complaint, AMA concedes that Defendants are

partners with AMA in the paidperview.com program (the subject of the CPA), that

AMA provided Defendants with content pursuant to this program, and as such

Defendants are authorized to display AMA content on Porn.com:

> Defendants are an advertising affiliate for Plaintiff, pursuant to which
> Plaintiff previously provided limited sample promotional videos for
> Defendants to display on Porn.com for the sole purpose of directing
> Internet traffic to Plaintiff's paid membership sites. Plaintiff and
> Defendants share in the revenue generated by Internet traffic directed
> to Plaintiff's paid membership sites when the Internet user signed up
> as a paid member.

6 ER 1069-1070 (FAC) at ¶ 63.

AMA argued to the District Court that this paragraph "specifically and

solely refers to the affiliate relationship established by Cyberweb in 2007," 1 SER

35, but the 2007 contract is not mentioned *anywhere* in the First Amended

Complaint. Nor did AMA refer to the 2007 contract in any of its myriad briefs

filed before August 31, 2018. Moreover, AMA's President, Adam Silverman,

admits that AMA entered into the CPA "for promotional materials to be posted on Porn.com." 5 ER 732 at ¶ 22. Paragraph 63 of the First Amended Complaint can refer only to the CPA.

Second, AMA expressly concedes that GIM granted Netmedia license rights under the CPA. 1 SER 81 ("Not only has GIM granted Netmedia rights to AMA's content under the CPA, but Netmedia employees are innvolved [sic] in all aspects of Porn.com.") The Court may deem this to be a binding judicial admission by AMA. *American Title Ins. Co.*, 861 F.2d at 227.

## VIII.    CONCLUSION

In light of the foregoing, Defendants-Appellees respectfully submit that the District Court's October 24, 2018, Order dismissing this action should be affirmed in its entirety. The forum selection clause in the CPA encompasses any legal action "arising out of or relating to" the CPA, and it applies to AMA's copyright infringement claims because, *inter alia*, a court will be required to interpret the CPA to rule on Defendants' license defense. Defendants have standing to enforce the forum selection clause because their alleged infringing conduct – displaying AMA's copyrighted videos on Porn.com – is closely related to the contractual relationship between AMA and GIM, a relationship established for the specific purpose of having AMA's videos displayed on Porn.com. Alternatively, Defendants have standing to enforce the CPA as third party beneficiaries, agents,

implied licensees, and/or assignees.

Dated: May 6, 2019                    /s/ Erica J. Van Loon
                                      Erica J. Van Loon
                                      Joshua J. Pollack
                                      Amy E. Burke
                                      Lathrop Gage LLP

                                      Counsel for Defendants-Appellees

## IX.   <u>STATEMENT OF RELATED CASES</u>

Pursuant to Ninth Circuit Rule 28-2.6, *AMA Multimedia, LLC v. Sagan Limited, et al.,* Ninth Circuit Court of Appeals Case No. 17-15178 relates to the instant matter because it arose out of the same case in the District Court, was previously heard in this Court, and involved the same events.

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the

Court for the United States Court of Appeals for the Ninth Circuit by using the

appellate CM/ECF system on May 6, 2019.

I certify that all participants in this case are registered CM/ECF users and

that service will be accomplished by the appellate CM/ECF system.


By: /s/Erica J. Van Loon
Erica J. Van Loon

Counsel for Defendants-Appellees

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 18-17117

I am the attorney or self-represented party.

**This brief contains** | 13,410 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

( • ) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of Fed. R. App. P.
29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because
*(select only one):*

    ( ) it is a joint brief submitted by separately represented parties;

    ( ) a party or parties are filing a single brief in response to multiple briefs; or

    ( ) a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [      ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Erica J. Van Loon     **Date** | May 6, 2019

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**        *Rev. 12/01/2018*

# EXHIBIT C

NO. 18-17117

# United States Court of Appeals
# For the Ninth Circuit

AMA Multimedia, LLC,
Plaintiff–Appellant,

v.

Sagan Limited, et al.,
Defendants–Appellees.

Appeal from the United States District Court for Arizona, Phoenix
Judge David G. Campbell, Presiding
Case No. 2:16-cv-01269-DGC

# Appellant's Reply Brief

Spencer D. Freeman (25069)
sfreeman@freemanlawfirm.org
Freeman Law Firm, Inc.
1107 ½ Tacoma Ave. South
Tacoma, WA  98402
(253) 383-4500

Veronica L. Manolio (020230)
vmanolio@mf-firm.com
Manolio & Firestone, PLC
8686 E. San Alberto Dr., Suite 200
Scottsdale, AZ  85258
(480) 222-9100

*Attorneys for Plaintiff-Appellant, AMA Multimedia, LLC*

# Table of Contents

Table of Authorities.................................................................................iii

Introduction................................................................................................1

Rebuttal Statement of Cases and Facts......................................................3

    A.    There is a True Distinction Between Porn.com and the CPA..............3

    B.    There is no "Watermark Assignment" Program...................................6

    C.    Cyberweb has its Own Contract with AMA, Specific

          to Porn.com.............................................................................................9

    D.    Videos Displayed Through PaidPerView.com vs. Infringement

          on Porn.com...........................................................................................11

Rebuttal Argument....................................................................................13

    I.    AMA's Claims are Not Subject to the CPA/FSC.............................14

        A.    AMA Did Not Waive This Issue and Has Repeatedly

            Raised It...............................................................................................14

        B.    The District Court Erred in Analyzing "Closely

            Related" Conduct.................................................................................16

            1.    Defendants and the Trial Court Both Confuse

                "Alleged Conduct".........................................................................17

            2.    The Plain Language of the CPA.....................................20

                §§1.1 and 4.6 of the CPA....................................20

                §3.9 of the CPA....................................................23

                Summary of the CPA Provisions.........................24

             3.    The Alleged Infringement is Clearly Unrelated

                to the CPA.....................................................................24

                  Netmedia Involvement.........................................25

                  The "Watermark Assignment" Fabricated

                  Defense..................................................................26

i

Image Infringement.............................................28

The 2007 Cyberweb-AMA Contract

Governs the Conduct.............................................28

New Defenses Raised in Answering Brief...........30

Summary of Conduct...........................................31

II.   Defendants Lack of Understanding to Enforce the CPA/FSC............32

    A.   Defendants are Not Licensees Under the CPA.......................32

    B.   Defendants are Not Implied Licensees Under

       the CPA...........................................................33

    C.   Defendants are Not Agents of GIM........................................34

    D.   Defendants are Not Intended Third-Party

       Beneficiaries of the CPA............................................35

Conclusion.........................................................................36

# Table of Authorities

*American Title Ins. Co v. Lacelaw Corp.,* 861 F.2d 224 (1988)............................32

*Britton v. Co-op Banking Group,* 4 F.3d 742, 745
 (9th Cir. 1993)......................................................................................16, 19, 35, 36

*Coastal v. Janger Wheelabrator Ltd.,* 709 F.2d. 195
 (3rd Cir. 1983).....................................................................................................19

*Foad Consulting Group, Inc. v. Musil Govan Azzalino,* 270
 F.3d 821, 829 (2001)......................................................................................35, 36

*Gen. Protecht Grp., Inc. v.* Leviton *Mfg. Co.*,
 651 F.3d 1355 (Fed. Cir. 2011)..............................................................................15

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 91 L.Ed. 1055,
 67 S.Ct. 839 (1947)..................................................................................................19

*Holland Am. Line, Inc. v. Wartsila N. Am. Inc.,* 485 F.3d 450
 (9th Cir. 2007)..................................................................................................13, 16

*Manetti-Farrow, Inc. v. Gucci America, Inc.,*
 858 F.2d 509 (9th Cir. 1988)......................................................................13, 16, 29

*Orange, S.A. v. United States Distr. Court*, 818 F.3d 956
 (9th Cir. 2016)......................................................................................................19

*Philips v. Audion Active, Ltd.,* 494 F.3d 378 (2nd Cir. 2007)...................................15

*Schoendeuve Corp. v. Lucent Technologies, Inc.,* 442 F.3d 727
 (9th Cir. 2006)......................................................................................................15

*Scott v. Ross,* 140 F.3d 1275 (9th Cir. 1998)………...……………………………15

*Sherman v. British Leyland Motors, Ltd.,* 601 F.2d 429, 440,
 n.13 (9th Cir. 1979)..........................................................................................35, 36

*Tribank Capital Invs. v. Orient Paper,* 523 Fed. Appx. 484, 486
 (9th Cir. 2013)..................................................................................................13, 16

## INTRODUCTION

Defendants' Answering Brief attempts to obscure the issues by conflating different web sites and programs. When the Court pierces that attempted obfuscation, truth emerges.

The owners and operators of Porn.com[1] claim benefit of a forum selection clause ("FSC") within a Content Partnership Agreement ("CPA") to which they are not parties. The CPA governs the PaidPerView.com program ("PPV") of non-party GIM Corp., wherein AMA provides promotional (not full-length) videos to GIM for GIM to stream over hundreds of websites, including Porn.com.[2] By contrast, the instant matter concerns full-length videos and images Defendants obtained from sources other than PaidPerView.com.

Porn.com, owned and operated by Defendants, displays videos obtained via several methods, including third-party uploads, Porn.com's internal sources, and PaidPerView.com. PaidPerView.com remains a separate program, owned by GIM; Porn.com is separate web property that Defendants own/control.

---

[1]  Sagan Ltd., Cyberweb Ltd., Netmedia Services, Inc., and David Koonar were each Defendants below and are owners and operators of Porn.com. For the sake of consistency with the Answering Brief, AMA refers to these parties as "Defendants" collectively in this Reply Brief.

[2]  Any/all content that AMA provided to GIM is *not at issue in this litigation*.

From the beginning of this case through their Answering Brief, Defendants have continually conflated the operation of Porn.com with PPV as if they are one and the same. They are not.

Defendants' repeated attempts to confuse the operation of Porn.com with GIM's PaidPerView.com program are for one reason: to take advantage of the CPA/FSC that governs PaidPerView.com. But neither PaidPerView.com nor videos AMA provided to GIM are at issue. This case is about content acquired by Defendants *independent of PaidPerView.com*, and whether the CPA/FSC could be extended to Defendants here.

Unfortunately, the District Court incorrectly accepted Defendants' conflated position. In doing so, it failed to address that Defendants continually displayed AMA's *full-length video*s, obtained independent of PPV, to the viewers of Porn.com without compensating AMA. These acts were taken solely in operation of Porn.com, without any benefits to GIM, PaidPerView.com, or AMA. This conduct is well outside the PaidPerView.com program and the CPA. This fundamental error infects the decision below, and requires reversal.

# REBUTTAL STATEMENT OF CASE AND FACTS

## A.    There is a True Distinction Between Porn.com and the CPA.

The trial court and Defendants focus heavily upon the fact AMA entered into the CPA with knowledge and intention that AMA-submitted PPV videos could be displayed on Porn.com.  Such is irrelevant to AMA's copyright infringement allegations against Defendants, who are not parties to the CPA.  Defendants' *alleged conduct* can only be "linked" to the CPA by wrongfully conflating conduct, submitting false evidence, and ignoring the CPA's plain language.

AMA's knowledge that PaidPerView.com videos could be displayed on Porn.com cannot be construed to mean that AMA knew or intended Porn.com owners/operators to be parties to the CPA.  Porn.com and PaidPerView.com are separate and distinct; only GIM owns/runs the PaidPerView.com program.  The CPA is clear that GIM is the entity authorized to stream AMA's videos (only when AMA provides/submits it).  Defendants do not get to presume the rights of GIM simply because they own/operate Porn.com and Porn.com chooses to display PaidPerView.com videos.

Defendants' position would be analogous to a theatre owner arguing it has a right to show full-length pirated Disney movies merely because Disney licensed movie trailers to another company with which the theatre shares a common vendor.

3

GIM owns and operates PPV, HostedTube.com, and Traffic Force (an advertising platform). GIM plays no role in the operation of Porn.com and derives no benefit from the operation of Porn.com (not part of HostedTube.com network). GIM contracts with Netmedia – explicitly as a *non-agent* – to assist with the technical operations of GIM sites/programs. 7 ER 1147-52. Under the CPA, GIM is permitted to stream promotional videos submitted by AMA to PaidPerView.com /GIM. While Netmedia provided technical services to GIM for PaidPerView.com and/or HostedTube.com, that did not give Netmedia ability to acquire content from non-PaidPerView.com sources and post full-length content on Porn.com where Cyberweb streams.

The only true "connection" between GIM and Defendants is that they use Netmedia as a common vendor. The remaining Defendants have no relationship with GIM. Defendants own/control Porn.com as an independent product. GIM's PaidPerView.com program runs independent of the remaining Defendants:

**Cyberweb** – owns/operates Porn.com, unequivocally separate and distinct from PPV. Cyberweb contracts with Netmedia for most of the operational and technical aspects of Porn.com, including uploading content. 3 ER 578; 5 ER 799; 6 ER 1028; 7 ER 1243-47, 1258-62, 1297-1306, 1320-22. Cyberweb has no direct relationship to GIM.

**Sagan** – Cyberweb's agent, existing merely for privacy to insulate Cyber-

4

web for banking purposes, with no direct relationship with GIM or PPV. 3 ER 673-81, 5 ER 808, 817.

**Koonar** – President of both GIM and Netmedia. 2 ER 308; 7 ER 1270-83. Though he has connections to both entities, the entities do not have true legal or enforceable connections to one another.

Porn.com is a website which contains, stores, and displays hundreds of thousands of videos. A *portion* of videos displayed on Porn.com are promotional videos sourced from the PPV program, submitted by content producers like AMA to be promoted across many sites to be streamed by GIM. However, Porn.com also displays a significant amount of videos that is ***not*** from PPV, which Cyberweb streams. Third-party users and Defendants themselves can directly upload videos for display on Porn.com. 2 ER 66. PPV content is a mere fraction of video(s) displayed throughout Porn.com.

AMA's lawsuit/allegations have nothing to do with videos from PaidPer-View.com. AMA only complains about the full-length videos and/or still images that Defendants obtained independent of PPV. Defendants attempt to connect *non-PPV sourced videos* to the CPA *after the fact* via a "watermark assignment" program.

5

## B. There is no "Watermark Assignment" Program.

AMA established that the Defendants have no **_standing_** under _Manetti-Farrow_ to enforce the FSC unless there's a close relationship between _their_ alleged actions at issue in this dispute and the CPA. Opening Brief, p 28-33. In response, Defendants focus on wrong conduct (videos AMA uploaded to PaidPerView.com), irrelevant conduct (AMA communication with Defendants regarding assistance of Porn.com operation), and manufactured a "watermark assignment" program. Answering Brief, p 4-5, 7-8, 30-34, 41-42.

Defendants assert their alleged conduct was part of the larger contractual relationship between AMA and GIM solely due to this fake "watermark assignment" program. Id. at 33-34. _Without a "watermark assignment" program, the disputed videos are not connected to PaidPerView.com._

A review of the "PPV account summary" Defendants provided proves there was no "watermark assignment" program. Mr. Bradbury (Netmedia) provided a complete account summary of all videos associated with AMA's PPV account, showing 2,116 videos uploaded to the account. 2 ER 80-82. AMA confirmed the 2,116 videos were **_promotional videos_** AMA uploaded to PaidPerView.com per the CPA. 2 ER 68. None of the videos in AMA's PPV account were full-length videos and/or videos assigned to AMA's account through some "watermark assignment" program.

While Defendants wrongfully swore to the trial court that a "thousand" un-authorized AMA videos were assigned to AMA's PPV account, therefore connected to the CPA, they presented evidence of *one,* and that video was assigned *after* AMA filed this lawsuit. 2 ER 69.

A review of AMA's screenshots of Porn.com establishes there was no assignment program. Each promotional video AMA submitted to PPV is displayed with an AMA advertising banner, linking directly to an AMA paid membership site. 2 ER 113-149. Each infringing AMA video on Porn.com is missing this banner. *Id.* Had any infringing videos been "assigned" to the PPV account, AMA's advertising banner would have been present.

Defendants ignore their Account Summary and the screenshots, and point to Skype logs. Answering Brief, p 33. The Skype logs establish such a program did not actually exist (and Defendants understood this content had no relationship to the CPA):

- In conversation between AMA and Netmedia, Mr. Camara (Netmedia) affirmed Appellees would not treat non-PPV sourced material as having been "licensed" under the CPA *unless and until* AMA provided "a list of [the] content" AMA wanted assigned. Mr. Silverman (AMA) confirmed again that illegal material was to be *removed*, and AMA should be paid for any monies earned up until the point it was discovered:

  > 2:53:13 *silverman: "3. The ad revshare program needs to be extended to our pirated clips. Ultimately those clips will be removed,* but also it needs to be calculated how much that movie

has earned in advertising and the revenue needs to be split with us on something that's agreeable for everyone."

3:39:12 glen camara: "3) *if you have a list of content that is yours, but was uploaded by users, we will happily add it to your ppv account, as this is the main purpose of the program"*

2 ER 71-72, 84-90 (emphasis added).

- In further conversation, Ross Allan (Netmedia) told AMA Netmedia does not perform any review of user uploaded material:

> 4:17:21 Ross Allan: you guys have an account with us [PPV] right
> 4:17:23 Ross Allan: you submit to us
> 4:17:25 Silverman: yes, *not that*
> 4:17:28 Silverman: 3rd party users.
> 4:17:31 Ross Allan: right ok
> 4:17:32 Ross Allan: so the issue with that
> 4:17:54 Ross Allan: *I know you understand the dmca law, if we moderate user uploads, and miss something, we're liable for HUGE lawsuits*
> *4:19:52 Ross Allan: any videos on our site that are yours, we are happy to move to under your PPV account*
> *4:20:18 Ross Allan: but we need to see the content, we need the links to it*
> 4:20:23 *Ross Allan: in order to act*
> *4:20:29 silverman: so let me rephrase*
> *4:20:37 silverman: we find illegal piracy on your site uploaded by 3rd party users*
> *4:20:39 silverman: you remove the content*
> *4:22:12 Ross Allan: yeah*
> 4:22:22 Ross Allan: we would pay you out at the rates that you qualify for in PPV
> 4:22:26 Ross Allan: so if your rate is 30% or whatever
> 4:22:28 Ross Allan: that's what we do
> 4:22:32 Silverman: 30% wouldn't cut it either
> 4:22:40 Silverman: because it's illegal
> 4:22:44 Silverman: why should you get to keep 70%

> 4:22:50 Silverman: it's stolen
> 4:22:53 Silverman: and unauthorized

2 ER 71-73, 91-95 (emphasis added).

The "watermark assignment" program is *allegedly* based on Defendants reviewing Porn.com for all third-party user uploads. Read in context, these conversations demonstrate that there was no "watermark assignment" program.

Mr. Allan explicitly informed AMA that Defendants refused to moderate/review user-uploaded content, for fear of "HUGE lawsuits." 2 ER 92.

Between the Account Summary, AMA's screenshots, and the complete Skype logs, *there was no "watermark assignment" program.* As such, the disputed content was never connected to the CPA. It was not provided by AMA to GIM, was never attached to PPV after the fact, and had no relationship to the CPA or any of its provisions.

## C. Cyberweb has its Own Contract with AMA, Specific to Porn.com.

Cyberweb, unrelated to PPV, entered its own contract with AMA in 2007 for its use of AMA promotional videos. The AMA-Cyberweb contract expressly governs material that AMA provides to Cyberweb, as Paragraph 13 of that contract specifically states:

> All SSC Group, LLC program materials, including and not limited to, banners, photographic materials, recordings, video, sound, and any other form of intellectual property provided to you by SSC Group, LLC shall remain the property of SSC

Group, LLC and may not be copied, reproduced, altered, modi-
fied, changed, distributed, transmitted, sold or offered for sale in
any manner, at any time anywhere in the world unless authorised
by SSC Group, LLC in writing.[3]

2 ER 64, 79.

Defendants acknowledge the AMA-Cyberweb contract without challenge.
AMA proved the legitimacy of the contract including a copy of the contract, the
date of execution, when Cyberweb first acted under the contract, and affirmation
they receive and cash payments under this contract *to this day*.

The alleged conduct in this case *solely* involves content obtained by Cyber-
web and its agents, *not content provided to GIM/PPV*.  Based upon this 2007 con-
tract, Cyberweb streams and directs traffic utilizing link codes created under this
contract (not GIM's link codes created under the CPA).  Cyberweb gets paid for
affiliate commissions, not GIM.  And, while Defendants assert CPA §3.9 is evi-
dence of a "connection" between their alleged conduct and the CPA, Defendants
actually used affiliate codes specific to the AMA-Cyberweb contract, not the CPA.
 2 ER 64, 118-19.

*The 2007 AMA-Cyberweb contract does not contain an FSC*.

---

[3] AMA was formerly known as SSC Group, LLC.

**D. Videos Displayed Through PaidPerView.com vs. Infringement on Porn.com.**

The CPA does *not* govern Porn.com, Cyberweb streaming, or all the different ways Porn.com acquires videos. The CPA governs PaidPerView.com, and how GIM may use videos AMA provides to GIM/PPV.

Defendants presented a confusing set of facts in order to purposefully confuse their alleged conduct with PPV. However, the diagrams below show a comparison between the function and application of PaidPerView.com vs. Porn.com; these diagrams illustrate the true difference(s) and a distinct separation between PPV versus infringing conduct on Porn.com that is the subject of this suit:

## THE CPA





11

# **ALLEGED CONDUCT**



The alleged conduct does not involve any content AMA provided to GIM.
GIM played no role in the alleged conduct.

# REBUTTAL ARGUMENT

The central issue on appeal is whether Defendants can benefit from an FSC within a contract to which they are not a party.  The parties agree that this question is resolved by determining whether non-party Defendants' *alleged conduct* "so closely related" to the CPA that they may benefit from the CPA's FSC.  *See, e.g., Tribank Capital Invs. v. Orient Paper,* 523 Fed. Appx. 484, 486 (9th Cir 2013); *Holland Am. Line, Inc. v. Wartsila N. Am. Inc.*, 485 F.3d 450 (9th Cir 2007); *Manetti-Farrow v. Gucci America, Inc.,* 858 F.2d 509, 514, fn. 5 (9th Cir. 1988).

Defendants are not qualified as "transaction participants" to be able to enforce the FSC.  Defendants' infringement conduct[4] is not "closely related" to the CPA between AMA and GIM.  The District Court erred in its application of the law to the facts here, and its result is without support in the record, requiring this Court to reverse and remand.

Defendants claim: (1) AMA waived the argument that "applicability" was not disturbed; (2) Defendants conduct closely relates to the CPA; and (3) Defendants have standing to enforce the FSC as assignees, agents, third party beneficiaries, or implied licensees.  Answering Brief, p 27-34, 38, 47-54.  Defendants are wrong.

---

[4] The "infringement conduct" is the alleged conduct in this case, Defendants scouring the internet for videos and images and posting them to Porn.com.  This involves content not obtained from or connected to PaidPerView.com.

## I.     AMA'S CLAIMS ARE NOT SUBJECT TO THE CPA/FSC.

Access to the FSC necessarily requires a two-step analysis: whether Defendants have *standing* to assert the FSC; and whether the *FSC applies to AMA's claims*.

### A.     AMA Did Not Waive This Issue and Has Repeatedly Raised It.

Defendants assert that the trial court's initial ruling (overturned) determined the FSC applied to AMA's infringement claims, and such determination remains here. Answering Brief, 17-20. The trial court's previous determination was based upon the CPA being "assigned" to Defendants, granting the right to enforce the FSC as *licensees*. 1 ER 22, 29. However, this Ninth Circuit determined Defendants did not prove they were licensees (and vacated), clearly disturbing the trial court's earlier determination. 1 ER 11-15. The trial court had to re-consider the first step – whether Defendants had standing to enforce the FSC, and then determine applicability.

In the previous appeal, this Court dealt only with the issue of standing (as assignees) and chose not to reach other issues AMA raised; there is no doubt AMA clearly argued that Defendants were not licensees. 1 ER 11-15. AMA re-raised the issue in the trial court on remand. 1 ER 3; 1 SER 16-37 (AMA argued GIM was the licensee and the CPA only applied to licensee GIM's actions). The trial court expressly declined to address this issue. Defendants do not make a good

14

faith argument that AMA "waived" the issue for consideration. *See Scott v. Ross*, 140 F.3d 1275, 1283 (9th Cir. 1998).

Defendants assert the CPA must be interpreted because they raise a license[5] defense under the CPA, focusing on the "relating to" language of the FSC, and relying heavily on *Schoendeuve Corp. v. Lucent Technologies, Inc.*, 442 F.3d 727 (9th Cir. 2006); *Gen. Protect Group, Inc. v. Leviton Mfg. Co.*, 651 F.3d 1355 (Fed. Cir. 2011); and *Philips v. Audion Active, Ltd.*, 494 F.3d 378 (2nd ir 2007). However, the focus on these cases is immaterial to a determination whether Defendants here have standing to enforce the FSC. Each of those cases involved *signatories*, while the instant matter involves non-signatories.

Before the Court rules on applicability, the Court must determine standing as "transaction participants," whether the alleged conduct "so closely relates" to transactional relationship such that it is "part of the larger contractual relationship" between AMA and GIM.

---

[5] It should not be lost on this Court they are not holding the license they are raising, as they are not the licensee, and the previous ruling, which they argued was "not disturbed" was predicated on the Defendants being the licensee.

**B.    The District Court Erred in Analyzing "Closely Related" Conduct.**

AMA established that non-signatories to a contract can only enforce an FSC *if* their alleged conduct so closely relates to the transactional relationship of the parties to the contract.  Opening Brief, p 28-33.  Defendants concur with this standard, but argue that the trial court correctly determined the infringement conduct "closely relates" to the CPA.  Answering Brief, p 39-42.  Defendants are wrong.  To be so closely related, Ninth Circuit case law dictates that the alleged conduct of the non-parties would not have occurred *but for* the existence of the contract.  *See Tribank Capital Invs. V. Orient Paper,* 523 Fed. Appx. 484, 486 (9th Cir 2013); *Holland Am. Line, Inc. v. Wartsila N. Am. Inc.*, 485 F.3d 450 (9th Cir 2007); *Britton v. Co-Op Banking Group*, 4 F.3d 742 (9th Cir. 1993); *Manetti-Farrow v. Gucci America, Inc.,* 858 F.2d 509 (9th Cir. 1988).  Such is not the case here.

Defendants wrongfully assert the alleged conduct is "so closely related" to the CPA/PPV by (i) confusing what the alleged conduct is, focusing on the wrong acts; (ii) ignoring the plain language of the CPA, asserting inapplicable provisions; and (iii) submitting false evidence of a "watermark assignment" program.  Answering Brief, p 4-5, 7-8, 30-34, 41-42.

The trial court also confused the conduct by focusing on sample videos AMA uploaded to PaidPerView.com (not alleged conduct), and made *no finding* as to whether the *infringement conduct* was closely related to the CPA, stating "they"

(Defendants) are closely related to the contract. Defendants assert the trial court analyzed the infringement conduct, though it's clear it focused on the videos AMA uploaded to PaidPerView.com, ignoring the videos Porn.com acquired independent of the PaidPerView.com program.

1. ***Defendants and the Trial Court Both Confuse "Alleged Conduct."***

Defendants continually conflate the operation of PaidPerView.com with the operation of Porn.com. They do so intentionally, relying on confusion to argue all aspects of Porn.com "closely relate" to PPV. They also convoluted facts to suggest that the owners and operators of Porn.com have a "close relationship" with GIM and are covered by the CPA/FSC. Both issues are intentionally misleading, and the trial court unfortunately followed.

The real issue is whether Defendants' alleged *infringement conduct* is closely related to the CPA. Defendants gloss over this issue by suggesting that the CPA governs "posting videos on Porn.com," and just because GIM/PPV can stream videos AMA uploaded to PaidPerView.com on Porn.com, the allegations in this lawsuit must be "closely related." Answering Brief, p 13.

This argument ignores that different conduct leads to different types of videos being posted on Porn.com. AMA providing sample videos to GIM via PPV, which are then streamed on Porn.com, *is unrelated to* Defendants or third-party us-

17

ers providing full-length videos to Porn.com, *which were never connected to PPV/CPA.*

Defendants cite the trial court ruling that, "AMA could not have posted its videos on Porn.com and benefited from the Paidperview.com program – the express purpose of the CPRA – without Defendants' involvement."[6] Answering Brief, p 45. This wrongly conflates the alleged conduct. Porn.com acquiring promotional sample videos from GIM/PPV is conduct different from Porn.com acquiring and displaying full-length content from its users or Defendants. The latter material was never provided to/by the PPV program, by any means; Defendants illegally obtained the material and then suggest that they are permitted to keep it under the CPA/PPV because they claimed to have assigned it via a "watermark assignment" program.

Defendants confuse and misstate AMA's argument by framing it as: "Defendants lack standing to invoke the CPA's forum selection clause because the CPA's license does not extend to Defendants' allegedly infringing conduct." Answering Brief, p 43. AMA's *actual* position is that PaidPerView.com is a program separate and distinct from the operation of Porn.com; and while AMA provides sample videos to GIM allowing GIM to stream those sample videos on any/all GIM sites and Porn.com sourced some of it's videos from GIM/PPV(videos not at

---

[6] The court was analyzing AMA's *sample* videos it uploaded to PaidPerView.com

issue here), Defendants' infringement conduct is specific and solely relates to non-PPV sourced content without any benefit to PPV or GIM. The illegal content was never part of the PPV/CPA program.

Defendants argue that by raising a license defense, the trial court must "interpret" the CPA, which mandates the case be sent to Barbados for resolution.[7] If Defendants' argument were true, every defendant who raises an argument claiming connection to a contract (including license they do not hold) would automatically win. Rather, the Court makes the determination as to whether alleged conduct bears any relationship to a contract or any provision of a contract *after* reviewing the contract in relation to the proper alleged conduct. *See Orange, S.A. v. United States Distr. Court,* 818 F.3d 956 (9th Cir. 2016); *Britton v. Co-Op Banking Group*, 4 F.3d 742 (9th Cir. 1993).

Defendants actually discourage this Court from examining the CPA and comparing it to the infringement conduct to determine whether the conduct implicates any provision of the CPA. Certainly, the Court must conduct a review of the CPA to determine whether the alleged conduct closely relates to the CPA. *See, Coastal*, 709 F.2d at 195, *citing Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 91 L.Ed. 1055, 67 S.Ct. 839 (1947). By performing the proper analysis it is clear De-

---

[7] Defendants cite the District Court to support this proposition. Answering Brief, p. 44. However, as is true with **many** of Defendants' citations to the District Court, they cite an Order that was specifically vacated/overturned by the previous appeal.

19

fendants' misconduct is not part of a "larger contractual relationship" between AMA and GIM. *See*, Answering Brief, p 46. The alleged infringement is between AMA and Defendants only; Defendants acquired and distributed AMA's full-length content independent of the CPA, not part of the PPV program. Defendants' argument that their misconduct is "covered" as a transaction ignores the plain language of the CPA.

### 2. The Plain Language of the CPA.

To make their infringement "closely related" to the CPA, Defendants must establish such conduct is contemplated by or it relates to the rights and duties enumerated in the CPA. They fail to establish this connection because they point to inapplicable provisions, and argue as if they are the licensee.

As outlined in AMA's Opening Brief, the terms, rights, and obligations of the CPA are clear: GIM has license to stream, on certain web sites, promotional videos AMA provides to GIM; and AMA and GIM share in revenue generated from the promotional materials. None of these rights/obligations are at issue now.

### §§1.1 and 4.6 of the CPA

Defendants claim that §1.1 of the CPA gives them "license" to all pirated content on Porn.com. Answering Brief, p 30-31. "License" would only apply if

the Defendants were licensees (they are not).[8]  §1.1 is clear on its face that a license is granted where AMA (Licensor) *submits or provides content to GIM* (Licensee).  6 ER 945-52.  Stolen content is not "submitted" or "provided" by AMA; it is taken without authorization, and not provided "to GIM."

§4.6, the only provision applicable to the central issue here, addresses how content must be provided by AMA *to GIM*, in order to be considered licensed under §1.1.  6 ER 945-52.  In their Answering Brief, Defendants brazenly assert §4.6 is *their* right to accept content, and that §4.6 was designed to *protect them, conceding this material was never provided "to GIM*."  Answering Brief, p 31.  This is patently wrong, and not up for interpretation.  §4.6 is GIM's right, and only GIM may accept content under the CPA.  The CPA governs content AMA provides *to GIM*.

§1.1 expressly precludes all content not provided by AMA *to GIM*.  Defendants argue that their alleged conduct, expressly precluded from the CPA, is "closely related" and part of the CPA.  Their position further ignores §4.6 dictating AMA has the "*SOLE RESPONSIBILITY*" for providing content to GIM.  §4.6 makes it clear that the CPA requires *action* by AMA that evidences AMA's intent to license content under the CPA.

---

[8] Defendants analyze the CPA under the "non-frivolous" argument and spend an inordinate amount of the Brief on the issue when it was not even raised on appeal.

Defendants instead point to three (3) different inapplicable provisions of the CPA where the word "provide" is used in the same sentence as "website," arguing that such means Defendants (not GIM) could take content from any website in the world and publish without AMA's authority because *all* online content is "provided" by AMA.   Answering Brief, p 30.  In reality:

- Background, Section B establishes the ultimate goal that GIM will display content to viewers on certain web sites.

- §1.4 merely clarifies where GIM displays content.

- §5.1 requires GIM to create and maintain the web sites where the content is displayed.

Nothing in these provisions even remotely supports Defendants' suggestion that the CPA permits Defendants (or GIM) to unilaterally scour the internet for AMA content, and publish it, and claim it was "provided." [9]

Defendants raise Exhibit A, out of context, because it contains a phrase "other origins".  Answering Brief, p 32.  This sentence is inapplicable.    Exhibit A lists submission requirements if AMA were providing physical DVDs to GIM.  GIM instructs AMA to contact it or go to PaidPerView.com for a list of submission requirements for content with "other origins" (i.e. not physical DVDs).    These provisions are a distraction, Defendants think the more they reference the CPA, the

---

[9] These provisions have no relationship to the described methods of delivering content **to licensee GIM**.

more this Court should be convinced an interpretation is needed, so they point to inapplicable provisions that need not be interpreted.

### §*3.9 of the CPA*

Defendants' assertion that §3.9 is rendered meaningless, nonsensical or superfluous without the ability to unilaterally obtain AMA content from any web site is equally flawed and illogical.  Answering Brief, p 31-32.  §3.9 establishes a compensation structure for licensed videos connected to an AMA paid membership site by creating a marketing relationship between GIM and AMA wherein GIM shares revenue in membership fees if display of promotional videos results in a paid membership.  Thus, potential revenue is created in addition to sharing ad revenue GIM generates from display of promotional videos.  Nothing in §3.9 allows third-parties (or GIM) to unilaterally take AMA's full length content and claim it is "provided" by AMA.

Defendants did not even act under §3.9 as they suggest.  No advertising banners are present, and in the *one* video set forth as subject to the "watermark assignment" program (assigned by Defendants to AMA's PPV account *after* the lawsuit was filed), Defendants failed to use GIM link codes.  They used the Cyberweb link codes created under the 2007 Cyberweb-AMA contract.  If paid memberships were generated from this video, revenue is paid to Cyberweb under the 2007 agreement, not GIM pursuant to CPA §3.9.  In their haste to create evidence, De-

fendants made a material mistake, and once again conceded they were acting under the wrong contract.

### Summary of the CPA Provisions

In sum, Defendants intentionally substitute themselves with GIM. They artfully plead AMA provided the pirated content, and presume they are the licensee in receipt of the piracy. AMA fully agrees that "nonsensical interpretations of contracts are disfavored." Answering Brief, p. 32. Not only are Defendants' positions *nonsensical*, but they lack all credibility.

### 3. The Alleged Infringement is Clearly Unrelated to the CPA.

Porn.com is a website that displays hundreds of thousands of videos obtained by several different methods. Third-party users are permitted to register as members of Porn.com and upload content directly to the site. Defendants have direct access to Porn.com servers and upload content displayed on the site. And, content producers (like AMA) can provide content through the PaidPerView.com program, which are then streamed on Porn.com.

The allegations here are *specific* to Defendants' direct access to Porn.com servers and direct uploading of content on Porn.com, unrelated to the promotional videos provided to PaidPerView.com. While AMA knew that the PPV program would display promotional materials on Porn.com (in addition to multiple other

sites hosted by GIM), the permissible content is only that which AMA provides to GIM.

Defendants simply took AMA's full-length videos located elsewhere on the Internet, accessed Porn.com servers, and posted them on Porn.com to be viewed for free. Direct access/uploads by the owners/operators of Porn.com is *not content AMA provides **to GIM**[10] (undisputed) and independent of PPV/CPA.*

The trial court conducted zero analysis regarding the infringement conduct and how it could possibly relate to the CPA or PaidPerView.com. When Defendants asserted that a "course of performance under the CPA" proved their point, the court ignored the evidence. Answering Brief, p 33-34. Defendants intentionally misled the trial court, and the trial court failed to conduct its own inquiry. At a minimum, the trial court should have considered the evidence that *Defendants* put forth, which leads to the only conclusion that their conduct is not closely related to the CPA. AMA's evidence also proves this.

### Netmedia Involvement

Netmedia provides technical assistance to both Porn.com and PaidPer-View.com. When AMA interacted with Netmedia, communications were specific to *either* Porn.com *or* PPV. When AMA communicated regarding PaidPer-

---

[10] While the parties may disagree about whether AMA provided the content, there is no disagreement that the content was solely provided to non-licensee third-party Defendants, not GIM.

View.com, the discussion was specific to the promotional materials it provided. AMA discussed the PPV program as a whole, including discussion surrounding GIM's multiple other sites (HostedTube.com sites). This is not Porn.com-related

Just because Netmedia provides assistance to both Porn.com and PaidPer-View.com does not mean that the two programs can be merged into one. For PPV, Netmedia provides assistance to GIM. For Porn.com, Netmedia assists Cyberweb. The two programs are separate and distinct, and AMA's claims are *specific to the operation of Porn.com*, without any connection, reliance, or benefit to PPV.

### The "Watermark Assignment" Fabricated Defense [11]

Defendants fabricated the "watermark assignment" program hoping to convince the trial court that AMA ratified their infringement conduct under the CPA. They claimed they would review unauthorized videos on Porn.com and assign them into AMA's PPV account, treating the material as licensed under the CPA. Defendants claimed to have "assigned" thousands of such unauthorized AMA videos into the PPV account under this scheme. Answering Brief, p 33.

---

[11] It is quite noteworthy that the "watermark assignment program" was only alleged by Defendants *after* the trial court ruled against their *forum non conveniens* motion wherein the Court explicitly stated that there was no link of AMA's infringed videos to PPV, no allegation that AMA approved of such a link, nor any evidence of compensation for the infringement videos. (See, 2 ER 112-149) Although the trial court later struck that ruling as "premature," there is no doubt that Defendants made up new evidence/arguments after they knew the Court's exact concerns.

The Skype logs and the "PPV account summary" Defendants provided both prove that this defense is absolutely false:

- Defendant employee (Ross Allan) expressly stated that no such program could exist because reviewing user uploaded videos would expose Defendants to "HUGE lawsuits."

- Before the adverse ruling, Defendants supplied a complete "PPV Account Summary" for AMA, conceding they did not assign "thousands" of unauthorized videos into AMA's PPV account– the entirety of the videos in the account were ones that AMA uploaded.

- Defendants claimed that they identified "assigned" videos with a red asterisk. Their evidence shows that there was only ONE video delineated with an asterisk, and was assigned to AMA's account *after this lawsuit was filed*.

In addition, AMA explicitly instructed that all unauthorized videos be removed. Without a "watermark assignment program," there was no mechanism to connect the infringing content to PPV.

### Image Infringement

Also unaddressed by the trial court was AMA's evidence Defendants utilized "images" as part of their infringement. Images are not licensed by the CPA, and such conduct is not "closely related" to the CPA.

Defendants addressed only one "image" in their argument, alleging AMA submitted a video from which the image was made. Answering Brief, p 34-35. (Defendants ignored the *multiple* images actually infringed.) Even if true that a single image was taken from an AMA video, *nothing* in the CPA permits licensing of images. Defendants do not argue the CPA licenses images, thus image infringement could never be a part of or "closely related" to the CPA.

### The 2007 Cyberweb-AMA Contract Governs the Conduct

In 2007, AMA and Cyberweb entered into the "AMA-Cyberweb Contract" that expressly governs materials AMA provided to Cyberweb. Therein, Cyberweb was permitted to stream promotional materials on Porn.com. The 2007 contract does not contain an FSC.

In 2012, AMA entered into the CPA with GIM. The CPA allowed GIM to stream content AMA provided or submitted to GIM/PPV.

The 2012 CPA did not render the 2007 AMA-Cyberweb Contract invalid. The agreements are between different parties, and none of the Defendants are par-

ties to the CPA. Cyberweb is a named party in the 2007 agreement, and its actions must be subject to that contract rather than the CPA.

However, Defendants claim access to the 2012 CPA rather than the 2007 AMA-Cyberweb Contract that specifically governs Cyberweb's actions. Defendants concede that their actions revolve around Cyberweb "link codes," created under the AMA-Cyberweb contract via their submitted evidence of their fabricated "watermark assignment" scheme. This demonstrates that Cyberweb acted under its own contract, *not* the CPA.

Defendants claim their "license defense" interpretation of the CPA renders the 2007 AMA-Cyberweb Contract moot. [12] Answering Brief, p 36. This argument fails to recognize that merely asserting the defense does not create a "close relationship" to a contract; the *alleged conduct* of the non-signatory parties must create the close relation. *Manetti-Farrow, supra*, at fn. 5. If it were simply the defense that made the FSC accessible, parties would be encouraged to assert fake defenses/evidence and claim an automatic win.

---

[12] Defendants complain that the 2007 AMA-Cyberweb Contract was new evidence in AMA's Supplemental Memorandum. While AMA did contest either party submitting new evidence at that stage, Defendants *explicitly* requested to be able to submit new evidence, and the trial court *granted* their request. It is completely disingenuous to argue now that AMA did something improper by providing the new evidence.

### *New Defenses Raised in Answering Brief*

While AMA has proven that the *date* of infringement distinguishes the conduct from acts that are "closely related" to the CPA (because Defendants claim that the conduct occurred years *before* the CPA was executed), Defendants assert three "new" arguments in the Answering Brief: (1) videos posted prior to the inception of the CPA would be barred by the statute of limitations; (2) AMA alleged the posting dates were manufactured; and (3) AMA presents no evidence alleged infringements occurred before the CPA was entered. Answering Brief, p 36-37. Each of those arguments fail:

- Whether an infringement claim on a specific video is barred by statute of limitations *is not a consideration regarding access to an FSC*. The only issue is whether the infringement conduct was closely related to the CPA.

- If certain videos were barred as untimely, that proves AMA's point that the Defendants engaged in a pattern and practice of infringement misconduct prior to the CPA, and thus not "closely related" to an agreement that did not exist.

- AMA alleges some of the posting dates were manufactured, and this *has* to be true for videos that claim to have been "posted" before the videos were actually made. But this does not mean *all* of the posting dates were

manufactured. Either they engaged in the infringement conduct, including covertly manufacturing posting dates/data, or they did not. But they cannot deny the manufactured dates (especially for those videos that did not exist on the alleged posting date) and simultaneously argue that the dates are true for statute of limitations.

- Absent other evidence, the court would only have information of the dates that Defendants list as the posting date of videos. And some of those dates pre-date the CPA.

- Defendants' own web site provides evidence that infringement began before the CPA was entered. The site displays videos with posting dates that pre-date the CPA.

### Summary of Conduct

AMA has alleged that Defendants scoured the internet for full-length videos and images which they distributed on Porn.com, and then created fake upload data to conceal their conduct from AMA. AMA did not provide the videos to GIM, and evidence proves this conduct was never connected to or treated as a part of the CPA/PPV.

## II. DEFENDANTS LACK STANDING TO ENFORCE THE CPA/FSC.

In addition to Defendants alleged conduct not being closely related to the contractual relationship (CPA/PPV), Defendants do not have sufficient connection with the CPA/PPV to have standing to enforce the FSC.

### A. Defendants are Not *Licensees* Under the CPA.

The Ninth Circuit previously determined that Defendants failed to prove any assignment of the CPA. It determined there was no evidence of scope of assignment, no documents relating to assignment, nothing to indicate single or multiple assignments, or even a date which assignment occurred. 1 ER 11-15.

On remand, Defendants did not provide any additional evidence of assignment. The trial court did not reconsider the assignment. Despite the glaring lack of evidence, Defendants continue to assert that they are "licensees" by way of assignment from GIM. Defendants argue "assignment" by pointing to two things, both of which were part of the previous record (and could have been raised in the first appeal).

Defendants rely on unverified pleadings as being "admissions" that an assignment occurred. While *American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224 (1988) stands for the proposition that statements in a complaint and/or statements of fact contained in a brief may be considered admissions, the determination relies on the *discretion* of the district court.

First, they point to paragraph 63 of the First Amended Complaint ("FAC") wherein AMA alleges an affiliate-marketing relationship with Defendants. As AMA explained before, such was reference to the 2007 AMA-Cyberweb Contract. The FAC never even mentions the CPA.

Second, Defendants point to one line in AMA's Opposition to Netmedia's Motion to Dismiss for Lack of Personal Jurisdiction, which is not supported by factual evidence.

The district court did not find Defendants' new "facts" to prove a valid assignment of the CPA, and this Court should decline such a finding now.[13] There remains *no evidence of assignment*, and Defendants are not licensees.

## B.    Defendants are Not *Implied Licensees* Under the CPA.

There has never been a case illustrating that an "implied licensee" may enforce another's forum selection clause. They are asking the Court to enter unchartered territory. This is not a *forum non conveniens* issue.

Defendants fail to demonstrate any "implied" license over the alleged conduct. What Defendants argue is that they were given an "implied license" to PPV-sourced content, thus they should be allowed to presume they are the *express* licensee.

---

[13] It should not be lost on this Court that Defendants filed their own Complaint (in Barbados) specifically stating all rights under the CPA are "held by GIM Corp." 2 ER 251-53. Thus, they inconsistently argue an "assignment" in the U.S.

AMA is not suing for any content provided to GIM as part of PaidPer-View.com and/or under the CPA. Even if Defendants had some sort of "implied" license to material AMA provided, that is not the material at issue in this litigation.

### C.   Defendants are Not Agents of GIM.

Defendants *completely* ignored the law of agency in the Answering Brief. Rather than providing *evidence* of the alleged agency theory, Defendants again claim that AMA made "judicial admissions" of agency in its pleadings (filed pre-jurisdictional discovery). They further argue that the Skype chat logs "prove" an agency relationship. Answering Brief, p 49-51. After discovery, it became clear that GIM does not have a *legal* agency relationship with Defendants. As discussed above, AMA's pleadings in opposition to dismissal were AMA complaining about the "shell game" played by Defendants. The evidence showed:

- Cyberweb allegedly hired GIM (no contract was produced) to make GIM *Cyberweb's* agent, not vice versa.

- Cyberweb hired Netmedia to operate Porn.com.

- GIM hired Netmedia to provide technical assistance of GIM sites, and the Agreement explicitly states *Netmedia is not an agent of GIM*.

The Skype chat logs do nothing to address a finding of agency. Communicating with parties does not confer agency status, nor have Defendants cited to any case law supporting such a contention.

There is no actual evidence to support the notion that the corporate Defendants are "agents" of GIM. With respect to Koonar, his conduct would be attributed to his executive status with Netmedia and Cyberweb, not GIM, as GIM played no role in the alleged conduct.

### D.     Defendants are Not *Intended* Third-Party Beneficiaries of the CPA.

To receive benefits as a "third party" to a contract, there must be mutual intent of the contracting parties to provide that benefit. *Foad Consulting Group, Inc. v. Musil Govan Azzalino*, 270 F.3d 821, 829 (2001); *Britton, supra,* at 745; *Sherman v. British Leyland Motors, Ltd*., 601 F.2d 429, 440, n. 13 (9th Cir. 1979). Without mutual intent, no third party will have rights under a contract to which he/it is not a party. *Id*.

Defendants assert AMA gave its "mutual intent" to bind all Defendants as third party beneficiaries of the CPA because the CPA permits GIM to use any employees or *agents* in executing the contract. Answering Brief, p 48-49. None of the Defendants, except Koonar, are legally "agents" of GIM. Koonar is also an "agent" of Cyberweb *and* Netmedia, and his participation in this case has to do with conduct independent of GIM carrying out the CPA. The CPA considers agents and employees helping to fulfill GIM's obligations, this does not confer beneficiary status to non-agents or non-employees.

Defendants further argue that (1) GIM lacks the technical capacity to operate Porn.com or PaidPerView.com;[14] (2) all day-to-day aspects of Porn.com and Paid-PerView.com are performed by Netmedia; and (3) GIM does not own/operate Porn.com. Answering Brief, p 48-49. Regardless of these allegations, no evidence demonstrates that AMA knew these facts when it entered the CPA *or* that AMA intended for any of the Defendants to be "beneficiaries" of the CPA. GIM may have had some *unilateral* intent to play shell games, but AMA did not *mutually* assent to any such misrepresentations. AMA believed GIM would be streaming content on Porn.com. For that reason, none of the Defendants could ever be intended third-party beneficiaries. *See, e.g, Foad, supra; Britton, supra; Sherman, supra.* (There must be mutual intent of the contracting parties to confer benefits of the contract onto third parties.)

# CONCLUSION

The record is unequivocal that the operation of Porn.com and the operation of PaidPerView.com are separate and distinct. The alleged conduct does not closely relate to the CPA. Defendants are not licensees, implied licensees, assign-

---

[14] GIM has no problem streaming the videos via it's own servers on its many websites.

ees, agents, or intended third-party beneficiaries of the CPA. No evidence supports a "transaction participant" theory.

Defendants conflated two separate products (Porn.com vs. PPV) in the trial court. Their intentional confusion ignored key distinctions and the alleged conduct. Defendants also manufactured evidence to mislead the trial court that AMA agreed that the CPA governed their misconduct.

This Court should prohibit Defendants from further misconduct/gamesmanship, finding that none of the Defendants are entitled to rely on the FSC to avoid trial in the United States. AMA respectfully asks this Court to reverse the trial court's decision granting access to the FSC, reinstate AMA's claims, and remand this case for litigation in the District of Arizona. No other result is properly supported by evidence or the law.

DATED: June 26, 2019.

/s/ Spencer Freeman

Spencer D. Freeman (25069)
sfreeman@freemanlawfirm.org
Freeman Law Firm, Inc.
1107 ½ Tacoma Avenue South
Tacoma, WA 98402
(253) 383-4500

/s/ Veronica L. Manolio

Veronica L. Manolio (020230)
vmanolio@mf-firm.com
Manolio & Firestone, PLC
8686 E. San Alberto Dr., Suite 200
Scottsdale, AZ 85258
(480) 222-9100

Counsel for Plaintiff/Appellant AMA Multimedia, LLC

**Certificate of Compliance Pursuant to FRAP 32(a)(7)(c), FRAP 32(g) and 9th Circuit Rules 32-1 for Case Number 18-17117**

I certify that this brief complies with the length limits permitted by Ninth Circuit Rule 32-1.  Using Microsoft Word word count, the brief is 6,959 words, excluding portions exempted by Fed.R.App.P. 32(f), if applicable.  The brief's type size and type face comply with Fed.R.App.P. 32(a)(5) and (6).

Dated June 26, 2019.

_/s/  Spencer D. Freeman_
Counsel for Appellant
AMA Multimedia, LLC

## Certificate of Service

<u>When All Case Participants are Registered for the Appellate CM/ECF System</u>

     I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on June 26, 2019.

                    /s/  *Spencer D. Freeman*
                    Counsel for Plaintiff/Appellant
                    AMA Multimedia, LLC

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 18-17117

I am the attorney or self-represented party.

**This brief contains** | 6,959 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P.
29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because
*(select only one):*

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [          ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Spencer D. Freeman | **Date** | 6/26/2019

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/2018*